UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LINDA MELLEN,<br><br>    Plaintiff,<br><br>    v.<br><br>TRUSTEES OF BOSTON UNIVERSITY<br>AND FRANCES A. DROLETTE,<br><br>    Defendants. | Civil Action No. 04-10644-MEL |

**DEFENDANTS' LR 56.1 STATEMENT
OF UNDISPUTED MATERIAL FACTS**

Pursuant to LR 56.1, Defendants hereby submit the statement of material facts as to which there is no genuine issue to be tried.

<u>Mellen's FMLA Leave</u>

Linda Mellen began her employment with Boston University in 1977. Transcript of Deposition of Linda Mellen, March 4, 2004 ("Mellen Day 1 Tr.") at 165. A copy of that transcript is attached as <u>Exhibit 1</u>. She held a variety of positions throughout the University before joining the School of Public Health ("SPH") as financial manager in 1998. Mellen Day 1 Tr. at 170-71. In June 2003 Mellen decided to take leave under the Family and Medical Leave Act to care for her mother. Mellen Day 1 Tr. at 175. She submitted her application for leave, a copy of which is attached as <u>Exhibit 2</u>, on July 17, 2003, Mellen Day 1 Tr. at 178-82, and requested leave from "Aug. 4, 2003 thru Oct. 3, 2003; Oct. 28, 2003 thru Nov. 18, 2003, if needed." Mellen Day 1 Tr. at 179-82; <u>Exhibit 2</u>. The July 17 application is the only request for leave that Mellen ever submitted,

Mellen Day 1 Tr. at 181-82, and she never contacted anyone at the University to ask for additional leave. Mellen Day 1 Tr. at 197.

On July 31, 2003 George Snowdon, Director of Human Resources for the Medical Campus, sent Mellen a letter notifying her of her rights under the FMLA. A copy of that letter is attached as <u>Exhibit 3</u>. Snowdon noted that (pending medical verification) Mellen was approved for leave "August 4, 2003 through October 3, 2003 and if needed, as well approved from October 28, 2003 through November 18, 2003." Mellen Day 1 Tr. at 188; <u>Exhibit 3</u>. Snowdon also explained in the section entitled "Conditions of Return from Leave":

> If you return from your Family and Medical Leave in twelve weeks or less, you will be entitled to return to the same or similar position without loss of employment benefits for which you are eligible on the date the leave commenced. If you advise the University that you do not intend to return to work (or if you fail to return to work by the expected return date), you will be considered to have resigned voluntarily from the University.
>
> If you are granted a leave beyond the twelve week period, you shall receive every reasonable consideration by the University to return to your original position or to a position of like responsibility and pay; however, the university cannot guarantee your position at Boston University.

<u>Exhibit 3</u>. Mellen testified that she understood these provisions when she received the letter, Mellen Day 1 Tr. at 189, and in any event never called Snowdon or anyone else at the University to ask questions or clarify any portion of the letter. Mellen Day 1 Tr. at 189. Mellen understood after receiving this letter that she was approved for FMLA leave through November 18, 2003, Mellen Day 1 Tr. at 195-96, and never asked for any leave beyond November 18, 2003. Mellen Day 1 Tr. at 197. *See also* Transcript of Deposition

2

of Linda Mellen, March 21, 2005 ("Mellen Day 2 Tr.") at 42-43. A copy of that transcript is attached together with the first transcript as Exhibit 1.[1]

On October 1, Mellen sent an e-mail explaining that she intended to use the last block of FMLA leave, which Mellen described as "October 28 – November 19." Mellen Day 1 Tr. 33. A copy of that e-mail is attached as Exhibit 4. Mellen testified that she could not recall why she used the November 19 date. Mellen Day 1 Tr. at 29, 33. On October 23, Mellen sent a letter confirming that she intended to use the last block of FMLA leave, which she then described as running "from Tuesday, October 29 through Thursday, November 20." Mellen Day 2 Tr. at 35-36. A copy of that letter is attached as Exhibit 5. Mellen noted in her letter that "I have extended the leave period by one day in light of the November 17 holiday recently granted by the Trustees of Boston University." Mellen Day 2 Tr. at 35-36; Exhibit 5.[2] Although Mellen claims to have consulted the University Policy Manual online about the "extension," she did not ask George Snowdon or anyone else at the University whether the holiday would, in fact, extend her authorized leave. Mellen Day 2 Tr. at 40-41.

On October 29, Mellen's supervisor, Defendant Frances A. Drolette, Associate Dean for Finance and Administration at the School of Public Health, sent a letter to Mellen explaining that the November 17 University holiday did not extend her leave. Drolette reiterated that "I expect you back at work on Wednesday, November 19, 2003." Mellen Day 2 Tr. at 41-42. A copy of that letter is attached as Exhibit 6. Mellen testified

---

[1] Mellen thereafter submitted the Certification of Health Care Provider form, a copy of which is attached as Exhibit 7, identifying "November 20" as the final day of her leave, Mellen Day 1 Tr. at 201, but she cannot recall why she listed November 20. In any event, never contacted anyone at the University to request approval to extend her leave by two days. Mellen Day 1 Tr. at 202-03.
[2] The Board of Trustees declared November 17, 2003 as a University holiday in honor of its then-incoming president, Daniel S. Goldin. Snowdon Tr. at 60-68. Copies of two e-mails concerning that holiday are attached as Exhibits 9 and 10.

3

that she did not agree with the University's conclusion, but she understood the University expected her to return to work on November 19, 2003.  Mellen Day 2 Tr. at 42.  In fact, Mellen understood from another letter she had received from Drolette earlier that month, a copy of which is attached as <u>Exhibit 11</u>, that she was expected back on November 19 and that she was to notify Drolette "as soon as possible" if her return plans changed.  Mellen Day 2 Tr. at 55.  Mellen did not respond to the October 29 letter, Mellen Day 2 Tr. at 43, and did not contact anyone at the University to discuss the issue or to request additional leave.  Mellen Day 2 Tr. at 42-43.

      Mellen did not return to work on November 19 or the following day, November 20.  Mellen Day 2 Tr. at 68.  In fact, she was in Albany, New York with her mother for most of the month of November.  Mellen Day 2 Tr. at 69.  Mellen testified that she believed that the University had miscalculated her leave time, but does not know how much additional time she was due because "I'm not an expert on family medical leave; I'm not an attorney."  Mellen Day 2 Tr. at 61-62.  She did not, however, notify anyone at the University that she believed the duration of her leave had been miscalculated.  Mellen Day 2 Tr. at 61-62.  At the close of business on November 20, Drolette mailed a letter to Mellen explaining that "[p]ursuant to the letter that George Snowdon sent you on July 31, 2003, your failure to return to work on November 19, 2003 constitutes a voluntary resignation from the University."  Mellen Day 2 Tr. at 70.  A copy of that letter is attached as <u>Exhibit 12</u>.

4

Mellen's Performance Issues

The School of Public Health grew considerably in the late 1990s and early 2000s, and the Dean of the School, Dr. Robert F. Meenan, wanted to establish a new budget relationship with the Medical School that would give SPH more independence, but also made SPH "more at risk for [its] finances." Transcript of Deposition of Dr. Robert F. Meenan, March 21, 2005 ("Meenan Tr.") at 24. A copy of that transcript is attached as Exhibit 13. The position of financial manager, held by Linda Mellen, had become increasingly "larger and more complex," Meenan Tr. at 20, and the Dean had concerns about her ability to adapt to that position. Meenan Tr. at 19-20, 22-24.

It is undisputed that during this period the culture at SPH changed. Drolette was hired in September, 2002, Transcript of Deposition of Frances Drolette, July 6, 2005 ("Drolette Tr.") at 54, and she understood that she was hired, in part, to change certain of the customs and practices that had been in place. *Id.* at 42-50 (explaining, *inter alia*, that SPH employees had been paid based on a 40-hour work-week but generally had not been working 40 hours per week). A copy of that transcript is attached as Exhibit 14. Both Meenan and Drolette made clear that they intended to impose more rigorous standards on SPH employees in order to meet the demands of exponential growth. Mellen testified that "SPH used to be like a family," and that SPH employees were not "a family any longer" after Drolette arrived. Mellen Day 1 Tr. at 157. Mellen had been very close to Drolette's predecessor, Dzidra Knecht, Mellen Day 1 Tr. at 161, and was not close with anyone else in the office after Ms. Knecht left. *Id.*

By the spring of 2003, Drolette had identified a number of issues concerning Mellen's performance, and Drolette met with Mellen in May to discuss Drolette's

5

concerns with Mellen's performance. Mellen asked Drolette to document her concerns, and Drolette did so. Mellen Day 1 Tr. at 89-90. A copy of that e-mail is attached as Exhibit 15.[3] Mellen continued to meet with Drolette, and also met with Snowdon to discuss these issues. Mellen Day 1 Tr. at 131-135, 140; Snowdon Tr. at 105-08. Copies of documents concerning those meetings are attached as Exhibits 16, 17 and 18. During the same time period, Mellen met with then-Medical Campus Provost (now President) Aram Chobanian and told him that she planned to look for another job because "the atmosphere at SPH had changed" since Drolette had arrived. Mellen Day 2 Tr. at 8-10.

Mellen's Communication Issues

Mellen first raised with Drolette the prospect of taking leave under the Family Medical Leave Act to care for her mother around June 20. Mellen Day 1 Tr. at 175-76. At that point, Mellen was uncertain of the duration of leave she would need, but said that she expected to be out for about six weeks. Mellen Day 1 Tr. at 178. Mellen submitted her written application for leave on Thursday, July 17, 2003. Mellen Day 1 Tr. at 178-82; Exhibit 2. Mellen left the application on Drolette's chair after Drolette had left for the day. Mellen had planned to be out of the office on Friday, July 18, and knew that Drolette would be out of the office for the remainder of July on vacation. Mellen's FMLA leave was to begin the Monday of Drolette's return, August 4. Mellen Day 1 Tr. at 211-13; Exhibit 2. Mellen noted that although she "applied for the maximum leave"

---

[3] Drolette also told Mellen that she would no longer be allowed to work from home on Fridays, as she had done in the past. Mellen Day 1 Tr. at 43. Mellen claims she was upset and disagreed with Drolette's decision, but she did not ask Drolette to reconsider or otherwise let Drolette know of the disagreement, Mellen Day 1 Tr. at 46, 131, never raised the issue with Dean Robert Meenan, Mellen Day 1 Tr. at 44-45, and never asked George Snowdon or anyone else to assist her with respect to that issue. Mellen Day 1 Tr. at 48. Both Meenan and Drolette had concerns about Mellen working from home on Fridays. *See*, *e.g.*, Meenan Tr. at 23, 27-30; Drolette Tr. at 46-47. As Mellen acknowledged, no other employee who reported to Drolette was permitted to work from home. Mellen Day 1 Tr. at 49.

6

she "didn't expect to need all of it." Exhibit 2. Drolette sought to clarify the amount of leave Mellen expected to take. Mellen Day 1 Tr. at 182-84. A copy of that e-mail is attached as Exhibit 19. Mellen was unsure how much time she would need and did not respond. Mellen Day 1 Tr. at 182-84.

In the meantime, Drolette was trying to plan staffing for projects and tasks that would require attention while Mellen was out on leave. Mellen Day 1 Tr. at 185; Mellen Day 2 Tr. at 48. Drolette made clear that Mellen's top priority before taking leave was to put together a list of tasks and ongoing projects for which Mellen was responsible so that others in the office could handle matters in Mellen's absence, and Mellen agreed to provide the list. Mellen Day 1 Tr. at 185-86. Mellen had not put together the task list by her last work day, July 31, but promised by e-mail to provide that information over the weekend. Mellen Day 1 Tr. at 204-05. A copy of that e-mail is attached as Exhibit 20. She never did so. Mellen Day 2 Tr. at 20, 52-53. Mellen also neglected to complete other important tasks – or even to let anyone know that she had failed to complete them – before she went out on leave. *See*, *e.g.*, Mellen Day 2 Tr. at 17-23; Mellen Day 2 Tr. at 32-33. A copy of an e-mail exchange outlining several of those outstanding issues is attached as Exhibit 21. Throughout August, Mellen's outgoing voicemail message said that she would return in September. Mellen Day 1 Tr. at 184; Mellen Day 2 Tr. at 34-35; Exhibit 11.

On October 1, Mellen sent an e-mail to Drolette notifying her that Mellen intended to use the last block of FMLA leave after taking a 4-week vacation in October. Mellen Day 2 Tr. 33, Exhibit 4. There had been – at the very least – some confusion about the October vacation. Mellen had asked for approval to take the October 4-week

7

vacation back in April, shortly after returning from another 4-week vacation in March. Mellen Day 1 Tr. at 20-21. A copy of the e-mail exchange concerning Mellen's request is attached as Exhibit 22. Drolette explained that the request was "problematic in the context of our priorities/budget calendar," *id.*, but approved the vacation after Mellen "concluded that [she could] work the vacation into [the] timeframe." *Id.* Mellen had not completed several projects before her FMLA leave began, Mellen Day 2 Tr. at 17-23, 32-33, and had not mentioned the October vacation either when she applied for or during her FMLA leave. Mellen Day 2 Tr. at 34. *See also* Mellen Day 2 Tr. at 29. During most of September, Mellen's automated voicemail message stated that Mellen would be out of the office through Friday, October 3, Mellen Day 2 Tr. at 34-35; Exhibit 23, and Drolette had expected Mellen to return on Monday, October 6. Exhibits 23 and 24.

On October 24, Drolette wrote to Mellen to voice her concerns about Mellen's "lack of professionalism, responsibility, and clarity in [her] communications regarding [her] family and medical leave and vacation plans" and to describe the "disruption caused by this behavior." Mellen Day 2 Tr. at 43-44; Exhibit 11. Drolette described several time-sensitive projects that were underway and explained that she would have "staffed the office differently to better prepare for these critical events" had Mellen communicated clearly about her leave plans. Drolette concluded by noting that "an ambitious calendar of projects to complete in a short window of time upon [Mellen's] return" would require regular meetings and diligent effort.[4] She noted that Mellen was expected to return on

---

[4] In anticipation of Mellen's return, Drolette sent an e-mail to Mellen on November 13 setting up times for the two to meet over the next few weeks. Mellen Day 2 Tr. at 59. A copy of that e-mail is attached as Exhibit 26. Mellen testified that she had planned to attend those meetings, even after she received the October 24 letter. Mellen Day 2 Tr. at 59-60.

8

November 19 and urged Mellen to let Drolette know "as soon as possible" if that schedule changed. *Id.*

Instead of returning on November 19 as required by her FMLA approval letter, Mellen mailed a letter to Drolette explaining that she had "concluded that it is not safe for me to return to my job at the School of Public Health." Mellen Day 2 Tr. at 60-61. A copy of that letter is attached as <u>Exhibit 25</u>. Mellen did not believe there was any threat to her physical safety, Mellen Day 2 Tr. at 63, but she testified that she felt that the October 24 letter "threatened me with my job." Mellen Day 2 Tr. at 65. Mellen acknowledged there was nothing in her November 19 letter that suggested she would return to work at the University. Mellen Day 2 Tr. at 68. Drolette received Mellen's November 19 letter after Drolette sent the letter dated November 20 informing Mellen that she was deemed to have resigned. Drolette Tr. at 129. Mellen filed this lawsuit shortly thereafter.

## **CONCLUSION**

WHEREFORE, Defendants respectfully request that judgment enter for Defendants on all counts of the complaint.

>TRUSTEES OF BOSTON UNIVERSITY
>AND FRANCES A. DROLETTE
>
>By their attorney,
>
>
>  /s/ Crystal D. Talley
>Lawrence S. Elswit
>(BBO # 153900)
>Crystal D. Talley
>(BBO # 633759)
>Boston University
>Office of the General Counsel
>125 Bay State Road
>Boston, Massachusetts  02215

Dated:  August 24, 2005                         (617) 353-2326

NOTE: Exhibits to this document are filed in hard copy with the Court.