## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**No. 04-10644-MEL**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**LINDA MELLEN,**
       **Plaintiff,**

**v.**

**TRUSTEES OF BOSTON**
**UNIVERSITY and FRANCES**
**A. DROLETTE,**
       **Defendants.**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (LIABILITY)

In accordance with Fed.R.Civ.P., R. 56(a), (c), and Local Rule 56.1, the plaintiff

Linda Mellen submits this Statement of Undisputed Material Facts in Support of her

Motion for Summary Judgment (Liability), filed this day.

### I. THE SIGNIFICANT PLAYERS

#### A. Linda Mellen, Plaintiff

1.  The plaintiff Linda Mellen ("Mellen") began her employment with defendant

University ("BU") in March 1977, as a secretary/administrative assistant in the business

office of BU's Medical Campus, which included the School of Public Health ("SPH").

*See* Tab 1 hereto, Complaint, and Tab 2, defendants' Amended Answer, para. 10. *See*

Tab 3 hereto, Deposition of George Snowden, BU's Director of Personnel, page 13, lines

19-21 ("Snowden [page], [lines]").

2.  Mellen worked her way through the ranks at BU's Medical Campus, first to Budget Coordinator (1983), Budget Manager (1992), and then to the position of Financial Manager for the School of Public Health (1998).  *See* Complaint and Amended Answer, para. 11.

3.  Over the course of her career at Boston University, Mellen's annual salary increased from $8,300 to $75,500 (approx.).  Complaint and Amended Answer, para. 12. *See also* Tab 3, Snowden 30, 23 – 31, 7 (Mellen received several merit pay increases during her tenure at SPH).

4.  As Financial Manager, Mellen had primary responsibility for budgeting, financial management, and financial forecasting at SPH, and was responsible for developing SPH budgets that approximated $45,000,000 annually.  *See* Complaint and Amended Answer, para. 14.

5.  Mellen is a qualified "employee" for purposes of the Family and Medical Leave Act ("FMLA") and Massachusetts' Small Necessities Leave Act ("SNLA").  *See* Complaint and Amended Answer, para. 1.

6.  By November 2003 Mellen had been employed by BU for 26+ years and as SPH's Financial Manager for 5+ years.  *See* Tab 3, Snowden 13, 22-24.

7.  Mellen's career at BU was terminated by defendant Drolette's letter dated November 20, 2003, by which Drolette communicated her determination that Mellen's not appearing for work on November 19, 2003, constituted her "voluntary resignation" from BU.  *See* Tab 4, Drolette's November 20, 2003 termination letter.

2

**B. Boston University, Defendant**

8. BU is organized into two campuses: its Charles River campus and its Medical Campus. *See* Tab 3, Snowden 13, 6-8.

9. The Medical Campus is comprised not only of SPH, but also BU's Medical School, Dental School, and the Medical Center Headquarters. *See* Complaint and Amended Answer, para. 10. *See also* Tab 3, Snowden 13, 19-21.

10. BU is a qualified "employer" for purposes of FMLA/SNLA. *See* Complaint and Amended Answer, para. 2.

**C. Defendant Frances Drolette, Associate Dean/Administration and Finance (present), BU's School of Public Health**

11. Defendant Frances A. Drolette ("Drolette") was hired as Asssociate Dean for Administration and Finance for SPH in September 2002, to succeed Ms. Dzidra Knecht. *See* Tab 5, Deposition of SPH Dean Robert Meenan ("Meenan"), pg. 12, lines 11-29; and Tab 6, Deposition of SPH Associate Dean Frances Drolette, pg. 54, lines 7-11.

12. Drolette was Mellen's direct supervisor in 2003. *See* Tab 3, Snowden 26, 13-15; *see* Tab 6, Drolette, 18, 22 – 19, 4 (Drolette acknowledged that she had "direct supervisory responsibility for the employees reporting directly to [her]"); *see* Tab 7, Mellen Affidavit, paras. 1-2.

13. Drolette controlled Mellen's work schedule in 2003. *See* Tab 3, Snowden 26, 16-18; Tab 7, Mellen Affidavit, paras. 1-2.

14. Drolette had the authority to change Mellen's salary. *See* Tab 3, Snowden 27, 23 – 28, 2.

15. Drolette initiated the decision to terminate Mellen, *see* Tab 3, Snowden 19, 3-4, and made the final decision to terminate her. *Id.* at 19, 5-11. *Accord* Tab 8, Deposition of Dzidra Knecht, 24, 23 – 25, 4 (Associate Dean approved all terminations within SPH, and did not need further approvals).[1]

16. Drolette did not oppose Mellen's termination. *See* Tab 3, Snowden 21, 7-10. *Accord* Tab 5, Meenan 35, 23 – 36, 3 (Drolette was supportive of decision to accept Mellen's "resignation").

17. Drolette had the authority to accept the resignations of SPH employees, *see* Tab 6, Drolette 19, 9-13, and did in fact accept the "resignation" of Mellen in November 2003. Drolette 21, 10 – 15.

18. The Associate Dean position that Drolette occupied, and which previously Knecht occupied, had primary responsibility for setting and implementing personnel policies regarding non-faculty employees and staff. *See* Tab 5, Meenan 12, 4 – 16.

19. The Associate Dean incumbent also had the authority to hire and fire employees without additional approval. *Id.* at 43, 12 – 20.

20. Drolette is a qualified "employer" for purposes of the FMLA/SNLA. *See* Memorandum in Support of Plaintiff's Motion for Summary Judgment (Liability), pp. 23-26.

---

[1]     *Compare* Statement of Undisputed Facts, Nos. 113-118, indicating that defendants disagree as to who among them terminated Mellen. A party, however, cannot create a dispute of material fact sufficient to delay the entry of judgment by contradicting itself. *See Hayes v. Raytheon*, 23 F.3d 410, 1994 WL 143000 (7th Cir. 1994); *Morrell v. Precise Engin.*, 36 Mass.App. 935, 937 (1994).

4

### D. Dzidra Knecht, Associate Dean/Administration and Finance (retired), BU's School of Public Health

21. Dzidra Knecht ("Knecht") was Drolette's immediate predecessor as

Associate Dean, Administration and Finance, SPH. *See* Tab 3, Snowden 24, 5-21.

22. Knecht was Associate Dean from July 1996 until the fall of 2002. *See*

Snowden 24, 12-14; Tab 7, Mellen Affidavit para. 3.

23. Knecht was Mellen's supervisor from 1998 until Drolette assumed the

position of Associate Dean in the fall of 2002. Snowden 25, 4-6; Tab 8, Knecht 22, 10 –

22.

### E. George T. Snowden, Director of Personnel, BU's Medical Campus

24. At all times relevant to this matter George T. Snowden served as Director of

Personnel, BU's Medical Campus. *See* Tab 3, Snowden 12, 3 – 7; 13, 9-11; Tab 5,

Meenan 15, 7-12.

### II. MELLEN'S EMPLOYMENT RECORD

25. Mellen's work performance was rated as "always very good," *see* Tab 8,

Knecht 22, 23 - 23, 3; Tab 3, Snowden 36, 16-20 (Mellen was never formally disciplined

because of deficiencies in her work performance), at least before March 2003, when

Mellen began taking time off to care for her mother. *See* Tab 7, Mellen Affidavit, para. 4

(Drolette did not say anything negative to Mellen about her performance until April or

May 2003).

5

26. Until then, BU had not questioned or doubted Mellen's ability or competency to perform her duties as Financial Manager. *See* Tab 8, Knecht 23, 4 – 8; Tab 5, Meenan 12, 23 - 13, 12 (Knecht did not report any work performance concerns regarding Mellen to Meenan); Drolette 40, 2 – 20 (acknowledging that Knecht, Mellen's supervisor of four years, had not raised any issue regarding Mellen's work performance, productivity, or her working as a team player).

27. Prior to March 2003, BU had not questioned or doubted Mellen's ability to serve as SPH Financial Manager as SPH grew larger and more successful. *See* Tab 8, Knecht 23, 9 – 12. *Accord* Tab 5, Meenan 25, 9 – 26, 10 (Meenan thought Mellen was sufficiently capable of continuing as Financial Manager, and found her performance in that role to be "satisfactory," which he communicated to her).

28. Prior to March 2003, BU never questioned Mellen's work productivity. Knecht 23, 13 – 21.

29. Prior to March 2003, BU never questioned Mellen's commitment to work as a team player within SPH. Knecht 24, 13 – 16.

30. Mellen was never disciplined for on-the-job misconduct. Snowden 36, 11 – 15; Knecht 24, 13 – 16.

31. Prior to March 2003, BU regarded Mellen as "always very professional." Knecht 24, 9 – 12. *Accord* Snowden 25, 7 – 23 (Snowden never discussed with Knecht any problems associated with Mellen's work performance, attendance, or whether Mellen should be terminated).

32. Prior to March 2003, BU regarded Mellen's attendance as "always good". Knecht 24, 17 – 22. *Accord* Snowden 35, 14 – 17; 35, 22 – 36, 10 (over the course of her

6

26+ year career at BU, Mellen never exhibited a pattern of unscheduled absences, and was never disciplined for having unscheduled or unauthorized absences); Meenan 13, 3 – 6 (Knecht never reported any attendance problems regarding Mellen to Meenan).

33. Prior to Drolette's disciplinary letter of reprimand of October 24, 2003, which Drolette issued *after* Mellen had begun her family leave – defendants had not taken any steps to discipline Mellen for any reason. Meenan 31, 2 – 12; Drolette 38, 17 – 39, 2.

## III. MELLEN BEGINS HER ACTIVE CARE FOR HER MOTHER, AND IN RESPONSE DEFENDANTS BECOME DISAPPROVING

### A. Mellen's Initial Use of Leave to Attend to Her Mother

34. With defendants' approval, Mellen used some of her accrued vacation time in March 2003 to spend time in South Carolina with her then 88 year old mother, whose physical and mental conditions had begun deteriorating. *See* Tab 7, Mellen Affidavit, para. 5.

35. Drolette knew no later than February 2003 that Mellen was using her vacation time in March 2003 to be with her mother. *See* Tab 6, Drolette 48, 4 – 14.

36. BU knew that Mellen's time off in March 2003 was necessary so that she could attend to her mother. *See* Tab 5, Meenan 22, 3 – 14.[2]

---

[2]    BU failed to designate, and did not contend at any point during Mellen's employment, that Mellen's March 2003 vacation with her mother constituted FMLA/SNLA leave. *See* 29 CFR 825.208(a) and (c)(employer must designate leave as FMLA leave, if at all, in writing and before employee returns to work from such leave). *Accord* 29 CFR 700(a)("[i]f an employee takes paid or unpaid leave and tehemployer does not designate the leave as FMLA leave, the leave taken does not count against an employee's FMLA entitlement"). Mellen's March 2003 leave, however, did put defendants on notice that her mother had begun deteriorating and needed care.

7

### B. Defendants Immediately Become Disapproving of Mellen

‡      *Defendants Take Away Mellen's Flextime, Which She Had Enjoyed for The Previous 4+ Years*

37. To persuade Mellen to accept the position of Financial Manager in 1998, BU agreed to Mellen's request that she work from home on Fridays. *See* Tab 8, Knecht 20, 5 – 21, 5.

38. BU understood that Mellen valued her ability to work from home on Fridays. Knecht 21, 13 – 17.

39. BU had previously determined that Mellen's working from home on Fridays did not prejudice her productivity, the quality of her work, and her accessibility to BU, *see* Tab 3, Snowden 21, 22 – 22, 9; and - prior to Drolette – BU was not concerned that Mellen was allowed this schedule. *See* Tab 5, Meenan 29, 8 – 16. *See also* Meenan 27, 17 – 21 (Meenan did not believe that Mellen was unproductive while working from home on Fridays).

40. Drolette was the first one to raise concerns about Mellen's working from home, Meenan 29, 17 – 30, 1, but not until April or May 2003, after Mellen returned from her March vacation with her mother. *See infra* No. 25. *See also* Tab 3, Snowden 92, 9 – 94, 19; Tab 6, Drolette 48, 15 – 21.

41. In April or May 2003, Drolette instructed Mellen that her flextime schedule was unacceptable. Drolette 47, 13 – 17; and 84, 13 – 16.

42. In an early May 2003 meeting with Snowden, Drolette stated her "frustration" and objection to Mellen's working from home on Fridays, Snowden 94, 8 – 10; and 151, 13 – 23, although Drolette recognized that Knecht had made this commitment to Mellen to persuade Mellen to accept the Financial Manager position. *Id.*

43. In or about April 2003, Drolette instructed Mellen that she was no longer authorized to work from home on Fridays. *See* Tab 7, Mellen Affidavit, para. 6. *Accord* Statement No. 48 *infra*.

‡     *Defendants Start Objecting to Mellen's Work Performance*

44. In April 2003, immediately upon Mellen's return from her March vacation with her mother, Drolette initiated her first review of Mellen's work performance. *See* Tab 6, Drolette 52, 3 – 19.

45. In early May 2003, Drolette told Snowden that she intended to meet with Mellen to discuss with her the importance of setting a "professional example". *See* Tab 3, Snowden 94, 18 – 19.

46. Drolette met with Mellen on May 5, 2003, and communicated to her in a critical and demeaning tone that she (Drolette) was concerned about Mellen's work and her role as Financial Manager of SPH. *See* Tab 7, Mellen Affidavit, para. 7.

47. Drolette met again with Snowden in early May, following Drolette's meeting with Mellen on May 5, 2003. *See* Snowden 96, 9 – 22.

48. At this meeting Drolette reported to Snowden that she (Drolette) was looking for more "leadership" from Mellen, and reiterated her interest in Mellen's having a "[f]ive day presence on campus". *Id.*

9

49. Later in May 2003, Drolette concluded that Mellen was not up to fulfilling the responsibilities of her job, and she accordingly lowered her expectations for Mellen. Snowden 99, 8 – 102, 11.[3]

50. Drolette did not offer any resources or training to Mellen in 2003 to improve the deficiencies she (Drolette) observed in Mellen's work performance. *See* Tab 5, Meenan 26, 20 – 27, 2.[4]

51. In November 2003 Drolette planned to increase the frequency of her reviews of Mellen's performance, to "continue dialogue with her [Mellen] around those issues where there were gaps." Drolette 69, 5 – 70, 9.

‡     *Defendants Start Objecting to Mellen's Attendance*

52. No later than May 2003 Drolette knew that Mellen's mother was ill. *See* Tab 3, Snowden 109, 8.

53. Mellen took several days off in June 2003 as sick and vacation days to be with her mother for her care and for doctors' appointments. *See* Tab 7, Mellen Affidavit, para. 8.

---

[3]     *Compare* Statement No. 27 *infra* (Dean Meenan believed that Mellen's job performance was satisfactory, and told her so).

[4]     BU, as with the issue of who terminated Mellen, *see* Nos. 15 and 113-117 *infra*, internally disagrees on this point. *Compare* Tab 5, Meenan 26, 20 – 27, 2 (no training or resources were offered to Mellen to improve her work performance), and Tab 6, Drolette 55, 18 – 56, 1; and 59, 21 – 61, 10 (Drolette suggested general training opportunities to Mellen but "stylistically" did not think it appropriate that she instruct Mellen to attend such trainings).

54. Drolette complained in mid June 2003 that Mellen had "many absences since budget meeting; four sick days and one vacation [day] since May." Snowden 110, 3 – 4; and 111, 2 – 9.

55. At the same time Drolette complained that Mellen was using "[a]lot of vacation time", and complained that Mellen's accrual of vacation time was excessive. Snowden 94, 1 – 19.

56. Drolette was not happy with Mellen's family-related absences in 2003, even before Mellen began using her formal family leave in August 2003. Snowden 86, 11 – 15.

57. No later than June 20, 2003, Drolette knew that Mellen would need intermittent family leave to allow her to care for her mother. Snowden 112, 3 – 21.

58. Drolette complained on July 1, 2003 that "it was challenging to plan and manage [her] office objectives" given Mellen's "sporadic absences". Snowden 86, 2 – 7. *See also* Complaint and Amended Answer, para. 20.

59. Drolette complained on July 14, 2003, following statements by her regarding Mellen's imminent family leave, that Mellen was "disconnect[ed]" from her "professional responsibility", and openly questioned "how will [Mellen's] responsibilities get covered?" Snowden 112, 22 – 115, 1.

60. Drolette complained to Mellen that Mellen's absences affected Drolette's decisions about her (Drolette's) office personnel. Drolette 147, 9 – 14.

61. Drolette was "frustrated" at the prospect of Mellen's upcoming family leave, and believed that Mellen's leave would place a difficult burden on SPH to accomplish its objectives over that period. Snowden 116, 1 – 10.

11

62. In sum, although Knecht had no performance, attendance, or productivity issues with Mellen while supervising Mellen for 4 years, Drolette raised each of these issues with Mellen following the March 2003 vacation Mellen took with her ailing mother. Drolette 40, 2 – 42, 7; Mellen Affidavit, para. 9.

## IV. MELLEN'S FMLA/SNLA LEAVE - DURATION

63. On or about July 16, 2003, Mellen formally applied for the maximum amount of family leave on account of her mother's "serious health condition". *See* Tab 9, Mellen's Application. *See also* Tab 6, Drolette 147, 15 – 148, 4 (Drolette knew by mid-July 2003 that Mellen was applying for the maximum amount of family leave). *See also* Statement No. 71 *infra*.

64. When Mellen applied for family leave, she was not certain how much leave she would need given her mother's condition, the availability of other of her family to help with her mother, and her mother's need for hospital, nursing home, and/or other institutional care. *See* Tab 7, Mellen's Affidavit, para. 10; Drolette 146, 8 – 23.

65. By letter dated July 31, 2003, BU approved Mellen's taking intermittent family leave. *See* Tab 3, Snowden 68, 18 – 69, 11. *See also* Tab 10, BU's Letter of July 31, 2003.

66. BU approved Mellen's taking FMLA leave from August 4, 2003 through October 3, 2003, and "if necessary", October 28, 2003 through November 18, 2003. *See* Tab 10, BU's Letter of July 31, 2003.[5]

---

[5]     The October gap during Mellen's family leave represents 15 days of vacation time that BU had previously approved for Mellen, which time Mellen intended (and ultimately used) for her own respite given the demands associated with her care of her mother. On

67. In fact and in law, Mellen's intermittent FMLA leave (excluding her

additional entitlements under the SNLA, discussed *infra*) privileged her to be out of work

through November 21, 2003. *See* Tab 11 hereto, Calendar.[6]

68. BU, by its letter of July 31, 2003, incorrectly calculated that Mellen's family

leave would expire on November 18, 2003. *Id.*

69. In addition to her FMLA entitlement, Mellen's SNLA leave privileged her to

be out of work an additional 24 hours of working time, that is, through November 25,

2003. *Id.*[7]

---

this point, BU's July 31st letter also serves as a tacit confirmation that BU had previously
approved this respite time. *Accord* Tab 6, Drolette 193, 14 – 194, 4.

[6]      In sum, the FMLA permitted Mellen 60 days of family leave. She took 20 days in
August 2003, 21 days in September 2003, and 7 days in October 23. *See also* footnote 5
*infra*. Through the last day of October 2003, therefore, Mellen had used 48 days of her
60 days of FMLA leave. Her leave through the end of October 2003 was supplemented
by authorized non-FMLA leave (15 days of previously approved vacation (October 6 –
27), and two days of holiday leave (Labor and Columbus Day)).

In November 2003, Mellen took 5 days of FMLA leave November 3 – 7, and 4
days November 10 – 14 (with November 11th, Veterans' Day, being non-FMLA holiday
leave). As of November 17, 2003, therefore, Mellen's count stood at 57 days of FMLA
leave. Daniel J. Goldin Day was observed as a University holiday on November 17th.
Therefore, FMLA Day 58 fell on November 18th, Day 59 on November 19th, and Day 60
on November 20th. Setting aside the additional allowances of the SNLA, Mellen's return-
to-work date following FMLA leave was Friday, November 21, 2003. By then, however,
defendants had terminated her for not appearing for work on November 19th.

[7]      Indeed, to extend her care of her mother, Mellen previously requested – and
defendants had approved – her using vacation time November 26th (the Wednesday
before the University's 2-day Thanksgiving holiday), and December 1-5, 2003. Given
this, Mellen's actual return-to-work date was December 8, 2003. *See* Tab 11, Calendar.
*See also* Tab 7, Mellen Affidavit, para. 12.

13

## V. MELLEN'S FMLA/SNLA LEAVE – DEFENDANTS' FAILURE TO CLARIFY DURATION

70. Mellen began her family leave on August 4, 2003. *See* Complaint and Amended Answer, para. 21. *See also* Tab 3, Snowden 121, 5 – 7.

71. At BU's request Mellen submitted medical documentation regarding her mother's condition, to support her entitlement to the "maximum" amount of family leave, Snowden 71, 7 – 72, 21, which BU found sufficient. Snowden 118, 1-3.[8]

72. In her August 8th submission of medical documentation, Mellen communicated her understanding to BU that her family leave would include the period October 28, 2003 through November 20, 2003. *See* Tab 12, Mellen's August 8, 2003 submission; Snowden 72, 18 – 74, 4.

73. Upon its receipt, BU realized that Mellen understood that her family leave would run through November 20, 2003. Snowden 73, 7 – 17.

74. BU did not make any effort between its receipt of Mellen's August 8th submission and its termination of Mellen on November 20, 2003 to communicate with Mellen or to correct Mellen's understanding in this respect. Snowden 73, 2 – 6, and 13 – 17.

75. BU also made no effort to inquire whether Mellen's August 8th submission constituted her request for SNLA leave. Snowden 73, 18 – 74, 4. [9]

---

[8]     At no time during Mellen's family leave did defendants request additional medical information supportive of Mellen's right to family leave. *See* Tab 1, Complaint and Tab 2, Amended Answer, para. 32.

[9]     A similar indifference may explain why BU did not inquire of Mellen on or after November 19, 2003 to determine why she was absent from work that day. *See* Statement No. 96 *infra*.

14

76. On October 1, 2003, Mellen advised defendants that because she had been unable to find alternative medical care arrangements for her mother, she would need to continue her family leave after her approved October vacation. *See* Complaint and Amended Answer, para. 26.

77. On her own initiative, Mellen submitted updates regarding her family leave at regular intervals, and she advised defendants that her mother's health condition had not changed. *Id.* at para. 31.

78. Later in October 2003, after an email exchange between Mellen and Drolette (which indicated that Drolette was confused about the duration of Mellen's family leave, Snowden 70, 7 – 10; and 74, 5 – 9; Drolette 146, 3 – 11, and that Mellen understood that her family leave ran through November 19th), BU neglected to communicate with Mellen regarding the duration of her family leave. Snowden 75, 15 – 76, 3.

79. As a result of Mellen's letter of October 23, 2003, BU understood that Mellen believed that her family leave ran through November 20, 2003. Snowden 78, 17 – 79, 8.

80. BU's Snowden, however, did not communicate with Mellen at that point regarding the duration of her family leave. Snowden 79, 9 – 20.

## VI. MELLEN'S FMLA/SNLA LEAVE – DEFENDANTS ESCALATE THEIR RETALIATION

81. In August 2003, just two weeks after Mellen began her family leave, Drolette told Snowden that she was not sure "it will work long term," referring to Mellen's employment. *See* Tab 13, Snowden's August 21, 2003 notes; Tab 3, Snowden 119, 6 – 121, 4; and 123, 16 – 125, 15.

82. At the same time, Drolette raised the possibility with Snowden of getting rid of Mellen through progressive discipline, by eliminating Mellen's position, or by negotiating a separation agreement with her. *Id.*

83. Drolette also expected Mellen to submit certain SPH work to her within a week following the start of Mellen's family leave. Snowden 121, 23 – 122, 8.

84. Drolette told Snowden that she intended to speak with SPH Dean Meenan and interim BU President Aram Chobanian regarding her strategy to resolve the Mellen situation. Snowden 120, 21 – 22; and 123, 1 – 15.

85. Snowden does not recall whether he ever spoke with Drolette about terminating Mellen anytime before Mellen began her family leave. Snowden 125, 23 – 126, 4.

86. Drolette was unhappy – just two weeks into Mellen's authorized family leave – because she thought Mellen was not doing her job as SPH's Financial Manager. Snowden 126, 13 – 19.

87. In September 2003, Drolette proposed to Snowden that she eliminate Mellen's position and in its place create an "analyst" position. *See* Tab 1, Complaint, and Tab 2, Amended Answer, para. 24. *See also* Snowden 127, 4 – 128, 15; and 131, 1 – 19.

88. In mid-September 2003 – six weeks into Mellen's family leave – Drolette reported to Snowden that Mellen had not been available for a scheduled work conference call. Snowden 127, 4 – 128, 4; and 128, 23 – 129, 4.

89. Notwithstanding BU's authorization of Mellen's family leave into November 2003, *see* Statement Nos. 65-66 *infra*, Drolette insisted that Mellen return to work on October 6, 2003. *See* Complaint and Amended Answer, para. 29.

16

90. By letter dated October 24, 2003, Drolette disciplined Mellen by means of a written letter of reprimand, which concluded, "If you are not able to make prompt and substantial improvements in these areas ["communication, initiative and ownership"] when you return, we will have to discuss whether it is mutually beneficial for you to continue your employment at [the School of Public Health]." At the time of Drolette's letter of reprimand, Mellen had not been present at BU or actively engaged as Financial Manager since August 3, 2003 because of her family leave. *See* Complaint and Amended Answer, para. 33. *See also* Tab 14, Drolette's October 24, 2003 letter.

91. Drolette wrote the letter of reprimand herself, Snowden 80, 11 – 13, and did not ask Snowden as Director of Personnel to approve it. Snowden 82, 9 – 14.

92. Drolette wrote the disciplinary letter, in part, because of "the things that [Mellen] didn't do during the leave." Drolette 241, 3 – 21.

## VII. DEFENDANTS TERMINATE MELLEN

93. Mellen did not appear for work on November 19, 2003. *See* Tab 7, Mellen Affidavit, para. 13.

94. Defendants regarded Mellen's absence on November 19th as unexcused. *See* Tab 3, Snowden 39, 6 – 8.

95. Defendants contend that they determined that Mellen had "resigned" for a single reason: she did not appear for work on November 19th. *See* Snowden 21, 19 – 22, 9. *Accord* Meenan 33, 18 – 20; Drolette 114, 11 – 17.[10]

---

[10]     BU acknowledges that Mellen did not tender a letter of resignation. Drolette 16, 18 – 23.

96. BU did not conduct any inquiry of any kind into why Mellen did not appear for work on November 19th before effecting her termination. Snowden 45, 8 – 46, 1; and 58, 10 – 19; Drolette 128, 5 – 129, 11 (neither Drolette or anyone in her office attempted to call or otherwise contact Mellen on November 19th). *See also* footnote 9 *infra*.

97. BU does not claim any injury as a result of Mellen's absence on November 19th. Drolette 115, 8 – 16.

98. On November 19th and 20th, Mellen was with her mother at medical appointments, and was engaged in coordinating future care for her, either with family members or with professional institutions. *See* Tab 7, Mellen Affidavit, paras. 13-14.

99. Drolette typed the letter that terminated Mellen. Drolette 115, 17 – 18. *See also* Tab 4, termination letter.

100. Drolette's termination letter did not reference any written BU policy or rule. *See* Tab 4, termination letter. *See also* Drolette 130, 5 – 16.

101. On either November 19th or 20th, in preparation for sending the termination letter, Drolette instructed the payroll department to calculate the cash value of Mellen's payable vacation leave. Drolette 104, 14 – 20.

102. In the afternoon of November 20th, Drolette received a check from the payroll department for the value of Mellen's payable vacation leave. She then attached the check to her termination letter; instructed an assistant from her office to accompany her; drove her own car in the "dark" to the South End Post Office; had her assistant sit in the car while she (Drolette) entered the Post Office; and, "close to closing time," mailed the termination letter to Mellen by certified mail. Drolette 107, 21 – 110, 4.

18

103. Other than the letter by which she terminated Mellen, Drolette cannot recall any other time when she, as Associate Dean at SPH, personally brought a letter relating to a SPH matter to the post office for delivery. Drolette 109, 22 – 110, 4.

104. Drolette herself photocopied her termination letter and delivered the copies to Snowden and Meenan. Drolette 126, 3 – 21.

## VIII. DEFENDANTS PLANNED TO TERMINATE MELLEN EVEN BEFORE NOVEMBER 19TH BECAUSE OF HER FAMILY LEAVE

105. Defendants made plans to terminate Mellen's employment soon after she began her family leave, *see* Statements Nos. 81 - 92 *infra*, and in any case well before November 19, 2003.

106. For example, although Snowden denies that he consulted with Dean Meenan at any time about terminating Mellen, Snowden 22, 16 – 20, 9, Meenan concedes that he and Snowden discussed the decision to terminate Mellen on two or three occasions. Meenan 16, 5 – 16.

107. The discussions between Meenan and Snowden related to Mellen's family leave, her return-to-work date, and "what the University's options were under different scenarios." Meenan 16, 23 – 17, 4; and 17, 18 – 18, 13.

108. Meenan was "concerned" when he spoke with Snowden regarding Mellen's employment about "the professionalism of the communications that Linda had had with us regarding when she was going to be away, when she was coming back, etc." Meenan 19, 3 – 7.

109. Meenan was also "concerned" that Linda had not been clear "what might be accomplished while she was out [on family leave]." Meenan 19, 10 – 18.

19

110. Drolette, like Meenan, was also concerned regarding the work that Mellen was supposed to accomplish during her family leave. Meenan 21, 6 – 12. *See also* Snowden 122, 3 – 8 (Drolette reported to Snowden that she (Drolette) was expecting Mellen to submit certain work to Drolette within one week following the start of Mellen's family leave). *See also* Snowden 128, 1 – 5 (Drolette reported to Snowden that Mellen had not been available for a work conference call during her family leave). *See also* Drolette 241, 3 – 21 (Drolette issued her disciplinary letter of reprimand to Mellen in October 2003 in part because of "the things that [Mellen] didn't do during the leave").

111. In or about mid-September 2003, Snowden told Drolette that he would check with the University's Office of General Counsel to find out how long defendants needed to keep Mellen in her position following her return from family leave. Snowden 127, 14 – 128, 17; and 131, 20 – 133, 21.

112. As with Meenan's contradiction of Snowden regarding their discussing Mellen's employment, *see* Statement No. 106 *infra*, Meenan's testimony that BU President Chobanian was not "at all" involved in the process leading up to Mellen's termination, Meenan 38, 17 – 22; and 40, 2 – 5, is contradicted by Drolette, who obtained Chobanian's approval of her strategy regarding Mellen. Snowden 127, 19 – 23.

## IX. DEFENDANTS DISAGREE AMONG THEMSELVES AS TO WHO TERMINATED MELLEN

113. Snowden denies that he initiated the decision to terminate Mellen, *see* Tab 3, Snowden 18, 18 – 21, and denies making the final decision to terminate her. Snowden 19, 5 – 6.

114. Snowden claims that Drolette made the decision to terminate Mellen. Snowden 19, 5 – 11.

115. On her part, Drolette acknowledges that her involvement in terminating Mellen began either on November 19th or 20th. Drolette 22, 5 – 21; and 105, 19 – 22.[11]

116. Drolette indicates that Meenan made the decision to terminate Mellen. Drolette 35, 18 – 36, 5.

117. Meenan admits that his primary source of information regarding Mellen was Drolette.  Meenan 20, 9 – 21, 5.

118. Although Meenan states that he terminated Mellen, Meenan 36, 4 - 7 and 11 - 15, he at the same time, concedes that he generally "[had] little active role in [non-faculty] employees and with staff," like Mellen. Meenan 11, 21 – 12, 10.

119. Meenan cannot recall when, prior to Mellen's termination in November 2003, he had been involved in the decision to terminate or to otherwise conclude the employment of a non-faculty SPH employee. Meenan 37, 1 – 10.

120. Meenan is unable to identify any other SPH employee in good standing who was held to have resigned because the employee missed one day of work. Meenan 33, 21 – 34, 17; Meenan 36, 16 – 24.

121. Meenan had no training regarding the rights and obligations created by the FMLA, Meenan 21, 19 – 22, or by the SNLA, Meenan 21, 23 – 22, 2; nor did Drolette. Drolette 156, 23 – 157, 14. *See also* Statement Nos. 164-165, 167-169 *infra* (Snowden had minimal FMLA/SNLA training).

---

[11]     Snowden's notes indicate that Drolette was involved in Mellen's termination on November 19th. Snowden 136, 16 – 138, 6.

122. Snowden cannot recall any employee similarly situated to Mellen (*i.e.*, more than 10 years at BU, without any job deficiency or attendance issues) ever being terminated for missing one day of work. Snowden 27, 14 – 21; Snowden 60, 10 – 15.

123. Drolette acknowledged that Mellen was the only employee she ever involuntarily "resigned". Drolette 101, 15 – 24; Drolette 14, 17 – 16, 6.

124. Drolette, further, acknowledged that Mellen is the only employee she knows who was held to have "resigned" because she did not appear for work on the day she was expected to return after a period of leave. Drolette 129, 18 – 130, 4.

## X. DEFENDANTS' CONDUCT AFTER THEY TERMINATED MELLEN

125. By letter dated and faxed to defendants on November 20, 2003, Mellen – through counsel - formally objected to and opposed defendants' harassment and retaliation because of her use of family leave. In the letter, Mellen represented that she was willing and able to return to work. *See* Complaint and Amended Answer, para. 39. *See also* Tab 15, Beach letter of November 20, 2003.

126. The letter of November 20th, Tab 15 *infra*, enclosed a letter dated November 19, 2003, by which Mellen communicated her concern to defendants that Drolette's "threatening" letter of reprimand, *see* Statement No. 90 *infra*, rendered plaintiff's job at BU "unsafe". *See* Complaint and Amended Answer, para. 37. *See also* Tab 16, Mellen letter dated November 19, 2003.

127. Drolette received the two letters referenced immediately above, Tabs 15 and 16 *infra*, *after* she posted her termination letter. Drolette 129, 9 – 17.

128. Following Drolette's termination of Mellen, Snowden initiated an investigation of Mellen, specifically, her alleged accessing five years earlier of BU's internal information system. Snowden 142, 20 – 144, 19.

129. Although BU determined that Mellen had not engaged in misconduct regarding BU's information system, it defended its post-termination investigation of Mellen as an effort "to set the context of Ms. Mellen's experience with the University." Snowden 143, 7 – 144, 10.[12]

130. When BU terminated Mellen, it paid her the cash value of 50 days of accrued vacation leave, although Mellen had "significantly" more than 50 days of accrued vacation leave in her account. Drolette 102, 1 – 14; Drolette 121, 15 – 23.

131. Drolette was responsible for instructing Snowden how much to pay Mellen in accrued vacation time. Drolette 103, 5 – 104, 20.

132. With respect to Mellen, Drolette contends that she applied a University policy that capped the cash value payout of accrued vacation leave at 50 days. Drolette 121, 24 – 122, 5.

133. However, other departing employees who had not been on family leave enjoyed a cash payout of their vacation leave up to approximately 150 days. *See* Tab 8, Knecht 15, 4 – 10.

---

[12]    At times, defendants' explanations suggest a certain discomfort with direct factual responses. *See e.g.* footnote 4 *infra*, where Drolette explained that "stylistically" she did not think it appropriate that she instruct Mellen to attend training courses.

23

## XI. DEFENDANTS APPLIED UNIVERSITY LEAVE POLICY TO DISADVANTAGE AND RETALIATE AGAINST MELLEN BECAUSE OF HER FAMILY LEAVE

134. BU's Personnel Policy Manual ("Manual") states the rules that governed Mellen's employment in 2003. Snowden 16, 16 – 17, 11. *See also* Tab 17, BU's Personnel Policy Manual.

135. Drolette and BU's personnel office were obligated to follow the Manual in their management of Mellen. Snowden 17, 12 – 24; and 18, 1 – 3; Drolette 131, 1 – 5; and 134, 12 – 24.

### A. 3 Day Grace Period

136. The Manual affords an employee three consecutive unexcused absences before BU construes such absences as a resignation. Snowden 38, 4 – 22. *See also* Tab 17, Manual s. 202.1.

137. Since the early 1980's SPH had a practice of affording employees who did not return to work on their first expected return-to-work date a measure a "flexibility," which ordinarily included the SPH supervisor's opening up a dialogue with the absent employee as to whether they needed additional leave. Knecht 32, 22 – 38, 21.

138. The purpose of this practice is to encourage "employees with good records of work – our goal was to work within the University guidelines and policies and provide, at the same time, some flexibility to their personal lives so they could . . . so that they could continue to . . . be happy at the school and be productive." Knecht 41, 5 – 21.

139. This policy reflects one of BU's personnel values. Knecht 41, 22 – 42, 1.

24

140. BU did not afford Mellen the benefit of its 3 day grace period with respect to her absence on November 19, 2003. Snowden 60, 9 – 15. *See also* Statement No. 96 *infra* (defendants did not even inquire as to why Mellen was absent on November 19th).

141. The fact that Mellen was on family leave prior to her absence on November 19th served as BU's reason for not permitting her the benefit of the 3 day grace period provided in section 202.1. Snowden 39, 15 – 42, 12.

**B. Sick Leave**

142. Mellen had a high number of sick leave days accrued to her in late 2003. Snowden 50, 16 – 51, 5; Drolette 133, 22 – 134, 22 (approximately 125 days).

143. The Manual permits employees to use their sick leave, *inter alia*, to care for an ill family member living in the same household. Snowden 48, 16 – 49, 3. *See also* Tab 17, Manual s. 302.1.

144. The fact that Mellen was on family leave prior to her absence on November 19th served as BU's reason for not permitting her to use her accrued sick leave benefits. Snowden 51, 6 – 53, 24.

**C. Vacation Leave**

145. Mellen had a substantial number of vacation leave days accrued to her in late 2003. Snowden 54, 14 – 17. *See also* Drolette 132, 19 – 133, 9 (approximately 62.5 days).

146. The Manual allows employees to use accrued vacation time to care for ill relatives. *See* Tab 17, Manual s. 302.6 (employees who exhaust their sick leave, *see* Statement No. 143 *infra*, may have additional absences charged to their vacation leave).

147. BU did not permit Mellen to use her accrued vacation leave on November 19th because – according to BU – Mellen did not ask to use her vacation leave for that day, Snowden 55, 8 – 19, although BU acknowledges that it did not tell Mellen that she had to submit a such a request. *Id.*

## D. Unpaid Time Off

148. BU provides an unpaid time off benefit to its employees, which employees may use for personal or medical reasons. *See* Tab 17, Manual s. 313.1.

149. BU is unable to explain why it denied Mellen its "unpaid time off" benefit with respect to her absence on November 19th. Snowden 57, 16 – 19.

150. Drolette did not inquire of Mellen whether she needed unpaid time off for November 19th. Drolette 139, 2 – 6.

## E. Leaves of Absence

151. BU affords its employees a medical leave of absence benefit, which employees may use to cover absences due to medical reasons. *See* Tab 17, Manual s. 314.1.

152. BU is unable to explain why it denied Mellen its medical leave of absence benefit with respect to her absence on November 19th. Snowden 57, 20 – 58, 9; Drolette 139, 15 – 140, 20.

153. BU affords its employees a personal leave of absence benefit, which employees may use to cover absences due to personal reasons. *See* Tab 17, Manual s. 315.1.

154. BU is unable to explain why it denied Mellen its personal leave of absence benefit with respect to her absence on November 19th. Snowden 58, 20 – 59, 8; Drolette 139, 15 – 140, 20.

### F. Holidays

155. BU's Personnel Policy Manual provides that employees are entitled to holiday leave if they are on authorized leave immediately before the holiday. Snowden 48, 6 – 15. *See also* Tab 17, Manual s. 308.

156. Mellen was on authorized leave before 2003's Labor, Columbus, Veterans', and Daniel J. Goldin holidays. Drolette 144, 14 – 22.[13]

157. With respect to employees out on family leave, however, BU claims to have an unwritten policy that University holidays do not work to extend an employee's family leave. Snowden 83, 10 – 84, 11.

158. BU's "no holidays for employees out on family leave" policy is not contained in the Manual and is not otherwise published or disseminated to BU's employees. Snowden 84, 12 – 85, 1.

159. Snowden never discussed this unwritten "no holidays" policy with Mellen either prior or during her family leave. Snowden 85, 2 – 5. *See* Tab 7, Mellen Affidavit, para. 15 (Mellen never heard of such a policy).

160. BU did not notify Mellen that Labor Day, Columbus Day, and Veterans' Day would count as part of her family leave. Snowden 63, 19 – 64 – 6; Drolette 145, 6 – 19 (Drolette did not give Mellen such notice either).

---

[13]    "Daniel J. Goldin Day" was a University holiday observed on November 17, 2003, Drolette 142, 14 – 143, 6, notwithstanding that by then BU had terminated Dr. Goldin before he assumed the position for which he was hired.

27

161. BU's published family leave policy does not count holidays against an employee's family leave entitlement. Snowden 64, 7 – 65, 7. *See also* Tab 17, Manual s. 312.5.[14]

162. Nothing in BU's notice of July 31, 2003, *see* Tab 10 *infra*, provided that holidays would be counted against Mellen's family leave entitlement. Snowden 65, 8 – 69, 8.

163. Drolette defends her failure to notify Mellen of this unwritten, non-disseminated "no holidays for employees on family leave" policy by stating that she did not regard family leave as "a key benefit" at BU. Drolette 143, 12 – 24.

## XII. DEFENDANTS WILLFULLY OR WITH RECKLESS INDIFFERENCE IGNORED THE OBLIGATIONS OF THE FMLA/SNLA

164. Snowden may have attended a brief workshop regarding the FMLA after the statute was enacted in 1992. Snowden 14, 15 – 15, 5.

165. Snowden was not trained in the Federal regulations that implement the FMLA. Snowden 15, 6 – 13.

166. Although BU claimed with respect to Mellen that it did no more than apply its policy that limited family leave to 12 weeks, in the case of at least one employee the following year BU permitted the employee to use in a one year span 14 – 15 weeks of paid leave to care for an ill family member and then herself, and allowed her to work

---

[14]     An employer who wants paid leave taken under an existing leave plan - here, BU's holiday leave - to be counted as FMLA leave must make the designation and give notice to the employee before the employee's FMLA leave begins. *See* 29 CFR 825.208(c). *See also Nusbaum v. CB Richard Ellis, Inc.*, 171 F.Supp.2d 377, 385-386 (D.N.J. 2001).

28

part-time for an additional 8-10 weeks for the same reasons. *See* Tab 19, Deposition of
Eileen Dennis, p. 13, line 12 – p. 31, line 21.

167. Snowden had no SNLA training, but did receive some information regarding
it. Snowden 15, 14 – 22.

168. Snowden was not trained in the SNLA regulations. Snowden 15, 23 – 16, 4.

169. Snowden was not trained in the Massachusetts Attorney General's advisory
opinions regarding the SNLA. Snowden 16, 5 – 7.

170. BU's Manual, Tab 17 *infra*, does not address the rights of employees under
the SNLA. Snowden 66, 9 – 22.

171. BU also did not address the SNLA rights of its employees in any other
University notice or posting. Snowden 66, 22 – 67, 11 (no public notices of employees'
SNLA rights).[15]

172. BU did not take into account the SNLA in calculating Mellen's period of
family leave in 2003, Snowden 67, 17 – 68, 8, and took no steps to assure itself that
Mellen was afforded SNLA benefits. Snowden 68, 3 – 8.

173. The only reason that BU denied Mellen the benefits of SNLA leave is that,
in its view, Mellen did not request such leave. Snowden 59, 16 – 60, 3; and 154, 21 –
155, 3.

174. BU did not make any attempt after Mellen submitted medical certification in
early August 2003, which indicated her intention to take family leave through November

---

[15]     An employee may be equitably estopped from challenging an employee's
eligibility to family leave when the employer has failed to inform its employees of the
protections provided by the relevant statute, and what was required of the employees for
them to qualify for those protections. *See Kozakow v. New Rochelle Radiology Assocs.*,
P.C., 274 F.3d 706, 722-727 (2nd Cir. 2001).

20, 2003, to inquire whether her submission represented her request for SNLA leave.

Snowden 73, 18 – 74, 4.[16]

Respectfully submitted,
**Linda Mellen,** by her attorney,

Harry C. Beach BBO#547893
**Law Offices of Harry C. Beach**
30 Walpole Street
Norwood, MA 02062
Office: 781.769.6900
Cell: 617.968.4531
**AttyBeach@aol.com**

**August 24, 2005**

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) MESSENGER on August 24, 2005.

Signed:

---

[16]     In accordance with M.G.L. ch. 149, ss. 148, 150, and M.G.L. ch. 149, s. 52D(f), Mellen submitted an administrative complaint to the Massachusetts Attorney General regarding defendants' violation of SNLA, and the Attorney General subsequently issued a private right-to-sue letter. *See* Tab 21, Attorney General's Right to Sue letter.