# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

LINDA MELLEN,               )

                        )

     Plaintiff,             )

                        )

       v.               )     Civil Action No. 04-10644-MEL

                        )

TRUSTEES OF BOSTON UNIVERSITY    )

AND FRANCES A. DROLETTE,       )

                        )

     Defendants.           )

                        )

_____)

## DEFENDANTS' RESPONSE TO PLAINTIFF'S
## STATEMENT OF UNDISPUTED MATERIAL FACTS

In accordance with Fed.R.Civ.P., R. 56(a), (c), and Local Rule 56.1, Defendants Trustees of Boston University (the "University") and Frances A. Drolette ("Drolette") (collectively "Defendants") submit the following response to Plaintiff's Statement of Undisputed Material Facts in Support of her Motion for Summary Judgment (Liability).

With respect to each statement, defendants identify whether the statement is disputed or not, and the basis for that designation. Many of the statements are immaterial, as described in Defendants' Opposition to Plaintiff's Motion for Summary Judgment, filed herewith.

## I.    THE SIGNIFICANT PLAYERS

### A.    Linda Mellen, Plaintiff

1. The plaintiff Linda Mellen ("Mellen") began her employment with defendant University ("BU") in March 1977, as a secretary/administrative assistant in the business office of BU's Medical Campus, which included the School of Public Health ("SPH").
*See* Tab 1 hereto, Complaint, and Tab 2, defendants' Amended Answer, para. 10. *See*

Tab 3 hereto, Deposition of George Snowden [sic], BU's Director of Personnel, page 13, lines 19-21 ("Snowden [page], [lines]").

**Response:  Undisputed.**

2. Mellen worked her way through the ranks at BU's Medical Campus, first to Budget Coordinator (1983), Budget Manager (1992), and then to the position of Financial Manager for the School of Public Health (1998). *See* Complaint and Amended Answer, para. 11.

**Response:  Undisputed.**

3. Over the course of her career at Boston University. Mellen's annual salary increased from $8,300 to $75,500 (approx.). Complaint and Amended Answer, para. 12. See also Tab 3, Snowden 30, 23 - 31, 7 (Mellen received several merit pay increases during her tenure at SPH).

**Response:  It is undisputed that Mellen's annual salary rose from approximately $8,300 to approximately $75,500.  Defendants dispute that Mellen received pay increases during her tenure at SPH that indicated above-average performance.  Amended Answer, para. 12.**

4. As Financial Manager, Mellen had primary responsibility for budgeting, financial management, and financial forecasting at SPH, and was responsible for developing SPH budgets that approximated $45,000,000 annually. *See* Complaint and Amended Answer, para. 14.

**Response:  Undisputed.**

5. Mellen is a qualified "employee" for purposes of the Family and Medical Leave Act ("FMLA") and Massachusetts' Small Necessities Leave Act ("SNLA"). *See* Complaint and Amended Answer, para. 1.

**Response:  Undisputed.**

6. By November 2003 Mellen had been employed by BU for 26+ years and as SPH's Financial Manager for 5+ years. *See* Tab 3, Snowden 13, 22-24.

**Response:  Undisputed.  Complaint and Amended Answer, paras. 10-11.**

7. Mellen's career at BU was terminated by defendant Drolette's letter dated November 20, 2003, by which Drolette communicated her determination that Mellen's not appearing for work on November 19, 2003, constituted her "voluntary resignation" from BU. *See* Tab 4, Drolette's November 20, 2003 termination letter.

**Response:  Paragraph 7 is disputed to the extent it implies that Defendants terminated Mellen and to the extent it purports to characterize the November 20 letter.  It is undisputed that Drolette sent a letter dated November 20, 2003 explaining that Mellen's failure to return to work as required on November 19 constituted a voluntary resignation from the University.  That letter is in writing and speaks for itself.  Plaintiff's Tab 4.**

**B.      Boston University, Defendant**

8. BU is organized into two campuses: its Charles River campus and its Medical Campus. *See* Tab 3, Snowden 13, 6-8.

**Response:  Undisputed.  Snowdon Tr. at 13.**

9. The Medical Campus is comprised not only of SPH, but also BU's Medical School, Dental School, and the Medical Center Headquarters. *See* Complaint and Amended Answer, para. 10. *See also* Tab 3, Snowden 13, 19-21.

**Response:  Undisputed.**

10. BU is a qualified "employer" for purposes of FMLA/SNLA. *See* Complaint and Amended Answer, para. 2.

**Response:  Undisputed.**

C.     **Defendant Frances Drolette, Associate Dean/Administration and Finance (present), BU's School of Public Health**

11. Defendant Frances A. Drolette ("Drolette") was hired as Associate Dean for Administration and Finance for SPH in September 2002, to succeed Ms. Dzidra Knecht. *See* Tab 5, Deposition of SPH Dean Robert Meenan ("Meenan"), pg. 12, lines 11-29; and Tab 6, Deposition of SPH Associate Dean Frances Drolette, pg. 54. lines 7-11.

**Response:  Undisputed.**

12. Drolette was Mellen's direct supervisor in 2003. *See* Tab 3, Snowden 26, 13-15; *see* Tab 6, Drolette, 18, 22 - 19, 4 (Drolette acknowledged that she had "direct supervisory responsibility for the employees reporting directly to [her]"); *see* Tab 7, Mellen Affidavit, paras. 1-2.

**Response:  Undisputed.**

13. Drolette controlled Mellen's work schedule in 2003. *See* Tab 3, Snowden 26, 16-18; Tab 7, Mellen Affidavit, paras. 1-2.

**Response:  Undisputed.**

14. Drolette had the authority to change Mellen's salary. *See* Tab 3, Snowden 27, 23 - 28, 2.

**Response:  Undisputed.**

15. Drolette initiated the decision to terminate Mellen, *see* Tab 3, Snowden 19, 3-4, and made the final decision to terminate her. Id. at 19, 5-11. Accord Tab 8, Deposition of Dzidra Knecht, 24, 23 - 25, 4 (Associate Dean approved all terminations within SPH, and did not need further approvals).

**Response:  Disputed.  The November 20 letter explains that Mellen's failure to return to work as scheduled on November 19 "constitutes a voluntary resignation from the**

University."  Plaintiff's Tab 4.  Snowdon testified that he "believe[d]" that it was Drolette who initiated the decision to accept Mellen's resignation and made the final decision. Snowdon Tr. at 19.  It is undisputed that Drolette was involved in the decision to accept Mellen's resignation, and that she conferred with both Snowdon and Dean Meenan before deciding to do so.  Drolette Tr. at 22, 28-30, 35-36.  Meenan testified that he made the decision "to hold that Linda Mellen had resigned."  Meenan Tr. at 36.  It is undisputed that the Associate Dean had the authority to hire and fire employees.  As a matter of practice, Drolette consulted with the Dean before making those decisions.  Drolette Tr. at 19.

Footnote 1:  *Compare* Statement of Undisputed Facts, Nos. 113-118, indicating that defendants disagree as to who among them terminated Mellen. A party, however, cannot create a dispute of material fact sufficient to delay the entry of judgment by contradicting itself. *See Hayes v. Raytheon,* 23 F.3d 410, 1994 WL 143000 (7th Cir. 1994); *Morrell v. Precise Engin., 36* Mass.App. 935, 937 (1994).

**Response:  Disputed.  *See* Response to paragraphs 113-118.  Defendants have not contradicted themselves on this point.**

16. Drolette did not oppose Mellen's termination. *See* Tab 3. Snowden 21, 7-10.  *Accord* Tab 5, Meenan 35, 23 - 36, 3 (Drolette was supportive of decision to accept Mellen's "resignation").

**Response:  Paragraph 16 is disputed to the extent it implies that Defendants terminated Mellen.  Drolette did support the decision to accept Mellen's resignation. Meenan Tr. at 35-36.**

17. Drolette had the authority to accept the resignations of SPH employees, *see* Tab 6. Drolette 19, 9-13, and did in fact accept the "resignation" of Mellen in November 2003. Drolette 21, 10 - 15.

**Response:  Undisputed.  Drolette sent a letter to Mellen on November 20 to inform Mellen that her failure to return to work on her scheduled return date constituted a voluntary resignation.  Defendants' Exhibit 12.[1]  Drolette had spoken with both Dean Meenan and George Snowdon, Director of Personnel, Medical Campus, before sending the letter.  Drolette Tr. at 22,  28-29.**

18. The Associate Dean position that Drolette occupied, and which previously Knecht occupied, had primary responsibility for setting and implementing personnel policies regarding non-faculty employees and staff. *See* Tab 5. Meenan 12, 4 - 16.

**Response:  Disputed.  The Associate Dean for Administration and Finance within the School of Public Health works with the Personnel Office to set and implement policies regarding non-faculty employees and staff.  Meenan Tr. at 12.**

19. The Associate Dean incumbent also had the authority to hire and fire employees without additional approval. *Id.* at 43, 12 - 20.

**Response:  Undisputed.  As a matter of practice, Drolette consulted with the Dean before making those decisions.  Drolette Tr. at 19.  Drolette did confer with Dean Meenan, before sending the November 20 letter accepting Mellen's resignation.  Drolette Tr. at 22.**

20. Drolette is a qualified "employer" for purposes of the FMLA/SNLA. *See* Memorandum in Support of Plaintiff s Motion for Summary Judgment (Liability), pp. 23-26.

**Response:  Undisputed.**

**D.    Dzidra Knecht, Associate Dean/Administration and Finance (retired), BU's School of Public Health**

21.    Dzidra Knecht ("Knecht") was Drolette's immediate predecessor as Associate Dean, Administration and Finance, SPH. *See* Tab 3, Snowden 24, 5-21.

**Response:  Undisputed.**

22.    Knecht was Associate Dean from July 1996 until the fall of 2002. *See* Snowden 24, 12-14; Tab 7, Mellen Affidavit para. 3.

**Response:  Undisputed.**

23.    Knecht was Mellen's supervisor from 1998 until Drolette assumed the position of Associate Dean in the fall of 2002. Snowden 25, 4-6: Tab 8, Knecht 22, 10-22.

**Response:  Undisputed.**

**E.    George T. Snowden, Director of Personnel, BU's Medical Campus**

24.    At all times relevant to this matter George T. Snowden [sic] served as Director of Personnel, BU's Medical Campus. *See* Tab 3, Snowden 12, 3 - 7; 13, 9-11; Tab 5, Meenan 15, 7-12.

**Response:  Undisputed. This individual's name is properly spelled "Snowdon."**

## II.    MELLEN'S EMPLOYMENT RECORD

25.    Mellen's work performance was rated as "always very good," *see* Tab 8, Knecht 22, 23 - 23, 3; Tab 3, Snowden 36, 16-20 (Mellen was never formally disciplined because of deficiencies in her work performance), at least before March 2003, when Mellen began taking

---

[1] For ease of reference, exhibits attached to Defendants' LR 56.1 Statement of Undisputed Material Facts (Exhibits 1-29) are referred to herein as "Defendants' Exhibit __." Exhibits attached to Plaintiff's Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment (Liability) (Exhibits 1-21) are referred to herein as "Plaintiff's Exhibit __." Additional documents referenced herein that have not been previously submitted are attached hereto (Exhibits 30-32) and are referred to as "Defendants' Exhibits __."

time off to care for her mother. *See* Tab 7, Mellen Affidavit, para. 4 (Drolette did not say anything negative to Mellen about her performance until April or May 2003).

**Response: Disputed. Knecht did not testify that she ever "rated" Mellen's performance, although she testified that Mellen's "work was always very good." Knecht Tr. at 22-23. While it is undisputed that Mellen was never "formally disciplined," Snowdon Tr. at 36, the emails and conversations between Drolette and Mellen described in ¶ 25 addressed performance issues. *See* Response to paragraph 25. Mellen's request for vacation in March 2003 noted that she needed "to spend some quality time with [her] aging mother." See e-mail from Mellen to Drolette and Meenan dated November 26, 2002, attached as Exhibit 30. Mellen did not, however, notify the University that her mother had a serious health condition. *See* Drolette Tr. at 47-8. The March 2003 vacation leave was not taken pursuant to the FMLA. Plaintiff's Statement of Undisputed Material Facts at p. 7, n.1.**

26. Until then, BU had not questioned or doubted Mellen's ability or competency to perform her duties as Financial Manager. *See* Tab 8, Knecht 23, 4 - 8; Tab 5, Meenan 12, 23 - 13, 12 (Knecht did not report any work performance concerns regarding Mellen to Meenan); Drolette 40, 2 - 20 (acknowledging that Knecht, Mellen's supervisor of four years, had not raised any issue regarding Mellen's work performance, productivity, or her working as a team player).

**Response: Disputed. For example, Dean Meenan testified that he was concerned about Mellen's ability to adapt to changes that made her position "larger and more complex." Meenan Tr. at 19-24. Meenan also testified that he was concerned about Mellen's working from home on Fridays, including "whether work was being produced consistently on those days and whether that arrangement was appropriate, in general,**

**given [Mellen's] responsibilities and then the interactions of the entire staff." Meenan Tr. at 22-23.** *See also* **Meenan Tr. at 27-28.**

27. Prior to March 2003, BU had not questioned or doubted Mellen's ability to serve as SPH Financial Manager as SPH grew larger and more successful. *See* Tab 8, Knecht 23, 9 - 12. *Accord* Tab 5, Meenan 25, 9 - 26, 10 (Meenan thought Mellen was sufficiently capable of continuing as Financial Manager, and found her performance in that role to be "satisfactory," which he communicated to her).

**Response:  Disputed.  For example, Dean Meenan testified that he was concerned whether Mellen "would be able to perform as Financial Manager for a larger and more complex organization, specifically around new budget models that [they] were creating for the school." Meenan Tr. at 22-23.  The School's budget "went from fifteen million dollars to almost fifty million dollars."  *Id.* at 24.  He was also concerned "about the arrangement for [Mellen] to work at home a day a week . . . and whether that arrangement was appropriate, in general, given [Mellen's] responsibilities and then the interactions of the entire staff."  *Id.*  at 22-23.  Ms. Knecht had not held the position of Associate Dean and had not supervised Mellen since the fall of 2002.  *See supra* ¶¶ 22-23.**

28. Prior to March 2003, BU never questioned Mellen's work productivity. Knecht 23, 13 - 21.

**Response:  Disputed.  For example, Dean Meenan testified that he had concerns about Mellen's performance before she took FMLA leave, including concerns about Mellen's working from home on Fridays.  Meenan testified that he was concerned "whether work was being produced consistently on those days and whether that arrangement was appropriate, in general, given [Mellen's] responsibilities and then the interactions of the entire staff."  Meenan Tr. at 22-**

23. *See also* **Meenan Tr. at 27-28.  Ms. Knecht had not held the position of Associate Dean and had not supervised Mellen since the fall of 2002.  *See supra* ¶¶ 22-23.**

29. Prior to March 2003, BU never questioned Mellen's commitment to work as a team player within SPH. Knecht 24, 1 3 - 16.

**Response:  Disputed.  For example, Dean Meenan was concerned with Mellen's "willingness to work as part of a team with overlapping training and responsibilities." Meenan Tr. at 20.  Ms. Knecht had not held the position of Associate Dean and had not supervised Mellen since the fall of 2002.  *See supra* ¶¶ 22-23.**

30. Mellen was never disciplined for on-the-job misconduct. Snowden 36, 11 -15; Knecht 24, 13 - 16.

**Response:  Disputed as characterized.  While it is undisputed that Mellen was never "formally disciplined," Snowdon Tr. at 36, the emails and conversations between Drolette and Mellen described in ¶ 25 addressed performance issues.  *See* Response to paragraph 25.**

31. Prior to March 2003, BU regarded Mellen as "always very professional."  Knecht 24, 9 - 12. *Accord* Snowden 25, 7 - 23 (Snowden never discussed with Knecht any problems associated with Mellen's work performance, attendance, or whether Mellen should be terminated).

**Response:  Disputed.  Ms. Knecht had not held the position of Associate Dean and had not supervised Mellen since the fall of 2002.  *See supra* ¶¶ 22-23.  Dean Meenan testified that he had concerns about Mellen's performance before she took FMLA leave, including concerns about Mellen's working from home on Fridays.  Meenan testified that he was concerned "whether work was being produced consistently on those days and**

**whether that arrangement was appropriate, in general, given [Mellen's] responsibilities and then the interactions of the entire staff."  Meenan Tr. at 22-23.  *See also* Meenan Tr. at 27-28.  He also was concerned whether Mellen "would be able to perform as Financial Manager for a larger and more complex organization, specifically around new budget models that [they] were creating for the school."  Meenan Tr. at 22-23.**

32. Prior to March 2003, BU regarded Mellen's attendance as "always good".  Knecht 24, 17-22.  *Accord* Snowden 35, 14 -17; 35, 22 - 36, 10 (over the course of her 26+ year career at BU, Mellen never exhibited a pattern of unscheduled absences, and was never disciplined for having unscheduled or unauthorized absences); Meenan 13, 3-6 (Knecht never reported any attendance problems regarding Mellen to Meenan).

**Response:  Undisputed.**

33. Prior to Drolette's disciplinary letter of reprimand of October 24, 2003, which Drolette issued after Mellen had begun her family leave - defendants had not taken any steps to discipline Mellen for any reason. Meenan 31, 2 - 12: Drolette 38, 17 - 39, 2.

**Response:  Disputed.  Drolette's letter of October 24, 2003 was sent while Mellen was on vacation.  *See* Plaintiff's Exhibit 11 (calendar).  Drolette had documented her concerns about Mellen's performance at least as early as May 2003, and had raised concerns "either verbally or through e-mails" prior to that time.  *See* Exhibit 15 to Defendants' LR 56.1 Statement of Undisputed Material Facts.**

**III.    MELLEN BEGINS HER ACTIVE CARE FOR HER MOTHER, AND IN RESPONSE DEFENDANTS BECOME DISAPPROVING[2]**

**A.    Mellen's Initial Use of Leave to Attend to Her Mother**

---

[2] Defendants dispute Plaintiff's attempt to mischaracterize facts in headings.

34. With defendants' approval, Mellen used some of her accrued vacation time in March 2003 to spend time in South Carolina with her then 88 year old mother, whose physical and mental conditions had begun deteriorating. *See* Tab 7, Mellen Affidavit, para. 5.

**Response:  Disputed as characterized.  It is undisputed that Defendants approved Mellen's request to take four weeks' paid vacation in March 2003.  Mellen Tr. at 21 (explaining that neither Drolette nor Meenan asked any questions or suggested that she should not take the time off).  Mellen's request for vacation noted that she needed "to spend some quality time with [her] aging mother."  See e-mail from Mellen to Drolette and Meenan dated November 26, 2002, attached hereto as Exhibit 30.  Mellen did not, however, notify the University that her mother had a serious health condition.  *See* Drolette Tr. at 47-8.  The March 2003 vacation leave was not taken pursuant to the FMLA.  Plaintiff's Statement of Undisputed Material Facts at p. 7, n.1.**

35. Drolette knew no later than February 2003 that Mellen was using her vacation time in March 2003 to be with her mother. *See* Tab 6, Drolette 48, 4 - 14.

**Response:  Undisputed.  While Drolette knew that Mellen was spending a month of vacation with her mother, she did not know of Mellen's "need to take time off to care for her mother until very late June or early July."  Drolette Tr. at 47-48.**

36. BU knew that Mellen's time off in March 2003 was necessary so that she could attend to her mother. *See* Tab 5, Meenan 22, 3 - 14.[2]

**Response:  Disputed as characterized.  It is undisputed that Meenan knew that Mellen planned to use her paid vacation leave in March 2003 to "attend" to her mother.  Mellen did not, however, notify the University that her mother had a serious health**

condition.  *See* Drolette Tr. at 47-8.  The March 2003 vacation leave was not taken pursuant to the FMLA.  Plaintiff's Statement of Undisputed Material Facts at p. 7, n.1.

Footnote 2:  BU failed to designate, and did not contend at any point during Mellen's employment, that Mellen's March 2003 vacation with her mother constituted FMLA/SNLA leave. *See* 29 CFR 825.208(a) and (c)(employer must designate leave as FMLA leave, if at all, in writing and before employee returns to work from such leave). Accord 29 CFR 700(a)("[i]f an employee takes paid or unpaid leave and the employer does not designate the leave as FMLA leave, the leave taken does not count against an employee's FMLA entitlement"). Mellen's March 2003 leave, however, did put defendants on notice that her mother had begun deteriorating and needed care.

**Response:  Disputed.  It is undisputed that Mellen's March 2003 vacation was not designated as FMLA or SNLA leave.  Mellen requested vacation and did not request leave pursuant to the FMLA or the SNLA in advance of her March vacation.  *See* Defendants' Exhibit 30.  Mellen's March 2003 vacation did not put Defendants on notice that her mother had a serious health condition.  *See* Drolette at 47-8.**

**B.      Defendants Immediately Become Disapproving of Mellen**

‡      *Defendants Take Away Mellen's Flextime, Which She Had Enjoyed for The Previous 4+ Years*

37. To persuade Mellen to accept the position of Financial Manager in 1998, BU agreed to Mellen's request that she work from home on Fridays. *See* Tab 8, Knecht 20, 5 -21, 5.

**Response:  Disputed.  Although Ms. Knecht agreed to permit Mellen to work from home on Fridays, the University did not oblige itself to permit Mellen to continue that practice if it became inconsistent with the goals of a new supervisor or the SPH.  *See*, *e.g.*, Drolette Tr. at 171-72.**

38. BU understood that Mellen valued her ability to work from home on Fridays. Knecht 21, 13 - 17.

**Response: Disputed. After Drolette informed Mellen that she would no longer be permitted to work from home on Fridays, Mellen never asked Drolette to reconsider, never asked Meenan for assistance in maintaining her schedule, and never asked Snowdon or anyone else to help restore the work-from-home schedule. Mellen Tr. at 46-48.**

39. BU had previously determined that Mellen's working from home on Fridays did not prejudice her productivity, the quality of her work, and her accessibility to BU, *see* Tab 3, Snowden 21, 22 - 22, 9; and - prior to Drolette - BU was not concerned that Mellen was allowed this schedule. *See* Tab 5, Meenan 29, 8 - 16. *See also* Meenan 27, 17 - 21 (Meenan did not believe that Mellen was unproductive while working from home on Fridays).

**Response: Disputed. For example, Dean Meenan testified that he had concerns about Mellen's performance before she took FMLA leave, including concerns about Mellen's working from home on Fridays. Meenan testified that he was concerned "whether work was being produced consistently on those days and whether that arrangement was appropriate, in general, given [Mellen's] responsibilities and then the interactions of the entire staff." Meenan Tr. at 22-23. *See also* Meenan Tr. at 27-28.**

40. Drolette was the first one to raise concerns about Mellen's working from home, Meenan 29, 17 - 30, 1, but not until April or May 2003, after Mellen returned from her March vacation with her mother. *See infra No.* 25. *See also* Tab 3, Snowden 92, 9 - 94, 19; Tab 6, Drolette 48, 15 - 21.

**Response: Disputed. Dean Meenan testified that his and Drolette's concerns about Mellen's working from home on Fridays were on "parallel tracks." Meenan Tr. at 29-30.**

Meenan explained that he "was not enthusiastic about [Mellen's] working at home at any point." *Id.*

41. In April or May 2003, Drolette instructed Mellen that her flextime schedule was unacceptable. Drolette 47, 13 - 17; and 84, 13 - 16.

**Response:  Undisputed.  *See also* Defendants' Exhibit 15, e-mail from Drolette to Mellen dated May 13, 2003 (explaining that Drolette could not support working from home one day per week "unilaterally for all staff given my goal to have our office accessible and open to our 'customers' during the University business hours.  A regular flex schedule for anyone would be counter to that goal, and thus, I expect that beginning in June your regular schedule will be on campus Monday through Friday."); Snowdon Tr. at 104 (confirming that no other employee who reported to Drolette had a "flex" schedule that permitted working from home regularly); Mellen Tr. at 49 (same).**

42. In an early May 2003 meeting with Snowden, Drolette stated her "frustration" and objection to Mellen's working from home on Fridays, Snowden 94, 8-10; and 151, 13-23, although Drolette recognized that Knecht had made this commitment to Mellen to persuade Mellen to accept the Financial Manager position. *Id.*

**Response:  Disputed as characterized.  It is undisputed that Drolette objected to Mellen's working from home on Fridays.  *See* Defendants' Exhibit 15.**

**Defendants dispute the remainder of paragraph 42.  Snowdon did not testify that Drolette "stated her 'frustration'" in a May 2003 meeting.  Snowdon Tr. at 94.  He did note an example in which Mellen did not get work to Drolette in time for Drolette to work on a project over the weekend, and explained that Drolette did not find Mellen's Friday schedule "to be a suitable work arrangement . . . to get the job done."  Snowdon Tr. at 94-**

**95.  When asked whether she knew that Mellen had accepted the position at SPH on the condition that Mellen be permitted to work from home on Fridays, Drolette testified that she did not know that fact.  Drolette Tr. at 83.  Drolette also testified that she understood that that schedule was an agreement with Mellen's prior supervisor, Drolette Tr. at 46-47, and that she was not obliged to continue the arrangement.  Drolette Tr. at 171-72.  Drolette was trying to create a different work culture, and did not believe that Mellen's working from home one day per week was consistent with that culture.  Drolette Tr. at 46-47.  Dean Meenan had similar concerns about Mellen's efforts to work from home on Fridays.  For example, Meenan testified that he was concerned "whether work was being produced consistently on those days and whether that arrangement was appropriate, in general, given [Mellen's] responsibilities and then the interactions of the entire staff."  Meenan Tr. at 22-23.  *See also* Meenan Tr. at 27-28.**

43. In or about April 2003, Drolette instructed Mellen that she was no longer authorized to work from home on Fridays. *See* Tab 7, Mellen Affidavit, para. 6. Accord Statement No. 48 *infra.*

**Response:  Undisputed.  *See also* Defendants' Exhibit 15 (explaining that Drolette could not support working from home one day per week "unilaterally for all staff given my goal to have our office accessible and open to our 'customers' during the University business hours.  A regular flex schedule for anyone would be counter to that goal, and thus, I expect that beginning in June your regular schedule will be on campus Monday through Friday.").**

‡     *Defendants Start Objecting to Mellen's Work Performance*

44. In April 2003, immediately upon Mellen's return from her March vacation with her mother, Drolette initiated her first review of Mellen's work performance. *See* Tab 6, Drolette 52, 3 - 19.

**Response:  Disputed.  At that time, the SPH did not have a formal evaluation process.  Drolette Tr. at 52.  Drolette began having conversations with Mellen about "particular concerns" with Mellen's performance in April 2003.  Drolette Tr. at 53.**

45. In early May 2003, Drolette told Snowden [sic] that she intended to meet with Mellen to discuss with her the importance of setting a professional example." *See* Tab 3, Snowden 94, 18 - 19.

**Response:  Undisputed.  Snowdon's testimony and notes confirm that Drolette intended to meet with Mellen to discuss a number of issues, including work that had not been delivered, Mellen's lack of priorities, and Mellen's taking vacation during the two critical months of the budget calendar, March and October.  Snowdon Tr. at 94.  Drolette did meet with Mellen and, at Mellen's request, Drolette documented her concerns in an e-mail.  Defendants' Exhibit 15.**

46. Drolette met with Mellen on May 5, 2003, and communicated to her in a critical and demeaning tone that she (Drolette) was concerned about Mellen's work and her role as Financial Manager of SPH. *See* Tab 7, Mellen Affidavit, para. 7.

**Response:  Disputed.  Mellen testified at her deposition that she could not recall anything at all about the conversation with Mellen in May except that Drolette "wanted to have better communication between the two of us" and did not mention a critical or demeaning tone.  Mellen testified that Drolette was not critical of Mellen's own**

**communication.  Mellen Day 1 Tr. at 90-93.  Mellen asked Drolette to document the issues that were raised in the meeting, and Drolette did so.  Defendants' Exhibit 15.[3]**

47. Drolette met again with Snowden [sic] in early May, following Drolette's meeting with Mellen on May 5, 2003. *See* Snowden 96, 9 - 22.

**Response:  Undisputed.**

48. At this meeting Drolette reported to Snowden [sic] that she (Drolette) was looking for more "leadership" from Mellen, and reiterated her interest in Mellen's having a "five day presence on campus".  *Id.*

**Response:  Undisputed.**

49. Later in May 2003, Drolette concluded that Mellen was not up to fulfilling the responsibilities of her job, and she accordingly lowered her expectations for Mellen. Snowden 99, 8 -102, 11.

**Response:  Undisputed.**

Footnote 3:  *Compare* Statement No. 27 *infra* (Dean Meenan believed that Mellen's job performance was satisfactory, and told her so.)

**Response:  Disputed.  For example, Dean Meenan testified that he was concerned about Mellen's ability to adapt to changes that made her position "larger and more complex."  Meenan Tr. at 19-24.  Meenan did testify that Mellen's performance with respect to certain specific "tasks" was "satisfactory," and that he "may have communicated that to her at some point in those years" but that he could not recall.  Meenan Tr. at 25-26.**

---

[3] Plaintiff cannot contradict her sworn deposition testimony with an affidavit in order to defeat summary judgment. *See*, *e.g.*, *Colantuoni v. Alfred Calcagni & Sons*, 44 F.3d 1, 4-5 (1st Cir. 1994).

50. Drolette did not offer any resources or training to Mellen in 2003 to improve the deficiencies she (Drolette) observed in Mellen's work performance. *See* Tab 5, Meenan 26, 20 - 27, 2.4

**Response:  Disputed.  The University offered several training programs, and Drolette encouraged Mellen to participate.  Drolette specifically encouraged Mellen to participate in training concerning turnarounds and the financial system and to take a course offered on PowerPoint presentations.  Drolette also generally encouraged Mellen to participate in professional development programs that would update her training and help her to develop new skills.  Drolette Tr. at 56-60.**

Footnote 4:  BU, as with the issue of who terminated Mellen, *see* Nos. 15 and 113-117 *infra,* internally disagrees on this point. Compare Tab 5, Meenan 26, 20 - 27. 2 (no training or resources were offered to Mellen to improve her work performance), and Tab 6, Drolette 55, 18 - 56, l; and 59, 21 - 61, 10 (Drolette suggested general training opportunities to Mellen but "stylistically" did not think it appropriate that she instruct Mellen to attend such trainings).

**Response:  Disputed.  *See* Response to paragraphs 15 and 113-117.  Dean Meenan testified that he was not aware of training or resources that were offered to Mellen. Meenan Tr. at 26-27.  He did not testify that no training or resources were offered to Mellen.  *Id.*  The University offered several training programs, and Drolette encouraged Mellen to participate.  Drolette specifically encouraged Mellen to participate in training concerning turnarounds and the financial system and to take a course offered on PowerPoint presentations.  Drolette also generally encouraged Mellen to participate in professional development programs that would update her training and help her to develop new skills.  Drolette Tr. at 56-60.**

51. In November 2003 Drolette planned to increase the frequency of her reviews of Mellen's performance, to "continue dialogue with her [Mellen] around those issues where there were gaps." Drolette 69, 5 - 70, 9.

**Response: Disputed. Drolette's meetings with Mellen were not characterized as performance reviews. Drolette planned the meetings "[b]ecause I wanted to work positively and productively toward achieving our objectives and I wanted to continue dialogue with her around those issues where there were gaps." Drolette Tr. at 70-71.**

‡      *Defendants Start Objecting to Mellen's Attendance*

52. No later than May 2003 Drolette knew that Mellen's mother was ill. *See* Tab 3, Snowden 109, 8.

**Response: Undisputed. Snowdon's notes indicate that Mellen told Drolette in a meeting on May 28, 2003 that her mother was ill. Snowdon Tr. at 109.**

53. Mellen took several days off in June 2003 as sick and vacation days to be with her mother for her care and for doctors' appointments. *See* Tab 7 . Mellen Affidavit, para. 8.

**Response: Disputed as characterized. On April 24 Mellen sent an e-mail to Drolette requesting authorization to take off work on Wednesday, April 30, Monday, May 12 and Monday, June 9 "to take [her] Mom to some doctor's appointments." A copy of that e-mail is attached as Exhibit 31. The University's records show that Mellen was absent from work on the following days during that time period for the following reasons: Monday, April 7 (sick); Wednesday, April 30 (sick); Monday, May 12 (sick); Tuesday, May 20 (sick); Wednesday, June 4 (sick); Thursday, June 5 (sick); Monday, June 9 (sick); Thursday, June 12 (sick); Monday, June 16 (vacation); Tuesday, June 17 (vacation); Wednesday, June 18**

**(sick); and Thursday, June 19 (sick).  The Exempt Employee Monthly Time Records for these months are attached as Defendants' Exhibit 32.**

54. Drolette complained in mid-June 2003 that Mellen had "many absences since budget meeting; four sick days and one vacation [day] since May."  Snowden 110, 3 - 4; and 111, 2 - 9.

**Response:  Undisputed, except that Defendants dispute the characterization that Drolette "complained."**

55. At the same time Drolette complained that Mellen was using "[a] lot of vacation time", and complained that Mellen's accrual of vacation time was excessive. Snowden 94, 1 -19.

**Response:  Disputed.  Drolette did not "complain."  The testimony referenced concerns a meeting between Snowdon and Drolette that took place on May 2, 2003.  At that meeting, Drolette told Snowdon that the SPH's budget calendar was set for March and October, making those critical months.  Mellen had taken four weeks' vacation in March, and had requested three weeks' vacation in October.  Drolette was concerned that Mellen would not be able to complete necessary tasks if she took seven weeks' vacation during those two critical months.  *See also* Drolette Tr. at 176.**

56. Drolette was not happy with Mellen's family-related absences in 2003, even before Mellen began using her formal family leave in August 2003.  Snowden 86, 11 -15.

**Response:  Disputed.  Snowdon testified that Drolette was not happy with Mellen's absences, but did not suggest that the absences were "family-related."  Snowdon Tr. at 86.  By August 2003 Mellen had taken more than four weeks' vacation and numerous sick days.  She was absent at least eight days in June alone.  *See* Response to paragraph 53.  Mellen also had requested four additional weeks' vacation for the remainder of the year, Mellen Day 1 Tr. at 33, the bulk of which would occur in October, a critical month in the School's**

**budget cycle.  *See* Defendants' Exhibit 22.  It is undisputed that Drolette had concerns about how the SPH would manage staffing needs and project completion without Mellen's presence during critical time periods.  Drolette Tr. at 147.**

57. No later than June 20, 2003, Drolette knew that Mellen would need intermittent family leave to allow her to care for her mother. Snowden 112, 3 - 21.

**Response:  Undisputed.**

58. Drolette complained on July 1, 2003 that "it was challenging to plan and manage [her] office objectives" given Mellen's "sporadic absences". Snowden 86, 2 - 7. *See also* Complaint and Amended Answer, para. 20.

**Response:  Undisputed, except that Defendants dispute the characterization of Drolette's statement as a complaint.  *See* Amended Answer, para. 20.**

59. Drolette complained on July 14, 2003, following statements by her regarding Mellen's imminent family leave, that Mellen was "disconnect[ed]" from her "professional responsibility", and openly questioned "how will [Mellen's] responsibilities get covered?" Snowden 112, 22 - 115, 1.

**Response:  Disputed as characterized; Drolette did not "complain."  It is undisputed that Drolette had concerns about how the SPH would manage staffing needs and project completion without Mellen's presence during critical time periods.  Drolette Tr. at 147.**

60. Drolette complained to Mellen that Mellen's absences affected Drolette's decisions about her (Drolette's) office personnel. Drolette 147, 9 - 14.

**Response:  Disputed.  Drolette did not "complain."  It is undisputed that the duration of Mellen's leave affected allocation of staffing and whether Drolette would need to hire temporary support to cover Mellen's responsibilities.  Drolette Tr. at 147.**

61. Drolette was "frustrated" at the prospect of Mellen's upcoming family leave, and believed that Mellen's leave would place a difficult burden on SPH to accomplish its objectives over that period.  Snowden 116, 1 -10.

**Response:  Disputed as characterized.  Snowdon testified that he was "under the impression" that Drolette was "frustrated" by the prospect of Mellen's request for vacation during October, a critical time for the school's budget process.  Snowdon Tr. at 116.  It is undisputed that Drolette had concerns about how the SPH would manage staffing needs and project completion without Mellen's presence during critical time periods.  Drolette Tr. at 147.**

62. In sum, although Knecht had no performance, attendance, or productivity issues with Mellen while supervising Mellen for 4 years, Drolette raised each of these issues with Mellen following the March 2003 vacation Mellen took with her ailing mother. Drolette 40, 2 - 42, 7; Mellen Affidavit, para. 9.

**Response:  Disputed.  Mellen's request for vacation noted that she needed "to spend some quality time with [her] aging mother."  See e-mail from Mellen to Drolette and Meenan dated November 26, 2002, attached as Exhibit 30 [BU 0233].  Mellen did not, however, notify the University that her mother had a serious health condition.  *See* Drolette Tr. at 47-8.  The March 2003 vacation leave was not taken pursuant to the FMLA. Plaintiff's Statement of Undisputed Material Facts at p. 7, n.1.  Drolette testified that she did not see anything in Mellen's personnel file that documented any concerns that Ms. Knecht may have had about Mellen.  Drolette Tr. at 40-42.  Drolette documented her concerns about Mellen's performance at least as early as May 2003, and had raised**

concerns "either verbally or through e-mails" prior to that time.  *See* **Defendants' Exhibit 15.**

IV.    **MELLEN'S FMLA/SNLA LEAVE - DURATION**

63. On or about July 16, 2003, Mellen formally applied for the maximum amount of family leave on account of her mother's "serious health condition". *See* Tab 9, Mellen's Application. *See also* Tab 6, Drolette 147, 15 - 148, 4 (Drolette knew by mid-July 2003 that Mellen was applying for the maximum amount of family leave). *See also* Statement No. 71 *infra*.

**Response:  Disputed.  Mellen applied for leave from "Aug. 4, 2003 thru Oct. 3, 2003; Oct. 28 thru. Nov. 18, if needed."  Plaintiff's Tab 9.  Mellen left the application for Drolette with a cover note explaining that "I have applied for the maximum leave but don't expect to need all of it."  Defendants' Exhibit 2.  *See also* Mellen Day 1 Tr. at 178-79.**

64. When Mellen applied for family leave, she was not certain how much leave she would need given her mother's condition, the availability of other of her family to help with her mother, and her mother's need for hospital, nursing home, and/or other institutional care. See Tab 7, Mellen's Affidavit, para. 10; Drolette 146, 8 - 23.

**Response:  Undisputed.**

65. By letter dated July 31, 2003, BU approved Mellen's taking intermittent family leave. *See* Tab 3, Snowden 68, 18 - 69, 11. *See also* Tab 10, BU's Letter of July 31, 2003.

**Response:  Undisputed.**

66. BU approved Mellen's taking FMLA leave from August 4, 2003 through October 3, 2003, and "if necessary", October 28, 2003 through November 18, 2003. *See* Tab 10, BU's Letter of July 31, 2003.

**Response:  Undisputed.**

Footnote 5:  The October gap during Mellen's family leave represents 15 days of vacation time that BU had previously approved for Mellen, which time Mellen intended (and ultimately used) for her own respite given the demands associated with her care of her mother. On this point, BU's July 31st letter also serves as a tacit confirmation that BU had previously approved this respite time. Accord Tab 6, Drolette 193, 14 -194, 4.

**Response:  It is undisputed that Mellen took vacation time between the two blocks of approved FMLA leave, and that time was not counted toward her FMLA leave.  In April 2003 Drolette had approved Mellen's request for vacation time in October only if Mellen could confirm that she could complete certain projects that were critical for that time period.  Drolette Tr. at 193-94.  *See also* Defendants' Exhibit 22, e-mail from Drolette to Mellen dated April 20, 2003 ("I am glad that you have concluded that you can work the vacation into this timeframe.")**

67. In fact and in law, Mellen's intermittent FMLA leave (excluding her additional entitlements under the SNLA, discussed *infra)* privileged her to be out of work through November 21, 2003. *See* Tab 11 hereto, Calendar.

**Response:  Disputed.  Mellen's application requested leave through November 18, 2003, and she was approved for leave through that date.  Defendants' Exhibits 2 and 3. Mellen was given the full twelve weeks (60 days) of leave.  Plaintiff's Calendar (attached at Tab 11) incorrectly does not count three holidays that fell during Mellen's period of leave (September 1, November 11 and November 17).  However, the law is clear that holidays do not serve to extend FMLA leave.  29 C.F.R. § 825.200(f) ("For purposes of determining the amount of leave used by an employee, the fact that a holiday may occur within the week taken as FMLA leave has no effect; the week is counted as a week of FMLA leave.").**

**Mellen understood that she was expected to return from her FMLA leave on November 19. Mellen Day 2 Tr. at 55.**

Footnote 6:  In sum, the FMLA permitted Mellen 60 days of family leave. She took 20 days in August 2003, 21 days in September 2003, and 7 days in October 23. *See also* footnote 5 *infra.* Through the last day of October 2003, therefore, Mellen had used 48 days of her 60 days of FMLA leave. Her leave through the end of October 2003 was supplemented by authorized non-FMLA leave (15 days of previously approved vacation (October 6 -27), and two days of holiday leave (Labor and Columbus Day)).

In November 2003, Mellen took 5 days of FMLA leave November 3 - 7, and 4 days November 10 - 14 (with November 11th, Veterans' Day, being non-FMLA holiday leave). As of November 17, 2003, therefore, Mellen's count stood at 57 days of FMLA leave. Daniel J. Goldin Day was observed as a University holiday on November 17th. Therefore, FMLA Day 58 fell on November 18th, Day 59 on November 19th, and Day 60 on November 20th. Setting aside the additional allowances of the SNLA, Mellen's return-to-work date following FMLA leave was Friday, November 21, 2003. By then, however, defendants had terminated her for not appearing for work on November 19th.

**Response:  Disputed.  Mellen's application requested leave through November 18, 2003, and she was approved for leave through that date.  Defendants' Exhibits 2 and 3. Mellen was given the full twelve weeks (60 days) of leave.  Plaintiff's Calendar (attached at Tab 11) incorrectly does not count three holidays that fell during Mellen's period of leave (September 1, November 11 and November 17).  However, the law is clear that holidays do not serve to extend FMLA leave.  29 C.F.R. § 825.200(f) ("For purposes of determining the amount of leave used by an employee, the fact that a holiday may occur within the week**

taken as FMLA leave has no effect; the week is counted as a week of FMLA leave."). **Mellen understood that she was expected to return from her FMLA leave on November 19. Mellen Day 2 Tr. at 55.**

68. BU, by its letter of July 31, 2003, incorrectly calculated that Mellen's family leave would expire on November 18, 2003. *Id.*

**Response: Disputed. Mellen's application requested leave through November 18, 2003, and she was approved for leave through that date. Defendants' Exhibits 2 and 3. Mellen was given the full twelve weeks (60 days) of leave. Plaintiff's Calendar (attached at Tab 11) incorrectly does not count three holidays that fell during Mellen's period of leave (September 1, November 11 and November 17). However, the law is clear that holidays do not serve to extend FMLA leave. 29 C.F.R. § 825.200(f) ("For purposes of determining the amount of leave used by an employee, the fact that a holiday may occur within the week taken as FMLA leave has no effect; the week is counted as a week of FMLA leave."). Mellen understood that she was expected to return from her FMLA leave on November 19. Mellen Day 2 Tr. at 55.**

69. In addition to her FMLA entitlement, Mellen's SNLA leave privileged her to be out of work an additional 24 hours of working time, that is, through November 25, 2003. *Id.*[7]

**Response: Disputed. Mellen never requested SNLA leave, or any other type of leave beyond the FMLA leave she requested. Defendants' Exhibit 2; Mellen Day 1 Tr. at 197; Mellen Day 2 Tr. at 42-43. Further, Mellen wrote a letter on November 19 in which she stated that she was "scheduled to return to work tomorrow [November 20] at the end of my Family and Medical Leave." Defendants' Exhibit 25. Mellen understood that she was expected to return from her FMLA leave on November 19. Mellen Day 2 Tr. at 55. Mellen**

**believed that the University had miscalculated her leave time, but does not know how much**

**additional time she was due because "I'm not an expert on family medical leave; I'm not an**

**attorney." Mellen Day 2 Tr. at 61-62. She did not, however, notify anyone at the**

**University that she believed the duration of her leave had been miscalculated. Mellen Day**

**2 Tr. at 61-62.**

Footnote 7: Indeed, to extend her care of her mother, Mellen previously requested - and

defendants had approved - her using vacation time November 26th (the Wednesday before the

University's 2-day Thanksgiving holiday), and December 1-5, 2003. Given this, Mellen's actual

return-to-work date was December 8, 2003. *See* Tab 11, Calendar. *See* also Tab 7, Mellen

Affidavit, para. 12.

**Response: Disputed. Mellen's application requested leave through November 18,**

**2003, and she was approved for leave through that date. Defendants' Exhibits 2 and 3.**

**Mellen understood that she was expected to return from her FMLA leave on November 19.**

**Mellen Day 2 Tr. at 55.**

**V.    MELLEN'S FMLA/SNLA LEAVE - DEFENDANTS' FAILURE TO CLARIFY
       DURATION**

70. Mellen began her family leave on August 4, 2003. *See* Complaint and Amended

Answer, para. 21. *See also* Tab 3, Snowden 121, 5 - 7.

**Response: Undisputed.**

71. At BU's request Mellen submitted medical documentation regarding her mother's

condition, to support her entitlement to the "maximum" amount of family leave, Snowden 71, 7 -

72, 21, which BU found sufficient. Snowden 118, 1-3.8

**Response: Disputed. Mellen applied for leave from "Aug. 4, 2003 thru Oct. 3, 2003;**

**Oct. 28 thru. Nov. 18, if needed." Plaintiff's Tab 9. Mellen left the application for Drolette**

with a cover note explaining that "I have applied for the maximum leave but don't expect to need all of it."  Defendants' Exhibit 2.  *See also* Mellen Day 1 Tr. at 178-79.  It is undisputed that Mellen submitted the Certification of Health Care Provider form.  Defendants' Exhibit 7.

Footnote 8:  At no time during Mellen's family leave did defendants request additional medical information supportive of Mellen's right to family leave. *See* Tab 1, Complaint and Tab 2, Amended Answer, para. 32.

**Response:  Undisputed.**

72. In her August 8th submission of medical documentation, Mellen communicated her understanding to BU that her family leave would include the period October 28, 2003 through November 20, 2003. *See* Tab 12, Mellen's August 8, 2003 submission; Snowden 72, 18 - 74, 4.

**Response:  Disputed.  The Certification of Health Care Provider submitted by Mellen on August 8, 2003 (after the duration of her leave had been approved) did not request an extension or extend the period of her leave.  Plaintiff's Tab 12.  Mellen's application requested leave through November 18, 2003, and she was approved for leave through that date.  Defendants' Exhibits 2 and 3.  Moreover, Mellen testified that she does not know why she used the November 20 date on the Certification, and does not know whether it was simply a mistake.  Mellen Day 1 Tr. at 202-03.  She never called anyone at the Office of Personnel to request two additional days of leave.  *Id.*  On at least two occasions after Mellen's submission of the Certification, the University informed Mellen that she was expected to return to work on November 19.  *See* Defendants' Exhibits 6, October 29 letter from Drolette to Mellen ("I expect you back at work on Wednesday, November 19, 2003.") and 11, October 24, 2003 letter from Drolette to Mellen ("It is my**

current understanding that you will return to work on November 19, 2003.  If your plans change in this regard you must communicate that to me as soon as possible.").  Mellen understood that she was expected to return from work on November 19, 2003.  Mellen Day 2 Tr. at 55 ("Q:  And so you understood, in addition to the other letters, that as a result of this letter, BU expected you back on November 19, 2003; is that right?  A:  Yes.").

73. Upon its receipt, BU realized that Mellen understood that her family leave would run through November 20, 2003. Snowden 73, 7 - 17.

**Response:  Disputed.  On at least two occasions after Mellen's submission of the Certification, BU informed Mellen that she was expected to return to work on November 19.  *See* Defendants' Exhibits 6, October 29 letter from Drolette to Mellen ("I expect you back at work on Wednesday, November 19, 2003.") and 11, October 24, 2003 letter from Drolette to Mellen ("It is my current understanding that you will return to work on November 19, 2003.  If your plans change in this regard you must communicate that to me as soon as possible.").  Mellen understood that she was expected to return from work on November 19, 2003.  Mellen Day 2 Tr. at 55 ("Q: And so you understood, in addition to the other letters, that as a result of this letter, BU expected you back on November 19, 2003; is that right?  A:  Yes.").**

74. BU did not make any effort between its receipt of Mellen's August 8th submission and its termination of Mellen on November 20, 2003 to communicate with Mellen or to correct Mellen's understanding in this respect. Snowden 73, 2 - 6, and 13 -17.

**Response:  On at least two occasions after Mellen's submission of the Certification, BU informed Mellen that she was expected to return to work on November 19.  *See* Defendants' Exhibits 6, October 29 letter from Drolette to Mellen ("I expect you back at**

work on Wednesday, November 19, 2003.") and 11, October 24, 2003 letter from Drolette to Mellen ("It is my current understanding that you will return to work on November 19, 2003. If your plans change in this regard you must communicate that to me as soon as possible."). Mellen understood that she was expected to return from work on November 19, 2003. Mellen Day 2 Tr. at 55 ("Q: And so you understood, in addition to the other letters, that as a result of this letter, BU expected you back on November 19, 2003; is that right? A: Yes.").

75. BU also made no effort to inquire whether Mellen's August 8th submission constituted her request for SNLA leave. Snowden 73, 18 - 74, 4.

**Response: Disputed. Mellen submitted only one request for leave, the July 17 application. Defendants' Exhibit 2. Mellen Day 1 Tr. at 181-82. Mellen never asked for additional leave after that application, and never requested leave pursuant to the SNLA. Mellen Day 1 Tr. at 197. The Certification submitted on August 8 was not a request for leave; it was the required medical certification form. Plaintiff's Tab 12.**

Footnote 9: A similar indifference may explain why BU did not inquire of Mellen on or after November 19, 2003 to determine why she was absent from work that day. *See* Statement No. 96 *infra.*

**Response: Disputed. *See* Response to paragraph 96.**

76. On October 1, 2003, Mellen advised defendants that because she had been unable to find alternative medical care arrangements for her mother, she would need to continue her family leave after her approved October vacation. *See* Complaint and Amended Answer, para. 26.

**Response: Undisputed.**

77. On her own initiative, Mellen submitted updates regarding her family leave at regular intervals, and she advised defendants that her mother's health condition had not changed. *Id.* at para. 31.

**Response: Undisputed. Drolette had asked Mellen to provide updates concerning the duration of her leave. Defendants' Exhibit 19.**

78. Later in October 2003, after an email exchange between Mellen and Drolette (which indicated that Drolette was confused about the duration of Mellen's family leave, Snowden 70, 7 - 10; and 74, 5 - 9; Drolette 146, 3 - 11, and that Mellen understood that her family leave ran through November 19th), BU neglected to communicate with Mellen regarding the duration of her family leave. Snowden 75, 15 - 76, 3.

**Response: Disputed. On at least two occasions after that e-mail exchange, BU informed Mellen that she was expected to return to work on November 19. *See* Defendants' Exhibits 6, October 29 letter from Drolette to Mellen ("I expect you back at work on Wednesday, November 19, 2003.") and 11, October 24, 2003 letter from Drolette to Mellen ("It is my current understanding that you will return to work on November 19, 2003. If your plans change in this regard you must communicate that to me as soon as possible."). Mellen understood that she was expected to return from work on November 19, 2003. Mellen Day 2 Tr. at 55 ("Q: And so you understood, in addition to the other letters, that as a result of this letter, BU expected you back on November 19, 2003; is that right? A: Yes.").**

79. As a result of Mellen's letter of October 23, 2003, BU understood that Mellen believed that her family leave ran through November 20, 2003. Snowden 78, 17 - 79, 8.

**Response: Disputed. On October 29, 2003, Drolette wrote to Mellen explaining that "I have been advised by the Office of Personnel that, pursuant to FMLA regulations and University policy, the fact that a holiday falls within a block of time taken as FMLA leave does <u>not</u> serve to extend an employee's allowed FMLA leave. Therefore, please be advised that, as I stated in my letter to you of October 24, 2003, I expect you back at work on Wednesday, November 19, 2003." Defendants' Exhibit 6 (emphasis in original). *See also* Snowdon Tr. at 83 (explaining that under the University's policy University holidays do not extend an employee's FMLA leave).**

80. BU's Snowden [sic], however, did not communicate with Mellen at that point regarding the duration of her family leave. Snowden 79, 9 - 20.

**Response: Undisputed.**

## VI.  MELLEN'S FMLA/SNLA LEAVE - DEFENDANTS ESCALATE THEIR RETALIATION

81. In August 2003, just two weeks after Mellen began her family leave, Drolette told Snowden [sic] that she was not sure "it will work long term," referring to Mellen's employment. *See* Tab 13, Snowden's August 21, 2003 notes; Tab 3, Snowden 119, 6 -121, 4; and 123, 16 -125, 15.

**Response: Disputed. Snowdon's notes reflect a conversation between Snowdon and Drolette in which Drolette explained the difficulty caused by Mellen's lack of communication about her leave. Mellen failed to provide the list of ongoing projects, failed to clarify the length of her leave, failed to tell colleagues that she was going on leave, left "protected" spreadsheets that her colleagues could not access, and did not leave an auto-reply on her e-mail account to alert clients of her absence. Plaintiff's Tab 3; Snowdon Tr.**

**at 120. Drolette also noticed that Mellen had cleared out most of her office when she left.**
*Id.*

82. At the same time, Drolette raised the possibility with Snowden [sic] of getting rid of Mellen through progressive discipline, by eliminating Mellen's position, or by negotiating a separation agreement with her. *Id.*

**Response: Disputed. Drolette testified that during that August 21, 2003 conversation, Snowdon emphasized the importance of progressive discipline to address performance concerns. Drolette Tr. at 207-08.**

83. Drolette also expected Mellen to submit certain SPH work to her within a week following the start of Mellen's family leave. Snowden 121, 23 - 122, 8.

**Response: Dispute. When Mellen requested FMLA leave, Drolette made clear that Mellen's top priority before taking leave was to put together a list of tasks and ongoing projects for which Mellen was responsible so that others in the office could handle matters in Mellen's absence, and Mellen agreed to provide the list. Mellen Day 1 Tr. at 185-86. Mellen had not put together the task list by her last work day, July 31, but promised by e-mail to provide that information over the weekend. Mellen Day 1 Tr. at 204-05. Mellen never provided the list. Mellen Day 2 Tr. at 20, 52-53. Similarly, Mr. Snowdon testified that he did not understand Drolette to be dissatisfied that Mellen was out on leave, but she was dissatisfied that Mellen did not "hav[e] things in place before she went on leave." Snowdon Tr. at 121. He further testified that he "wasn't aware of any expectations that [Drolette] had for [Mellen] while on leave but [he] did understand that there were loose ends when she left on leave." Snowdon Tr. at 121.**

84. Drolette told Snowden [sic] that she intended to speak with SPH Dean Meenan and interim BU President Aram Chobanian regarding her strategy to resolve the Mellen situation. Snowden 120, 21 - 22; and 123, 1 - 15.

**Response: Disputed. Drolette did not speak with then-President Chobanian about the situation with Mellen. Drolette Tr. at 124. Dean Meenan spoke with Dr. Chobanian to "inform him that we were having employment issues with [Mellen]." Meenan Tr. at 49-50. Dean Meenan had that conversation with Dr. Chobanian "primarily as a courtesy" because Dr. Chobanian had worked with Mellen in the past. *Id.***

85. Snowden [sic] does not recall whether he ever spoke with Drolette about terminating Mellen anytime before Mellen began her family leave. Snowden 125, 23 -126. 4.

**Response: Disputed. Drolette sent a letter to Mellen on November 20 to inform Mellen that her failure to return to work on her scheduled return date constituted a voluntary resignation. Defendants' Exhibit 12. Snowdon testified that earlier in the year he and Drolette had discussed "concerns about [Mellen's] performance and what the long-term relationship was going to look like." Snowdon Tr. at 125.**

86. Drolette was unhappy - just two weeks into Mellen's authorized family leave - because she thought Mellen was not doing her job as SPH's Financial Manager. Snowden 126, 13 - 19.

**Response: Disputed. Drolette did not expect Mellen to "do her job as SPH's Financial Manager" while Mellen was on leave. Snowdon testified that he and Drolette had discussed Mellen's performance problems prior to Mellen's going out on leave. Snowdon Tr. at 125-26. As Snowdon explained, "I didn't take [Drolette's] dissatisfaction with**

[Mellen] being out on leave, but rather not having things in place before she went on leave." Snowdon Tr. at 121.

87. In September 2003, Drolette proposed to Snowden [sic] that she eliminate Mellen's position and in its place create an "analyst" position. *See* Tab 1, Complaint, and Tab 2, Amended Answer, para. 24. *See* also Snowden 127, 4 - 128. 1 5; and 131, 1 - 19.

**Response: Defendants do not dispute that Drolette proposed the creation of an analyst position in September 2003. Defendants dispute the remainder of paragraph 87.**

88. In mid-September 2003 - six weeks into Mellen's family leave - Drolette reported to Snowden [sic] that Mellen had not been available for a scheduled work conference call. Snowden 127, 4 - 128, 4; and 128, 23 - 129, 4.

**Response: Disputed. When Mellen requested FMLA leave, Drolette made clear that Mellen's top priority before taking leave was to put together a list of tasks and ongoing projects for which Mellen was responsible so that others in the office could handle matters in Mellen's absence, and Mellen agreed to provide the list. Mellen Day 1 Tr. at 185-86. Mellen had not put together the task list by her last work day, July 31, but promised by e-mail to provide that information over the weekend. Mellen Day 1 Tr. at 204-05. Mellen never provided the list. Mellen Day 2 Tr. at 20, 52-53. Similarly, Mr. Snowdon testified that he did not understand Drolette to be dissatisfied that Mellen was out on leave, but she was dissatisfied that Mellen did not "hav[e] things in place before she went on leave." Snowdon Tr. at 121. He further testified that he "wasn't aware of any expectations that [Drolette] had for [Mellen] while on leave but [he] did understand that there were loose ends when she left on leave." Snowdon Tr. at 121. *See also* Meenan Tr. at 55 ("My understanding is that there was a description of work to be done or a matrix of some**

**processes that [Mellen] had indicated she would complete before going on medical leave**
**and then indicated she would send in shortly after. . . . We were not requesting her to do**
**work while she was on family medical leave.")  When Mellen failed to complete the project**
**list as she had said she would do, Drolette sent an e-mail requesting a short conference call**
**to clarify some outstanding issues.  Mellen declined to participate.  *See* Defendants' Exhibit**
**29.  *See also* Complaint ¶ 21 ("Plaintiff also told colleagues that she would make herself**
**available to address emergencies that might develop during her family leave.")**

89. Notwithstanding BU's authorization of Mellen's family leave into November 2003,
*see* Statement Nos. 65-66 *infra,* Drolette insisted that Mellen return to work on October 6, 2003.
*See* Complaint and Amended Answer, para. 29.

**Response:  Disputed.  The University approved Mellen's leave through October 3,**
**2003 and "if necessary", October 28, 2003 through November 18, 2003.  *See* Defendants'**
**Exhibit 3.  Through late September and early October, Mellen's voicemail message**
**continued to report that Mellen would be out of the office through October 3, Mellen Day 2**
**Tr. at 34-35; Exhibit 23, and Drolette had expected Mellen to return on Monday, October**
**6.  Defendants' Exhibits 23 and 24.  Drolette did not insist that Mellen return to work on**
**October 6, and Mellen did not return to work on October 6.  Instead, Mellen began a three-**
**week vacation.  *See* Plaintiff's Exhibit 11 (Calendar).**

90. By letter dated October 24, 2003, Drolette disciplined Mellen by means of a written
letter of reprimand, which concluded, "If you are not able to make prompt and substantial
improvements in these areas ["communication, initiative and ownership"] when you return, we
will have to discuss whether it is mutually beneficial for you to continue your employment at
[the School of Public Health]."  At the time of Drolette's letter of reprimand, Mellen had not

been present at BU or actively engaged as Financial Manager since August 3, 2003 because of her family leave. *See* Complaint and Amended Answer, para. 33. *See also* Tab 14, Drolette's October 24, 2003 letter.

**Response:  Disputed.  Defendants dispute the characterization of the October 24 letter as an act of "discipline" or a "letter of reprimand."  The letter is at Tab 14 of Plaintiff's Statement of Facts and speaks for itself.  Mellen had not been present at BU or actively engaged as Financial Manager since August 3, 2003.  She had been on FMLA leave through October 3, and on vacation thereafter.  Plaintiff's Tab 11 (Calendar).**

91. Drolette wrote the letter of reprimand herself, Snowden 80, 11 - 13, and did not ask Snowden [sic] as Director of Personnel to approve it.  Snowden 82, 9 - 14.

**Response:  Disputed.  Snowdon testified that he discussed the letter with Drolette and may have seen a draft.  Snowdon Tr. at 80.  Drolette circulated the draft to George Snowdon, Dean Meenan and to a lawyer within the Office of the General Counsel.  Drolette Tr. at 238.  Dean Meenan commented on the draft letter.  Drolette Tr. at 238-39; Meenan Tr. at 44.**

92. Drolette wrote the disciplinary letter, in part, because of "the things that [Mellen] didn't do during the leave."  Drolette 241, 3 - 21.

**Response:  Disputed.  Drolette sent the letter during Mellen's vacation because of the "lack of clarity around the terms of her leave [and] the absence of the completed assignment I was expecting before she left."  Drolette Tr. at 241.  Mellen had not put together the task list by her last work day, July 31, but promised by e-mail to provide that information over the weekend.  Mellen Day 1 Tr. at 204-05.  Mellen never provided the list. Mellen Day 2 Tr. at 20, 52-53.  *See also* Meenan Tr. at 55 ("My understanding is that there**

was a description of work to be done or a matrix of some processes that [Mellen] had indicated she would complete before going on medical leave and then indicated she would send in shortly after. . . . We were not requesting her to do work while she was on family medical leave.")  *See also* **Complaint ¶ 21 ("Plaintiff also told colleagues that she would make herself available to address emergencies that might develop during her family leave.")**

## VII.    DEFENDANTS TERMINATE MELLEN

93. Mellen did not appear for work on November 19. 2003. *See* Tab 7, Mellen Affidavit, para. 13.

**Response:  Undisputed.  Mellen also did not appear for work on November 20, or at any time thereafter.  Mellen Day 2 Tr. at 69-69.**

94. Defendants regarded Mellen's absence on November 19th as unexcused. *See* Tab 3, Snowden 39, 6 - 8.

**Response:  Undisputed.**

95. Defendants contend that they determined that Mellen had "resigned" for a single reason: she did not appear for work on November 19th. *See* Snowden 21, 19 - 22, 9. Accord Meenan 33, 18 - 20; Drolette 114, 11 -17.[10]

**Response:  Undisputed.  *See also* Meenan Tr. at 33 (Q:  "Had she appeared for work that day, she would not have been considered to have resigned; is that correct?"  A: "That's correct.")**

Footnote 10:  BU acknowledges that Mellen did not tender a letter of resignation. Drolette 16, 18-23.

**Response:  Undisputed.  The letter of July 31 Mellen approving Mellen's leave made clear that failure to appear for work on the scheduled return date would constitute resignation.  Defendants' Exhibit 3; Drolette Tr. at 16.  Mellen did, however, send a letter on November 19 explaining that she would not return to work because she had concluded that it was "unsafe."  Defendants' Exhibit 25.**

96. BU did not conduct any inquiry of any kind into why Mellen did not appear for work on November 19th before effecting her termination. Snowden 45, 8 - 46, l; and 58, 10 - 19; Drolette 128, 5 - 129, 11 (neither Drolette or anyone in her office attempted to call or otherwise contact Mellen on November 19th). *See also* footnote 9 infra.

**Response:  It is undisputed that Defendants did not make any inquiry as to why Mellen did not appear for work on either November 19 or November 20.  Defendants dispute the allegations concerning the "termination" of Mellen.  Drolette sent a letter to Mellen on November 20 to inform Mellen that her failure to return to work on her scheduled return date constituted a voluntary resignation.  Defendants' Exhibit 12.  On at least two occasions in October, the University informed Mellen that she was expected to return to work on November 19.  *See* Defendants' Exhibits 6, October 29 letter from Drolette to Mellen ("I expect you back at work on Wednesday, November 19, 2003.") and 11, October 24, 2003 letter from Drolette to Mellen ("It is my current understanding that you will return to work on November 19, 2003.  If your plans change in this regard you must communicate that to me as soon as possible.").  Mellen understood that she was expected to return from work on November 19, 2003.  Mellen Day 2 Tr. at 55 ("Q: And so you understood, in addition to the other letters, that as a result of this letter, BU expected you back on November 19, 2003; is that right?  A:  Yes.").**

97. BU does not claim any injury as a result of Mellen's absence on November 19th. Drolette 115, 8 - 16.

**Response:  Undisputed.**

98. On November 19th and 20th, Mellen was with her mother at medical appointments, and was engaged in coordinating future care for her, either with family members or with professional institutions. *See* Tab 7, Mellen Affidavit, paras. 13-14.

**Response:  Disputed.  At the time of her scheduled return, Mellen had not hired anyone to provide home healthcare coverage, admitted her mother to an assisted living facility, or identified anyone else to provide primary care for her mother.  Mellen Day 2 Tr. at 96.**

99. Drolette typed the letter that terminated Mellen. Drolette 115, 17 - 18. *See also* Tab 4, termination letter.

**Response:  Disputed.  Drolette typed the letter that appears at Plaintiff's Tab 4. Drolette Tr. at 115.  That letter explains that Mellen's failure to return to work as scheduled on November 19 "constitutes a voluntary resignation from the University."**

100. Drolette's termination letter did not reference any written BU policy or rule. *See* Tab 4, termination letter. *See also* Drolette 130, 5 - 16.

**Response:  Disputed.  The November 20 letter explains that Mellen's failure to return to work as scheduled on November 19 "constitutes a voluntary resignation from the University."  Plaintiff's Tab 4.  The November 20 letter references the "Conditions of Leave" section from the July 31, 2003 letter approving Mellen's FMLA leave.  *See* Defendants' 56.1 Statement, Exhibit 3.  The July 31 letter, in turn, referenced the University's Family and Medical Leave Policy.  *Id.***

101. On either November 19th or 20th, in preparation for sending the termination letter. Drolette instructed the payroll department to calculate the cash value of Mellen's payable vacation leave. Drolette 104, 14 - 20.

**Response:  Disputed.  The November 20 letter explains that Mellen's failure to return to work as scheduled on November 19 "constitutes a voluntary resignation from the University."  Plaintiff's Tab 4.  Drolette did instruct the Payroll department to calculate the cash value of Mellen's payable vacation leave, after speaking with both Dean Meenan and George Snowdon of the Office of Personnel.  Drolette Tr. at 104.**

102. In the afternoon of November 20th, Drolette received a check from the payroll department for the value of Mellen's payable vacation leave.  She then attached the check to her termination letter; instructed an assistant from her office to accompany her; drove her own car in the "dark" to the South End Post Office; had her assistant sit in the car while she (Drolette) entered the Post Office; and, "close to closing time," mailed the termination letter to Mellen by certified mail. Drolette 107, 21 - 110, 4.

**Response:  Disputed.  The November 20 letter explains that Mellen's failure to return to work as scheduled on November 19 "constitutes a voluntary resignation from the University."  Plaintiff's Tab 4.  Drolette did drive to the South End Post Office at the end of the day on November 20 and sent the letter to Mellen by certified mail.  She brought an administrative assistant with her in case parking was unavailable and she had to "live" or "double" park.  Drolette Tr. at 107-110.**

103. Other than the letter by which she terminated Mellen, Drolette cannot recall any other time when she, as Associate Dean at SPH, personally brought a letter relating to a SPH matter to the post office for delivery. Drolette 109, 22 - 110, 4.

**Disputed:  The November 20 letter explains that Mellen's failure to return to work as scheduled on November 19 "constitutes a voluntary resignation from the University." Plaintiff's Tab 4.  Otherwise, the statements in paragraph 103 are undisputed.**

104. Drolette herself photocopied her termination letter and delivered the copies to Snowden and Meenan.  Drolette 126, 3 - 21.

**Response:  Disputed.  The November 20 letter explains that Mellen's failure to return to work as scheduled on November 19 "constitutes a voluntary resignation from the University."  Plaintiff's Tab 4.  Otherwise, the statements in paragraph 104 are undisputed.**

## VIII.   DEFENDANTS PLANNED TO TERMINATE MELLEN EVEN BEFORE NOVEMBER 19 [TH] BECAUSE OF HER FAMILY LEAVE

105. Defendants made plans to terminate Mellen's employment soon after she began her family leave, *see* Statements Nos. 81 - 92 *infra,* and in any case well before November 19, 2003.

**Response:  Disputed.  *See* Response to Statements Nos. 81-92 *infra*.  Further, Drolette had planned to meet with Mellen upon her return.  Drolette sent an e-mail to Mellen on November 13 setting up times for the two to meet over the next few weeks. Mellen Day 2 Tr. at 59.  *See* Defendants' Exhibit 26.  Mellen testified that she had planned to attend those meetings, even after she received the October 24 letter.  Mellen Day 2 Tr. at 59-60.**

106. For example, although Snowden [sic] denies that he consulted with Dean Meenan at any time about terminating Mellen, Snowden 22, 16 - 20, 9, Meenan concedes that he and Snowden discussed the decision to terminate Mellen on two or three occasions. Meenan 16, 5 -16.

**Response:  Disputed.  Snowdon testified that he does not believe he spoke with Dean Meenan directly, but does recall confirming with Drolette that she had spoken with Dean**

**Meenan about the decision to accept Mellen's resignation.  Snowdon Tr. at 22-23.  Meenan**

**testified that the "believe[d]" that he spoke with Snowdon directly, but "honestly can't be**

**sure" how many conversations he may have had.  Meenan Tr. at 16.**

107. The discussions between Meenan and Snowden related to Mellen's family leave, her return-to-work date, and "what the University's options were under different scenarios." Meenan 16, 23 - 17, 4; and 17, 18 - 18, 13.

**Response:  Undisputed.  Meenan testified that he recalled discussions concerning "a**

**holiday and whether that added another day on," and "to identify specifically what her**

**return to work day was, from the University's perspective."  Meenan Tr. at 17-18.**

108. Meenan was "concerned" when he spoke with Snowden [sic] regarding Mellen's employment about "the professionalism of the communications that Linda had had with us regarding when she was going to be away, when she was coming back, etc."  Meenan 19, 3 - 7.

**Response:  Undisputed.**

109. Meenan was also "concerned" that Linda had not been clear "what might be accomplished while she was out [on family leave]."  Meenan 19, 10 - 18.

**Response:  Disputed.  Meenan was concerned about "what would be accomplished**

**prior to her going out."  Meenan Tr. at 19.  He understood "there was a description of**

**work to be done or a matrix of some processes that [Mellen] had indicated she would**

**complete before going on medical leave and then indicated she would send in shortly after.**

**. . .  We were not requesting her to do work while she was on family medical leave."**

**Meenan Tr. at 55.  *See also* Complaint ¶ 21 ("Plaintiff also told colleagues that she would**

**make herself available to address emergencies that might develop during her family**

**leave.")**

110. Drolette, like Meenan, was also concerned regarding the work that Mellen was supposed to accomplish during her family leave. Meenan 21, 6 -12. *See also* Snowden 122, 3 - 8 (Drolette reported to Snowden [sic] that she (Drolette) was expecting Mellen to submit certain work to Drolette within one week following the start of Mellen's family leave). *See also* Snowden 128, 1 - 5 (Drolette reported to Snowden [sic] that Mellen had not been available for a work conference call during her family leave). *See also* Drolette 241, 3 - 21 (Drolette issued her disciplinary letter of reprimand to Mellen in October 2003 in part because of "the things that [Mellen] didn't do during the leave").

**Response:  Disputed.  When Mellen requested FMLA leave, Drolette made clear that Mellen's top priority before taking leave was to put together a list of tasks and ongoing projects for which Mellen was responsible so that others in the office could handle matters in Mellen's absence, and Mellen agreed to provide the list.  Mellen Day 1 Tr. at 185-86. Mellen had not put together the task list by her last work day, July 31, but promised by e-mail to provide that information over the weekend.  Mellen Day 1 Tr. at 204-05.  Mellen never provided the list.  Mellen Day 2 Tr. at 20, 52-53.  Similarly, Mr. Snowdon testified that he did not understand Drolette to be dissatisfied that Mellen was out on leave, but she was dissatisfied that Mellen did not "hav[e] things in place before she went on leave." Snowdon Tr. at 121.  He further testified that he "wasn't aware of any expectations that [Drolette] had for [Mellen] while on leave but [he] did understand that there were loose ends when she left on leave."  Snowdon Tr. at 121.  *See also* Meenan Tr. at 55 ("My understanding is that there was a description of work to be done or a matrix of some processes that [Mellen] had indicated she would complete before going on medical leave and then indicated she would send in shortly after. . . .  We were not requesting her to do**

work while she was on family medical leave.")  When Mellen failed to complete the project

list as she had said she would do, Drolette sent an e-mail requesting a short conference call

to clarify some outstanding issues.  Mellen declined to participate.  *See* Defendants' Exhibit

29.  *See also* Complaint ¶ 21 ("Plaintiff also told colleagues that she would make herself

available to address emergencies that might develop during her family leave.")

111. In or about mid-September 2003, Snowden [sic] told Drolette that he would check

with the University's Office of General Counsel to find out how long defendants needed to keep

Mellen in her position following her return from family leave. Snowden 127, 14 - 128, 17; and

131, 20 - 133, 21.

**Response:  Disputed.  Snowdon conferred with the Office of the General Counsel to**

**determine "what would be a reasonable amount of time upon [Mellen's] return to then**

**evaluate her performance in the job."  Snowdon Tr. at 132-33.**

112. As with Meenan's contradiction of Snowden [sic] regarding their discussing

Mellen's employment, *see* Statement No. 106 infra, Meenan's testimony that BU President

Chobanian was not "at all" involved in the process leading up to Mellen's termination, Meenan

38, 17 - 22; and 40, 2 - 5, is contradicted by Drolette, who obtained Chobanian's approval of her

strategy regarding Mellen. Snowden 127, 19 - 23.

**Response:  Disputed.  Drolette did not speak with then-President Chobanian about**

**the situation with Mellen.  Drolette Tr. at 124.  Dean Meenan spoke with Dr. Chobanian to**

**"inform him that we were having employment issues with [Mellen]."  Meenan Tr. at 49-50.**

**Dean Meenan had that conversation with Dr. Chobanian "primarily as a courtesy" because**

**Dr. Chobanian had worked with Mellen in the past.  *Id.***

## IX.    DEFENDANTS DISAGREE AMONG THEMSELVES AS TO WHO TERMINATED MELLEN

113. Snowden [sic] denies that he initiated the decision to terminate Mellen, see Tab 3, Snowden 18, 18 - 21, and denies making the final decision to terminate her. Snowden 19, 5 - 6.

**Response:  Disputed.  The November 20 letter explains that Mellen's failure to return to work as scheduled on November 19 "constitutes a voluntary resignation from the University."  Plaintiff's Tab 4.  It is undisputed that Snowdon did not initiate the decision to accept Mellen's resignation.  Dean Meenan and Drolette conferred about that decision after seeking Snowdon's guidance.  Drolette Tr. at 28-30, 35-36; Meenan Tr. at 16-71, 34-35.**

114. Snowden [sic] claims that Drolette made the decision to terminate Mellen. Snowden 19, 5 -11.

**Response:  Disputed.  Snowdon testified that he "believe[d]" that it was Drolette who initiated the decision to accept Mellen's resignation and made the final decision.  Snowdon Tr. at 19.**

115. On her part, Drolette acknowledges that her involvement in terminating Mellen began either on November 19th or 20th. Drolette 22, 5 - 21; and 105, 19 - 22.

**Response:  Disputed.  The November 20 letter explains that Mellen's failure to return to work as scheduled on November 19 "constitutes a voluntary resignation from the University."  Plaintiff's Tab 4.  It is undisputed that Drolette was involved in the decision to accept Mellen's resignation, and that she conferred with both Snowdon and Dean Meenan before deciding to do so.  Drolette Tr. at 22, 28-30, 35-36.**

Footnote 11:  Snowden's notes indicate that Drolette was involved in Mellen's termination on November 19th. Snowden 136, 16 -138, 6.

**Response:  Disputed.  The November 20 letter explains that Mellen's failure to return to work as scheduled on November 19 "constitutes a voluntary resignation from the University."  Plaintiff's Tab 4.  Snowdon's notes indicate that on November 19 Drolette reported to Snowdon that Mellen had not reported for work that day, and conferred with Snowdon about an appropriate response.  Snowdon Tr. at 136-138.  It is undisputed that Drolette was involved in the decision to accept Mellen's resignation on November 20.**

116. Drolette indicates that Meenan made the decision to terminate Mellen. Drolette 35, 18 - 36, 5.

**Response:  Undisputed.  Drolette conferred with Meenan about the decision to accept Mellen's resignation and recalled that he had "strong feelings" to accept the resignation.  Drolette Tr. at 35-36.**

117. Meenan admits that his primary source of information regarding Mellen was Drolette. Meenan 20, 9 - 21, 5.

**Response:  Disputed.  Meenan had the opportunity to evaluate Mellen's performance (although not by way of formal performance reviews) from 1998 – 2003, including attending meetings and budget presentations.  Meenan was clear that he "was able to form an opinion of her performance in those tasks."  Meenan Tr. at 25.  Meenan testified at length about his own concerns "setting aside . . . what Frances Drolette informed [him] about [Mellen's] work performance," including his concerns about whether Mellen "would be able to perform as Financial Manager for a larger and more complex organization, specifically around new budget models that [they] were creating for the school."  Meenan Tr. at 22-23.  The School's budget "went from fifteen million dollars to almost fifty million dollars."  Id. at 24.  He was also concerned "about the arrangement for**

[Mellen] to work at home a day a week . . . and whether that arrangement was appropriate, in general, given [Mellen's] responsibilities and then the interactions of the entire staff." *Id.* at 22-23.

118. Although Meenan states that he terminated Mellen, Meenan 36, 4 - 7 and 11 - 15, he at the same time, concedes that he generally "[had] little active role in [non-faculty] employees and with staff," like Mellen. Meenan 11, 21 - 12, 10.

**Response:  Disputed.  Meenan testified that he made the decision "to hold that Linda Mellen had resigned."  Meenan Tr. at 36.  He explained that he is "occasionally involved" in decisions "to terminate or to conclude the employment of non-faculty members," "depending on the status of the employee and, perhaps, the issues involved." Meenan Tr. at 36-37.**

119. Meenan cannot recall when, prior to Mellen's termination in November 2003, he had been involved in the decision to terminate or to otherwise conclude the employment of a non-faculty SPH employee. Meenan 37, 1 - 10.

**Response:  Undisputed.**

120. Meenan is unable to identify any other SPH employee in good standing who was held to have resigned because the employee missed one day of work. Meenan 33, 21 - 34, 17; Meenan 36, 16 - 24.

**Response:  Disputed.  Meenan testified repeatedly that he could not recall a situation with facts similar to Mellen's, particularly where there was "substantial correspondence with [Mellen] around her correct day of return to work."  Meenan Tr. at 34.**

121. Meenan had no training regarding the rights and obligations created by the FMLA, Meenan 21, 19 - 22, or by the SNLA, Meenan 21, 23 - 22, 2; nor did Drolette. Drolette 156, 23 - 157, 14. *See also* Statement Nos. 164-165, 167-169 *infra* (Snowden had minimal FMLA/SNLA training).

   **Response:  Undisputed.**

122. Snowden [sic] cannot recall any employee similarly situated to Mellen *(i.e.*, more than 10 years at BU, without any job deficiency or attendance issues) ever being terminated for missing one day of work. Snowden 27, 14 - 21; Snowden 60, 10 - 15.

   **Response:  Disputed.  Page 27 of Mr. Snowdon's deposition does not address the issue described in Paragraph 122.  Mr. Snowdon testified that he could not recall whether he had ever "been involved in a termination of a BU employee who had an unblemished, long-term tenure at BU because that employee missed one day of work."  Snowdon Tr. at 60.**

123. Drolette acknowledged that Mellen was the only employee she ever involuntarily "resigned". Drolette 101, 15 - 24; Drolette 14, 17 - 16, 6.

   **Response:  Disputed.  Drolette testified that Mellen is the only employee who resigned during Drolette's tenure at the University.  Drolette Tr. at 101.  Two individuals did retire during her tenure, and she accepted notices of retirement from those individuals.  Drolette Tr. at 16.**

124. Drolette, further, acknowledged that Mellen is the only employee she knows who was held to have "resigned" because she did not appear for work on the day she was expected to return after a period of leave. Drolette 129, 18 - 130. 4.

**Response: Disputed. At the pages referenced, Drolette testified that she did not "have any experience at the School of Public Health determining that an employee had resigned because that employee did not appear for work on the day that employee was expected to return to work." Drolette Tr. at 129-30.**

## X. DEFENDANTS' CONDUCT AFTER THEY TERMINATED MELLEN

125. By letter dated and faxed to defendants on November 20, 2003, Mellen - through counsel - formally objected to and opposed defendants' harassment and retaliation because of her use of family leave. In the letter, Mellen represented that she was willing and able to return to work. *See* Complaint and Amended Answer, para. 39. *See also* Tab 15, Beach letter of November 20, 2003.

**Response: Disputed. The letter of November 20, Plaintiff's Tab 15, speaks for itself. Defendants' dispute Plaintiff's characterization that the letter "objected to and opposed defendants' harassment and retaliation because of her use of family leave." Mellen's own letter of November 19, Plaintiff's Tab 16, confirmed that Mellen did not plan to return to work at the University.**

126. The letter of November 20th, Tab 15 *infra*, enclosed a letter dated November 19, 2003, by which Mellen communicated her concern to defendants that Drolette's "threatening" letter of reprimand, *see* Statement No. 90 *infra*, rendered plaintiff's job at BU "unsafe". *See* Complaint and Amended Answer, para. 37. *See also* Tab 16, Mellen letter dated November 19, 2003.

**Response: Disputed. The letter of November 19, Plaintiff's Tab 16, speaks for itself. In that letter, Mellen confirmed that she did not plan to return to work at the University.**

127. Drolette received the two letters referenced immediately above, Tabs 15 and 16 *infra, after* she posted her termination letter. Drolette 129, 9 - 17.

**Response:  Undisputed.**

128. Following Drolette's termination of Mellen, Snowden [sic] initiated an investigation of Mellen, specifically, her alleged accessing five years earlier of BU's internal information system. Snowden 142, 20 -144, 19.

**Response:  Disputed.  Snowdon contacted an individual at the BU Office of Financial Affairs, the University office for which Mellen worked before she transferred to SPH, "regarding the circumstances of [Mellen's] departure from the Office of Financial Affairs to the School of Public Health."  Snowdon Tr. at 140.**

129. Although BU determined that Mellen had not engaged in misconduct regarding BU's information system, it defended its post-termination investigation of Mellen as an effort "to set the context of Ms. Mellen's experience with the University." Snowden 143, 7 -144, 10.

**Response:  Disputed.  Snowdon did not characterize his conversation as an "investigation," and he was not able to determine whether or not Mellen had engaged in misconduct.  Snowdon Tr. at 144.  Snowdon explained that he initiated the inquiry because he was "seeking context regarding [Mellen's] earlier experiences in the Office of Financial Affairs" and "to set the context of Ms. Mellen's experience with the University."  *Id.***

Footnote 12 :  At times, defendants' explanations suggest a certain discomfort with direct factual responses. *See e.g.* footnote 4 *infra,* where Drolette explained that "stylistically" she did not think it appropriate that she instruct Mellen to attend training courses.

**Response:  Disputed.**

130. When BU terminated Mellen, it paid her the cash value of 50 days of accrued vacation leave, although Mellen had "significantly" more than 50 days of accrued vacation leave in her account. Drolette 102, 1 - 14; Drolette 121, 15 - 23.

**Response:  Disputed.  The November 20 letter explains that Mellen's failure to return to work as scheduled on November 19 "constitutes a voluntary resignation from the University."  Plaintiff's Tab 4.  It is undisputed that the University paid Mellen the cash value of 50 days of accrued vacation time.  *Id.* ("Enclosed with this letter is your final paycheck, which includes salary through November 18, 2003, as well as payment for 50 accrued but unused vacation days.")  The Personnel Policy Manual specifies that University employees "will be compensated for unused Vacation Leave at the time their employment with Boston University terminates, up to a maximum of the number of days that they would accrue over a two (2) year period."  Plaintiff's Exhibit 17 at § 301.5.  *See* Drolette Tr. at 102 (explaining that Mellen's "vacation time exceeded the University policy so the fifty days was the max").  *See also* Mellen Day 2 Tr. at 70 (admitting that she had no reason to dispute the amount of the check).**

131. Drolette was responsible for instructing Snowden [sic] how much to pay Mellen in accrued vacation time.  Drolette 103, 5 - 104, 20.

**Response:  Disputed.  Drolette instructed the Payroll Department within her office to calculate the cash value of that portion of Mellen's vacation leave for which she would receive payment.  Drolette Tr. at 103-04.**

132. With respect to Mellen, Drolette contends that she applied a University policy that capped the cash value payout of accrued vacation leave at 50 days. Drolette 121, 24 - 122, 5.

**Response:  Undisputed.**

133. However, other departing employees who had not been on family leave enjoyed a cash payout of their vacation leave up to approximately 150 days. *See* Tab 8, Knecht 15, 4 -10.

**Response:  Disputed.  The University's arrangement with Knecht is not material to Mellen's vacation accrual.  As Knecht explained, she obtained approval from George Snowdon for the atypical arrangement.  Knecht Tr. at 15.**

## XI.    DEFENDANTS APPLIED UNIVERSITY LEAVE POLICY TO DISADVANTAGE AND RETALIATE AGAINST MELLEN BECAUSE OF HER FAMILY LEAVE

134. BU's Personnel Policy Manual ("Manual") states the rules that governed Mellen's employment in 2003. Snowden 16, 16 -17, 11. *See also* Tab 17, BU's Personnel Policy Manual.

**Response:  Disputed.  The Manual provides "policies that are to be administered in a consistent manner by supervisory personnel," "do not constitute an employment contract" and "may be modified, revoked, or changed at any time by the University with or without notice."  Plaintiff's Exhibit 17 at p. 3.**

135. Drolette and BU's personnel office were obligated to follow the Manual in their management of Mellen. Snowden 17, 12 - 24; and 18. 1 - 3; Drolette 131, 1 - 5; and 134, 12 - 24.

**Response:  Disputed.  While the Manual is not a contract, supervisors are expected to administer the policies set forth in the Manual.  Plaintiff's Exhibit 17 at p. 3.**

### A.    3 Day Grace Period

136. The Manual affords an employee three consecutive unexcused absences before BU construes such absences as a resignation. Snowden 38, 4 - 22. *See also* Tab 17, Manual § 202.1.

**Response:  Disputed.  Section 202 addresses "Attendance" and Section 202.1 ("Absences from Work") specifies that "[i]f an employee is absent from work for three (3) consecutive scheduled workdays and has not notified his or her supervisor of the unscheduled absence, the employee will be considered to have resigned voluntarily from**

**the University." As George Snowdon explained, Section 202.1 does not apply to individuals on FMLA leave.** *Accord* **Knecht Tr. at 39-40 ("I think in the cases that we were talking about now, when a person would not be able to come back after the leave, I'm not so sure that I would not refer mentally so much to the three days because that seems to me are the cases where there had been performance problems and they had missed work or what have you."); Mellen Day 1 Tr. at 201, 216-17 (admitting that she could not recall any individual who was given an additional three days leave under FMLA because of the "3-day grace period"). Snowdon's letter of July 31, 2003 (Defendant's Exhibit 3) and Section 312.7 of the Personnel Manual (Plaintiff's Exhibit 17) specify that an employee who does not return to work on the expected return date after FMLA leave will be considered to have resigned voluntarily from the University.**

137. Since the early 1980's SPH had a practice of affording employees who did not return to work on their first expected return-to-work date a measure a "flexibility," which ordinarily included the SPH supervisor's opening up a dialogue with the absent employee as to whether they needed additional leave. Knecht 32, 22 - 38, 21.

**Response: Disputed. Ms. Knecht was not a University employee at the time the University accepted Mellen's resignation.** *See supra* **¶¶ 22-23. While she was employed with the University, Ms. Knecht deferred to George Snowdon, Office of Personnel, on matters concerning the University's personnel policies. Knecht Tr. at 63-64. Ms. Knecht testified that she "work[ed] within the University guidelines and policies" to provide "some flexibility to [employees'] personal lives." Knecht Tr. at 41.**

138. The purpose of this practice is to encourage "employees with good records of work - our goal was to work within the University guidelines and policies and provide, at the same time,

some flexibility to their personal lives so they could . . . so that they could continue to . . . be happy at the school and be productive." Knecht 41, 5 - 21.

**Response:  The University does not dispute that Ms. Knecht testified as specified. However, Ms. Knecht was not a University employee at the time the University accepted Mellen's resignation.  *See supra* ¶¶ 22-23.   While she was employed with the University, Ms. Knecht deferred to George Snowdon, Office of Personnel, on matters concerning the University's personnel policies.  Knecht Tr. at 63-64.**

139. This policy reflects one of BU's personnel values. Knecht 41, 22 - 42, 1.

**Response:  Disputed as characterized.  The policy speaks for itself.  Ms. Knecht was not a University employee at the time the University accepted Ms. Mellen's resignation. *See supra* ¶¶ 22-23.**

140. BU did not afford Mellen the benefit of its 3 day grace period with respect to her absence on November 19, 2003.  Snowden 60, 9 -15. See also Statement No. 96 *infra* (defendants did not even inquire as to why Mellen was absent on November 19th).

**Response:  Undisputed.**

141. The fact that Mellen was on family leave prior to her absence on November 19th served as BU's reason for not permitting her the benefit of the 3 day grace period provided in section 202.1. Snowden 39, 15 - 42, 12.

**Response:  Disputed.  As Mr. Snowdon explained, Section 202.1 does not apply to individuals who are on FMLA leave.  Snowdon Tr. at 41.**

**B.    Sick Leave**

142. Mellen had a high number of sick leave days accrued to her in late 2003. Snowden 50, 16 - 51, 5; Drolette 133, 22 -134, 22 (approximately 125 days).

**Response:  Undisputed.**

143. The Manual permits employees to use their sick leave, *inter alia,* to care for an ill family member living in the same household. Snowden 48, 16 - 49, 3. *See also* Tab 17, Manual § 302.1.

**Response:  Undisputed.**

144. The fact that Mellen was on family leave prior to her absence on November 19th served as BU's reason for not permitting her to use her accrued sick leave benefits. Snowden 51, 6 - 53, 24.

**Response:  Disputed.  Snowdon explained that although Mellen could not use accrued sick days to continue her leave, "[o]ur Policy Manual provides for an employee to request a continued leave of absence once the Family Medical Leave Act runs out.  Given that scenario, it would have been appropriate for [Mellen] to have requested continued leave."  Snowdon Tr. at 51.**

### C.     Vacation Leave

145. Mellen had a substantial number of vacation leave days accrued to her in late 2003. Snowden 54, 14 - 17. *See* also Drolette 132, 19 - 133, 9 (approximately 62.5 days).

**Response:  Disputed.  "Employees may accrue Vacation Leave to a maximum of the number of days that they would earn over a two (2) year period of employment at their current accrual rate."  Personnel Policy Manual, Plaintiff's Exhibit 17, at § 301.4.  Mellen had more than 50 days' Vacation Leave "on the books," but that Vacation Leave had not "accrued."  *See* Drolette Tr. at 102 (explaining that Mellen's "vacation time exceeded the University policy so the fifty days was the max").**

146. The Manual allows employees to use accrued vacation time to care for ill relatives. See Tab 17, Manual s. 302.6 (employees who exhaust their sick leave, *see* Statement No. 143 *infra,* may have additional absences charged to their vacation leave).

**Response:  Undisputed.  Section 302.6 of the Manual specifies that "[e]mployees who exhaust their accrued Sick Leave may request that additional absences that would normally be taken as Sick Leave be charged to their accrued Vacation Leave, available Personal Days or available Compensatory Time Off."  Plaintiff's Exhibit 17 at p. 35.**

147. BU did not permit Mellen to use her accrued vacation leave on November 19th because – according to BU – Mellen did not ask to use her vacation leave for that day, Snowden 55, 8-19, although BU acknowledges that it did not tell Mellen that she had to submit a such a request. *Id.*

**Response:  Disputed.  The Personnel Manual specifies that "[e]mployees must submit a written request to their immediate supervisor at least two (2) weeks in advance of the desired Vacation Leave.  The two (2) week requirement may be shortened in unusual situations."  Personnel Manual, § 301.6.  Ms. Mellen did not request to use her accrued vacation leave on November 19.  Snowdon Tr. at 55; Mellen Day 1 Tr. at 197, 203.  *See also* Snowdon Tr. at 56 ("It's my opinion that if Ms. Mellen had requested additional time off or requested to use the vacation time that there would have been a different analysis regarding her continued status at the University.").**

### D.     Unpaid Time Off

148. BU provides an unpaid time off benefit to its employees, which employees may use for personal or medical reasons.  *See* Tab 17, Manual § 313.1.

**Response: Undisputed. Mellen did not request unpaid time off. Mellen Day 1 Tr. at 197, 203.**

149. BU is unable to explain why it denied Mellen its "unpaid time off" benefit with respect to her absence on November 19th. Snowden 57, 16-19.

**Response: Disputed. As Mr. Snowdon testified repeatedly, the University was not aware that Mellen needed leave beyond her approved leave through November 19. Snowdon Tr. at 52, 55, 58, 59, 155.**

150. Drolette did not inquire of Mellen whether she needed unpaid time off for November 19th. Drolette 139, 2-6.

**Response: Undisputed.**

**E.    Leaves of Absence**

151. BU affords it employees a medical leave of absence benefit, which employees may use to cover absences due to medical reasons. *See* Tab 17, Manual § 314.1.

**Response: Undisputed. The leave must be "authorized" and may be granted "after an employee has exhausted his or her Vacation Leave, Sick Leave, available Personal Days, and available Compensatory Time Off." Plaintiff's Exhibit 17, § 314.1.**

152. BU is unable to explain why it denied Mellen its medical leave of absence benefit with respect to her absence on November 19th. Snowden 57, 20 – 58, 9; Drolette 139,15-140, 20.

**Response: Disputed. *See* Snowdon Tr. at 58 ("I'm not aware that at the time we had any indication that continued leave was necessary.") *See also* Drolette Tr. at 140 ("Perhaps because they were not requested.")**

153. BU affords its employees a personal leave of absence benefit, which employees may use to cover absences due to personal reasons. *See* Tab 17, Manual § 315.1.

**Response:  Undisputed.  The leave must be "authorized" and "may be granted after an employee has exhausted his or her Vacation Leave, available Personal Days, and available Compensatory Time Off."  Plaintiff's Exhibit 17, § 315.1.**

154. BU is unable to explain why it denied Mellen its personal leave of absence benefit with respect to her absence on November 19th. Snowden 58, 20 - 59, 8; Drolette 139, 15 - 140, 20.

**Response:  Disputed.  *See* Snowdon Tr. at 58 ("I'm not aware that at the time we had any indication that continued leave was necessary.")  *See also* Drolette Tr. at 140 ("Perhaps because they were not requested.")**

F.    Holidays

155. BU's Personnel Policy Manual provides that employees are entitled to holiday leave if they are on authorized leave immediately before the holiday. Snowden 48, 6 - 15. *See also* Tab 17, Manual s. 308.

**Response:  Disputed.  The Personnel Policy Manual provides that "[e]mployees who are on an authorized paid absence (e.g., Sick Leave and Vacation Leave) for the last scheduled workday preceding a holiday observance and first scheduled workday following the holiday observance will be eligible for Holiday Leave on the day of the observance."  Plaintiff's Exhibit 17 at p. 46, § 308.8.  Holidays do not serve to extend FMLA leave.  29 C.F.R. § 825.200(f) ("For purposes of determining the amount of leave used by an employee, the fact that a holiday may occur within the week taken as FMLA leave has no effect; the week is counted as a week of FMLA leave.").  Section 308 of the Personnel Policy Manual cross-references the relevant "Related Policies," and does not reference the policy concerning Family Medical Leave (Section 312).  Plaintiff's Exhibit 17 at p. 45.**

156. Mellen was on authorized leave before 2003's Labor, Columbus, Veterans', and Daniel J. Goldin holidays. Drolette 144, 14 - 22.

**Response:  Undisputed.**

Footnote 13:  "Daniel J. Goldin Day" was a University holiday observed on November 17, 2003, Drolette 142, 14 - 143, 6, notwithstanding that by then BU had terminated Dr. Goldin before he assumed the position for which he was hired.

**Response:  Undisputed.**

157. With respect to employees out on family leave, however, BU claims to have an unwritten policy that University holidays do not work to extend an employee's family leave. Snowden 83, 10 - 84, 11.

**Response:  Disputed.  The University's policy follows the law.  As Mr. Snowdon testified, "under BU policy, University holidays do not extend an employee's family leave." Snowdon Tr. at 83.  The University does make an exception to that rule for Intersession, the week-long break between Christmas Day and New Year's Day, which is viewed as a "shut down" *id.*, as required by 29 C.F.R. § 825.200(f) ("For purposes of determining the amount of leave used by an employee, the fact that a holiday may occur within the week taken as FMLA leave has no effect;  the week is counted as a week of FMLA leave. However, if for some reason the employer's business activity has temporarily ceased and employees generally are not expected to report for work for one or more weeks (*e.g.,* a school closing two weeks for the Christmas/New Year holiday or the summer vacation or an employer closing the plant for retooling or repairs), the days the employer's activities have ceased do not count against the employee's FMLA leave entitlement.")**

158. BU's "no holidays for employees out on family leave" policy is not contained in the Manual and is not otherwise published or disseminated to BU's employees. Snowden 84, 12 - 85, 1.

**Response:  The July 31, 2003 letter confirmed that leave was approved only through November 18, 2003, from which Mellen could infer that holidays that occurred within a week taken as FMLA leave counted toward the FMLA leave period.  *See* Snowdon Tr. at 63 ("I believe in the confirming letter that we sent to Ms. Mellen approving her leave, we outlined that the time that the leave had been approved.")  Further, Drolette wrote to Mellen on October 29, 2003 and explained that "I have been advised by the Office of Personnel that, pursuant to FMLA regulations and University policy, the fact that a holiday falls within a block of time taken as FMLA does <u>not</u> serve to extend an employee's allowed FMLA leave." Defendants' Exhibit 6 (emphasis in original).**

159. Snowden [sic] never discussed this unwritten "no holidays" policy with Mellen either prior or during her family leave. Snowden 85, 2 - 5. *See* Tab 7, Mellen Affidavit, para. 15 (Mellen never heard of such a policy).

**Response:  The July 31, 2003 letter confirmed that leave was approved only through November 18, 2003, from which Mellen could infer that holidays that occurred within a week taken as FMLA leave counted toward the FMLA leave period.  *See* Snowdon Tr. at 63 ("I believe in the confirming letter that we sent to Ms. Mellen approving her leave, we outlined that the time that the leave had been approved.")  Further, Drolette wrote to Mellen on October 29, 2003 and explained that "I have been advised by the Office of Personnel that, pursuant to FMLA regulations and University policy, the fact that a holiday falls within a block of time taken as FMLA does <u>not</u> serve to extend an employee's allowed FMLA leave."  Defendants' Exhibit 6 (emphasis in original).**

160. BU did not notify Mellen that Labor Day, Columbus Day, and Veterans' Day would count as part of her family leave. Snowden 63, 19 - 64 - 6; Drolette 145, 6 -19 (Drolette did not give Mellen such notice either).

**Response:  Disputed.  The July 31, 2003 letter confirmed that leave was approved only through November 18, 2003, from which Mellen could infer that holidays that occurred within a week taken as FMLA leave counted toward the FMLA leave period.  *See* Snowdon Tr. at 63 ("I believe in the confirming letter that we sent to Ms. Mellen approving her leave, we outlined that the time that the leave had been approved.")  Further, Drolette wrote to Mellen on October 29, 2003 and explained that "I have been advised by the Office of Personnel that, pursuant to FMLA regulations and University policy, the fact that a holiday falls within a block of time taken as FMLA does <u>not</u> serve to extend an employee's allowed FMLA leave."  Defendants' Exhibit 6 (emphasis in original).**

161. BU's published family leave policy does not count holidays against an employee's family leave entitlement. Snowden 64, 7 - 65, 7. *See also* Tab 17, Manual § 312.5.

**Response:  Disputed.  As Mr. Snowdon testified, "under BU policy, University holidays do not extend an employee's family leave."  Snowdon Tr. at 83.  The University does make an exception to that rule for Intersession, the week-long break between Christmas Day and New Year's Day, which is viewed as a "shut down" *id.*, as required by 29 C.F.R. § 825.200(f) ("For purposes of determining the amount of leave used by an employee, the fact that a holiday may occur within the week taken as FMLA leave has no effect;  the week is counted as a week of FMLA leave.  However, if for some reason the employer's business activity has temporarily ceased and employees generally are not expected to report for work for one or more weeks (*e.g.,* a school closing two weeks for the**

Christmas/New Year holiday or the summer vacation or an employer closing the plant for retooling or repairs), the days the employer's activities have ceased do not count against the employee's FMLA leave entitlement.")

Footnote 14:  An employer who wants paid leave taken under an existing leave plan - here, BU's holiday leave - to be counted as FMLA leave must make the designation and give notice  to the employee before the employee's FMLA leave begins. *See* 29 CFR 825.208(c). *See also Nusbaum v. CB Richard Ellis, Inc.,* 171 F.Supp.2d 377, 385-386 (D.N.J. 2001).

**Response:  The University's inclusion of holidays in determining the amount of leave used by an employee is not a matter of an employer requiring paid leave to be taken under an existing leave plan; it is simply the application of clear law.  29 C.F.R. § 825.200(f) ("For purposes of determining the amount of leave used by an employee, the fact that a holiday may occur within the week taken as FMLA leave has no effect; the week is counted as a week of FMLA leave.").  Even if Plaintiff were correct, however, the University unequivocally gave Mellen notice that her approved FMLA leave included those holidays that fell within the duration of her approved leave.  Defendants' Exhibit 3.  Moreover, Drolette wrote to Mellen on October 29 and explained specifically that "the fact that a holiday falls within a block of time taken as FMLA does <u>not</u> serve to extend an employee's allowed FMLA leave."  Defendants' Exhibit 6 (emphasis in original).**

162: Nothing in BU's notice of July 31, 2003, *see* Tab 10 *infra,* provided that holidays would be counted against Mellen's family leave entitlement. Snowden 65, 8 - 69, 8.

**Response:  Disputed.  The July 31, 2003 letter confirmed that leave was approved only through November 18, 2003, from which Mellen could infer that holidays that**

occurred within a week taken as FMLA leave counted toward the FMLA leave period.  *See* **Snowdon Tr. at 63 ("I believe in the confirming letter that we sent to Ms. Mellen approving her leave, we outlined that the time that the leave had been approved.")  Further, Drolette wrote to Mellen on October 29, 2003 and explained that "I have been advised by the Office of Personnel that, pursuant to FMLA regulations and University policy, the fact that a holiday falls within a block of time taken as FMLA does <u>not</u> serve to extend an employee's allowed FMLA leave."  Defendants' Exhibit 6 (emphasis in original).**

163. Drolette defends her failure to notify Mellen of this unwritten, non-disseminated "no holidays for employees on family leave" policy by stating that she did not regard family leave as "a key benefit" at BU. Drolette 143, 12 - 24.

**Response:  Disputed.  Drolette wrote to Mellen on October 29, 2003 and explained that "I have been advised by the Office of Personnel that, pursuant to FMLA regulations and University policy, the fact that a holiday falls within a block of time taken as FMLA does <u>not</u> serve to extend an employee's allowed FMLA leave."  Defendants' Exhibit 6 (emphasis in original).**

## XII.    DEFENDANTS WILLFULLY OR WITH RECKLESS INDIFFERENCE IGNORED THE OBLIGATIONS OF THE FMLA/SNLA

164. Snowden [sic] may have attended a brief workshop regarding the FMLA after the statute was enacted in 1992. Snowden 14, 15 - 15, 5.

**Response:  Disputed.  Snowdon had training with respect to the FMLA in the form of an internal workshop.  Snowdon Tr. at 15.**

165. Snowden [sic] was not trained in the Federal regulations that implement the FMLA. Snowden 15, 6 -13.

**Response: Disputed. Snowdon had training with respect to the FMLA in the form of an internal workshop. Snowdon Tr. at 15.**

166. Although BU claimed with respect to Mellen that it did no more than apply its policy that limited family leave to 12 weeks, in the case of at least one employee the following year BU permitted the employee to use in a one year span 14 -15 weeks of paid leave to care for an ill family member and then herself, and allowed her to work part-time for an additional 8-10 weeks for the same reasons. *See* Tab 19, Deposition of Eileen Dennis, p. 13, line 12 - p. 31, line 21.

**Response: Disputed. Ms. Dennis' son was critically ill in January 2004, and she requested and was approved to take 2-3 weeks' paid leave to care for her son. Dennis Tr. at 14-15. Despite her son's condition, she remained in contact with her supervisors and colleagues "almost on a daily basis." *Id.* at 35-36. After her son was released from the hospital, she requested and received approval to work part-time so that she could be with her son while he went through rehabilitation. *Id.* at 17-19. She worked part-time for less than a month. *Id.* at 18.**

**Ms. Dennis herself became critically ill in September of 2004, and took leave pursuant to the FMLA. Dennis Tr. at 19-20. The University sent Dennis a letter approving her leave and notifying her of her return date, November 29. Dennis Tr. at 20, 38. Dennis returned to work on November 29, as scheduled, but on a part-time basis as required by her doctors. *Id.* at 30-31. Although Ms. Dennis was in a coma for some time, her sister maintained communications with the University, and Ms. Dennis communicated with the University directly when she was able. *Id.* at 37-38. When she learned that she was**

required to return to work on November 29 (after her 12 weeks of FMLA had been taken), "that's when we had to work out something for me to go ahead and come back." *Id.* at 38.

In stark contrast, Mellen never told anyone at the University that she needed leave beyond November 18. Mellen Day 1 Tr. at 197, 203. The University sent Mellen two letters in October explaining that she was required to return to work on November 19, Defendants' Exhibits 6 and 11, and Mellen understood that she was expected to return on November 19. Mellen Day 2 Tr. at 55. Nevertheless, she simply did not return to work on November 19 or November 20. Mellen Day 2 Tr. at 68. Instead, she wrote a letter on November 19 explaining that she would not return to work because she had concluded that it was "unsafe." Defendants' Exhibit 25.

167. Snowden [sic] had no SNLA training, but did receive some information regarding it. Snowden 15, 14 - 22.

**Response: Undisputed.**

168. Snowden [sic] was not trained in the SNLA regulations. Snowden 15, 23 - 16, 4.

**Response: Undisputed. Snowdon did receive information from the Office of Human Resources concerning the SNLA when it became effective. Snowdon Tr. at 15.**

169. Snowden [sic] was not trained in the Massachusetts Attorney General's advisory opinions regarding the SNLA. Snowden 16, 5 - 7.

**Response: Undisputed. Snowdon did receive information from the Office of Human Resources concerning the SNLA when it became effective. Snowdon Tr. at 15.**

170. BU's Manual, Tab 17 *infra,* does not address the rights of employees under the SNLA. Snowden 66, 9 - 22.

**Response: Undisputed.**

171. BU also did not address the SNLA rights of its employees in any other University notice or posting. Snowden 66, 22 - 67, 11 (no public notices of employees' SNLA rights).

**Response: Paragraph 171 is disputed to the extent it implies that the SNLA requires notice or posting; the SNLA does *not* so require. The SNLA does not require notice or posting. Although the Secretary of Labor has promulgated regulations pursuant to 29 U.S.C. § 2654 describing specific notice requirements for the FMLA, 29 C.F.R. 825.301, those requirements are not set forth or even incorporated by reference in the SNLA. M.G.L. ch. 149, § 52D. Indeed, the Advisory from the Attorney General specifies that Sections 2611 through 2615 of the FMLA are explicitly incorporated by reference in the SNLA, but makes no reference to any FMLA regulations or to Section 2654. Advisory 98/1: An Advisory from the Attorney General's Fair Labor and Business Practices Division on An Act Providing Employees Leave for Certain Family Obligations. It is undisputed that the University did not make postings concerning the SNLA.**

Footnote 15: An employer may be equitably estopped from challenging an employee's eligibility to family leave when the employer has failed to inform its employees of the protections provided by the relevant statute, and what was required of the employees for them to qualify for those protections. *See Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 722-727 (2nd Cir. 2001).

**Response: Footnote 15 does not allege any undisputed facts. The *Kosakow* case addresses FMLA and not SNLA, which does not require notice or posting.**

172. BU did not take into account the SNLA in calculating Mellen's period of family leave in 2003, Snowden 67, 17 - 68, 8, and took no steps to assure itself that Mellen was afforded SNLA benefits. Snowden 68, 3 - 8.

**Response:  Disputed.  Mellen did not request SNLA leave, provide notice of taking SNLA leave, or otherwise give any indication that she needed an extension of her leave period.  Mellen Day 1 Tr. at 197; Mellen Day 2 Tr. at 55.  *See also* Snowdon Tr. at 155 ("I'm of the opinion that that leave would have needed to be requested.")**

173. The only reason that BU denied Mellen the benefits of SNLA leave is that, in its view, Mellen did not request such leave. Snowden 59, 16 - 60, 3; and 154, 21 -155, 3.

**Response:  Undisputed.  Mellen never applied for leave after she submitted her initial application for FMLA leave, Mellen Day 1 Tr. at 181-82, and never let anyone at the University know that she needed any additional time.  *Id.* at 197; Mellen Day 2 Tr. at 55. The SNLA requires employees to provide "not less than seven days' notice" of the need for leave where, as in Mellen's case, it is foreseeable.  M.G.L. ch. 149, § 52D(d).**

174. BU did not make any attempt after Mellen submitted medical certification in early August 2003, which indicated her intention to take family leave through November 20, 2003, to inquire whether her submission represented her request for SNLA leave. Snowden 73, 18 - 74, 4.

**Response:  Disputed.  The Certification of Health Care Provider submitted by Mellen on August 8, 2003 (after the duration of her leave had been approved) did not request an extension of her approved leave or additional leave of any kind (including leave under the SNLA).  Mellen testified that she does not know why she used the November 20 date, and does not know whether it was simply a mistake.  Mellen Day 1 Tr. at 202-03.  She never called anyone at the Office of Personnel to request additional days of leave.  *Id.*  On at least two occasions after Mellen's submission of the Certification, BU informed Mellen that she was expected to return to work on November 19.  *See* Defendants' Exhibits 6,**

October 29 letter from Drolette to Mellen ("I expect you back at work on Wednesday, November 19, 2003.") and 11, October 24, 2003 letter from Drolette to Mellen ("It is my current understanding that you will return to work on November 19, 2003.  If your plans change in this regard you must communicate that to me as soon as possible.").  Mellen understood that she was expected to return from work on November 19, 2003.  Mellen Day 2 Tr. at 55 ("Q: And so you understood, in addition to the other letters, that as a result of this letter, BU expected you back on November 19, 2003; is that right?  A:  Yes.").

Footnote 16:  In accordance with M.G.L. ch. 149, ss. 148, 150, and M.G.L. ch. 149, s. 52D(f), Mellen submitted an administrative complaint to the Massachusetts Attorney General regarding defendants' violation of SNLA, and the Attorney General subsequently issued a private right-to-sue letter. *See* Tab 21, Attorney General's Right to Sue letter.

**Response:  Undisputed.**

Respectfully submitted,

TRUSTEES OF BOSTON UNIVERSITY
AND FRANCES A. DROLETTE

By their attorney,


  /s/ Crystal D. Talley     
Lawrence S. Elswit, BBO # 153900
Crystal D. Talley, BBO # 633759
Boston University
Office of the General Counsel
125 Bay State Road
Boston, Massachusetts  02215
Dated:  October 14, 2005        (617) 353-2326