COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                          SUPERIOR COURT
                                                      C. A. No.

*******************************************

LINDA PIVACEK and
MARILYN LEAVY,
    Plaintiffs

02-2294 - C

vs.

TRUSTEES OF BOSTON UNIVERSITY and
    C. ROBERT VALERI, M.D.,
    Defendants

*******************************************

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

1. This is a civil action through which the plaintiffs Linda Pivacek and Marilyn Leavy seek redress for the discriminatory and tortious actions of their supervisor, Dr. C. Robert Valeri, and their employer, Boston University. Despite its knowledge of the individual defendant's threatening, abusive, discriminatory and other unlawful conduct, Boston University has continued to employ Valeri and has failed to take adequate steps to prevent his hostile and discriminatory conduct towards his employees or to remedy the hostile work environment which Valeri has created, and the resultant injuries to plaintiffs.

### PARTIES

2. Linda Pivacek is a woman of majority age residing in Nahant, Essex County, Massachusetts. Pivacek is a female whose date of birth is November 11, 1940. Pivacek is within the class of persons protected from age discrimination, sex discrimination and retaliation by M.G.L.

c. 151B. She has been employed by Boston University since on or about 1982.

3. Marilyn Leavy is a woman of majority age residing in Winthrop, Suffolk County, Massachusetts. As a female born on June 6, 1946, Leavy is within the class of persons protected from age discrimination, sex discrimination and retaliation by M.G.L. c. 151B. She has been employed by Boston University since on or about 1979.

4. Trustees of Boston University is the corporate entity of Boston University ("BU" or "university"), an institution of higher education whose principal place of business is in Boston, Suffolk County, Massachusetts. BU employs more than five persons and as such is an employer as defined by M.G.L. c. 151B.

5. C. Robert Valeri, M.D. is an individual of majority age residing in Marblehead, Essex County, Massachusetts. At all relevant times, Valeri was Director of the Naval Blood Research Laboratory ("NBRL") and was plaintiffs' direct supervisor.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

6. On or about December 3, 2001, plaintiff Linda Pivacek filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD"). A copy of plaintiff's charge is attached as Exhibit 1 and is herein incorporated by reference.

7. On or about December 3, 2001, plaintiff Marilyn Leavy filed a Charge of Discrimination with the MCAD. A copy of plaintiff's charge is attached as Exhibit 2 and is herein incorporated by reference.

8. On or about March 5, 2002, plaintiff Pivacek requested that the MCAD close her case in order that she might bring this civil action.

9. On or about March 5, 2002, plaintiff Leavy requested that the MCAD close her case in order that she might bring this civil action.

10. On or about March 23, 2002, the MCAD acceded to plaintiff Pivacek's request and notified her of her right to file this civil action. A copy of the MCAD's notice is attached as Exhibit 3 and is herein incorporated by reference.

11. On or about March 23, 2002, the MCAD acceded to plaintiff Leavy's request and notified her of her right to file this civil action. A copy of the MCAD's notice is attached as Exhibit 4 and is herein incorporated by reference.

**STATEMENT OF FACTS**

12. Plaintiff Linda Pivacek has worked under the direct supervision of the individual defendant Valeri at the NBRL since on or about 1963, with the exception of the years 1978-1981.

13. Pivacek's work performance has met the legitimate expectations of her employer throughout her tenure.

14. Pivacek is a biostatistician with a Masters Degree from the Boston University School of Public Health.

15. Plaintiff Marilyn Leavy has worked under the direct supervision of the individual defendant Valeri at the NBRL since on or about 1967, and most recently has been Administrative Director of the NBRL.   Leavy is an American of Irish ancestry.

16. Leavy's work performance has met the legitimate expectations of her employer throughout her tenure.

17. From the first years of plaintiffs' employment until 1979, the NBRL was a military laboratory under the aegis of the United States Navy.

18. On or about 1979, the NBRL, with Valeri as its Director, moved to premises located adjacent to the Boston University School of Medicine, and has operated under the aegis of Boston University since that date.

19. Plaintiff Leavy has been a BU employee since on or about 1979, and plaintiff Pivacek has been a BU employee since on or about 1982.

20. Over a period of many years, the individual defendant Valeri has created, maintained and perpetuated a hostile work environment permeated with discrimination, threats of physical violence, and abusive and excessively controlling employment practices.

21. Valeri repeatedly expresses virulent hatred of women, Irish, Jews, and older people, among others, and frequently expresses his admiration for Hitler. Valeri's statements include, but are not limited to, the following:

a. Expressions of a desire to be reincarnated as Hitler in order to "finish the job" because "he didn't go far enough. He only killed 6 million of them (Jews)."

b. References to Irish persons and persons of Irish descent as "lazy", "drunks", "on the dole" and "worthless", as well as statements of his intent to "get them."

c. Statements that women are "controlling bitches" and "fuckers" who should be "put in their place", controlled by men, and denied the right to vote.

d. Expressions of admiration for John Salvi, who murdered five women in a Brookline abortion clinic in 1997.

e. References to Jews as "scumbags".

f. Insults of older people (although he himself is 69), stating, inter alia, "You know what they do to old horses. They send them to the glue factory." He also stated to plaintiff Pivacek,

on or about August of 2001, that she had been there "too long", stating "Old people can't use their brains."

22. More recently, Valeri's behavior has further deteriorated. He screams and debases employees both publicly and privately. He refused to allow certain employees, including but not limited to plaintiff Pivacek, to answer the phone. On or about August of 2001, Valeri instructed Pivacek not to answer the phone, and if no one else was there and she received an emergency call "that's too bad."

23. Pivacek needed access to the phone for the work she was doing for the NBRL, and her ability to perform was compromised by Valeri's refusal to allow her to answer the phone in the laboratory.

24. Valeri expresses admiration for the Mafia and its methods, and has made repeated threats to "get even with" plaintiffs, who, he states, will realize his vindictiveness when they are murdered.

25. On at least one occasion, on or about early spring of 2001, Valeri threatened: "Marilyn (plaintiff Leavy) and Linda (plaintiff Pivacek) complain to Personnel! I'm gonna get even! You're gonna be dead!"

26. On another occasion, Valeri threatened to plaintiffs: "I'm going to get you, and you'll know it because you'll be dead.

27. On or about May of 2001, Valeri told plaintiff Pivacek he would "bury" her.

28. On still another occasion, on or about July of 2001, Valeri threatened plaintiff Leavy, that he would hang her.

29. As his behavior deteriorated, Valeri repeatedly said he believes in vendettas, and believes in the Mafia's method of killing one's enemies and those who do not respect him. Valeri has stated repeatedly that "the people (who work) upstairs should be assassinated." At that time, plaintiff Pivacek worked upstairs in the lab.

30. As his behavior deteriorated, Valeri held meetings each morning which would last from one-three hours. During these meetings, he demeaned and abused his employees; spouted his hatred of older people; different ethnic groups, including particularly Jews and Irish; and expressed his disdain for women, and the need to control them. He repeatedly enunciated his intent to "get even", expressing admiration for the way Tony Soprano, of The Sopranos television show, "gets even" with his enemies by shooting them in the back of the head.

31. During these meetings, Valeri additionally claimed that there was a "contract" out on former President Clinton and Sen. Hilary Clinton for a million dollars, and "I support it." When questioned about this statement, Valeri stated he was "a free man. I can say what I want. He's (former President Clinton) going to be dead. You'll see. He and Hilary won't be around much longer."

32. During these meetings, Valeri also expressed his admiration for, and attempted emulation of, Machiavelli, saying, inter alia: "Machiavelli was right. I am Machiavellian: you can only motivate people through fear. That's the only reason they will do anything. Then if they don't perform you kill them. You shoot them." He coupled these threats with accusations that NBRL employees, including plaintiffs, weren't performing and were out to "screw" him.

33. Plaintiffs Pivacek and Leavy became increasingly fearful of Valeri, and alarmed that he would carry out his threats of violence towards them or others.

34. Over the past several years, numerous employees working under the direction and control of Valeri, including but not limited to the plaintiffs, have complained to various administrators of BU about Valeri. In addition to plaintiffs, BU employees have complained to responsible BU administrators, including the Dean of the Medical School, the university's Personnel Director and the Medical School's Personnel Director, and the university's Office of the General Counsel, about Valeri's discriminatory treatment of, inter alia, older workers, women workers, and employees who are Irish or of Irish descent. (Upon information and belief, Valeri hired no Jewish employees.)

35. Plaintiff Leavy took her complaints against Valeri, including but not limited to his anti-Irish prejudice, to the Medical School's Director of Personnel, then Michael Donovan, now Assistant Vice President for Administration at BU.

36. At Donovan's behest, and based on his promise of confidentiality, Leavy then told the Dean of the Medical School, Aram Chobanian, of Valeri's abusive and discriminatory behavior.

37. Contrary to Donovan's promises of confidentiality, the Dean almost immediately informed Valeri of Leavy's complaints against him.

38. After he learned that Leavy had complained against him, Valeri's abusive behavior directed at her increased. His retaliatory actions towards her included, but were not limited to, refusing to allow her to answer the phone (although that was one of her job responsibilities), threatening her with reprisals, and excluding her from administrative meetings although she was Director of Administration.

39. The university has investigated some of the complaints against Valeri and substantiated at least some of them. In at least one such instance, an employee fired by Valeri who complained of age bias, plaintiffs Leavy and Pivacek provided information to the university's attorneys, at their request, who then reached a settlement with the complaining former employee.

40. Plaintiff Leavy had alerted BU's attorneys that her speaking to them would cause Valeri to retaliate against her, as he had when she had complained about him to the Medical School's Director of Personnel and Dean. BU nonetheless left Leavy exposed to and unprotected from the inevitable retaliation perpetrated by Valeri.

41. Valeri learned that Leavy had given truthful information to BU's attorneys, which was negative information about his discriminatory and abusive practices and the hostile work environment which he created and perpetuated, and retaliated against the plaintiff up until October of 2001 when she was compelled to go on sick leave due to Valeri's discriminatory, abusive and threatening conduct, and BU's failure to protect her.

42. Despite its actual knowledge of Valeri's discriminatory, hostile and abusive practices, the university has nonetheless continued to employ and sponsor Valeri.

43. BU has acted and continues to behave with a reckless disregard for the safety and well-being of plaintiffs and other employees who have been subjected to Valeri's hostile, discriminatory and abusive mistreatment despite the university's actual knowledge of his gross misconduct and violation of equal employment laws.

44. As Valeri's conduct has deteriorated, the NBRL has experienced a high turnover, with numerous employees leaving due to his hostile and abusive treatment and the generally abusive, fearful and discriminatory work environment.

45. As Valeri's conduct has worsened, plaintiffs have complained to various university officials over the last several years about Valeri's treatment of them and others, each time hoping, in vain, that the university would take action against Valeri.

46. Plaintiff Pivacek complained to the Personnel Director of the Medical School about Valeri's abusive, threatening and discriminatory conduct towards her and others. On one occasion, the Personnel Director transferred an employee of NBRL to work directly for him due to Valeri's mistreatment of and abuse towards that female employee.

47. Valeri learned of Pivacek's complaints against her, and subjected her to retaliation, including but not limiting to refusing to allow her to answer the phone, subjecting her to regular verbal degradation, insults, taunts, discriminatory comments, and threats of his revenge and intent to kill her.

48. On or about August of 2001, Pivacek contacted BU's Director of Personnel, and informed her of Valeri's abusive and threatening behavior. Upon information and belief, the Director of Personnel took no action in response to Pivacek's complaints.

49. Valeri's conduct continued to deteriorate up to and including October of 2001, when plaintiffs reported his misconduct to the university's attorneys. His verbal abuse, discriminatory actions and threats of violence became more severe. He personally monitored all use of the lab telephone, as he had earlier forbidden plaintiff Pivacek from answering the phone. He blasted loud disruptive music throughout the lab which interfered with plaintiffs' ability to do their work,

and kept the lab at an uncomfortably cold temperature. He repeatedly expressed his admiration of the Mafia's methods of revenge as he repeatedly threatened plaintiffs with reprisal, asserting over and over again that he would "get even" with them, and that they would be dead.

50. While continuing to protect Valeri, BU was sending its employees, including plaintiffs, documents regarding and warning about the threat of workplace violence.

51. Plaintiffs became increasingly frightened of Valeri, and became increasingly emotionally distressed. Plaintiffs enrolled in a self-defense class and took security precautions in their homes.

52. During 2001, plaintiffs and a co-worker sought assistance from the university's Employee Assistance Program ("EAP"). The EAP counselor with whom they consulted advised them to discontinue working for Valeri for their own personal safety.

53. Plaintiffs sought the help of mental health professionals as well as their primary health care providers, all of whom also advised plaintiffs that they could not and should not continue to work under Valeri's supervision and control.

54. In October, 2001, both plaintiffs became so fearful and so distraught that they were unable to continue working. Both plaintiffs went on sick leave from BU.

55. Contemporaneously, on or about October, 2001, plaintiffs notified the university, through their counsel, in detail of their allegations against Valeri, and requested that the university investigate their complaints and place them on paid administrative leave while the investigation was pending.

56. BU refused to place plaintiffs on administrative leave, and instead required them to use their sick leave.

57. After it was notified of plaintiffs' allegations against Valeri, BU asserted that it would investigate their complaints.

58. The university failed to conduct an investigation which conformed to the requisites of the law in that:

    a. BU failed or refused to interview the plaintiffs.

    b. BU referred Valeri to an attorney of its choosing.

    c. BU allowed Valeri's attorney ex parte access to BU employees while denying same to counsel for plaintiffs;

    d. BU refused to provide plaintiffs with Valeri's defense or to give them an opportunity to rebut his defense, or any allegations he may have made against either or both of them;

    e. BU refused to provide plaintiffs with its investigative report or summary; and

    f. BU took five (5) months to complete its grossly inadequate and biased "investigation".

59. On or about March 7, 2002, or nearly five (5) months after plaintiffs had notified BU of their complaints about Valeri, BU informed plaintiffs that it rejected their allegations that Valeri engaged in discriminatory behavior or was a threat to their physical safety, finding only that his "style of management" "does not represent ideal management practices and behavior".

60. In its letter to plaintiffs, BU relied in part upon a "violence assessment" performed by a psychiatrist allegedly retained by BU for that purpose. BU has refused to provide plaintiffs with a copy of this psychiatric assessment.

61. During plaintiffs' employment, Valeri ran the NBRL according to his own, not BU's policies, including work hours, pay, and terms and conditions of employment.

Page 11 of 17

62. Valeri discouraged employees from using leave time. In August, 2001, Valeri verbally abused plaintiff Pivacek when she requested annual leave, and then retaliated against her by refusing to allow her to answer the phone while in the lab.

63. One method by which Valeri discouraged employees from using leave time was by allowing them to accrue vacation and sick time in excess of the university's parameters. Thus, an employee who became seriously ill or injured, as plaintiffs did as a result of the abuse of their supervisor and reckless indifference of their employer, would be able to use all accrued sick time. The NBRL practice and policy was to pay employees who were terminating their employment by allowing them to use their accrued vacation time prior to their termination or by keeping them on the NBRL payroll until their vacation time was within university parameters

64. At the time they reported their complaints about Valeri to the university, both plaintiffs had accrued sick and vacation time in excess of the university's parameters. Each plaintiff used part of her accrued sick time during the pendency of BU's investigation, which took five (5) months.

65. On or about March, 2002, BU, which had actual knowledge of the plaintiffs' participation in protected activity of complaining about discrimination both within BU and to the MCAD, retaliated against plaintiffs by refusing to allow them to use all their accrued sick time.

66. On or about March, 2002, BU retaliated against plaintiffs by stating that it was placing them on Family Medical Leave Act leave for twelve weeks, and would terminate their employment at the end of that period. The University has subsequently stated it will pay plaintiffs for all accrued vacation time.

67. Valeri's conduct towards plaintiffs was extreme, outrageous, and beyond the bounds of civilization. He knew or should have known that plaintiffs would experience severe emotional distress. Plaintiffs did in fact experience severe emotional distress as a result of Valeri's misconduct. His discriminatory and abusive behavior and repeated threats did not advance the interests of the employer.

68. BU had actual and/or constructive knowledge of Valeri's abusive and discriminatory conduct, and that he had created and perpetuated a hostile, discriminatory work environment. The university evidenced and continues to evidence reckless disregard for its employees, and has retaliated against them instead of protecting their physical and emotional safety and well-being.

69. As a direct and proximate consequence of the defendants' misconduct, plaintiffs have been severely damaged. They have been terminated or constructively discharged from their employment. They have lost the wages and benefits of their employment, a diminution of their earning capacities, have suffered severe, ongoing emotional and physical harm, and have incurred substantial medical costs and legal fees and costs. All damages continue to this date.

**CLAIMS**

**COUNT ONE: EMPLOYMENT DISCRIMINATION**
**DEFENDANTS: BOSTON UNIVERSITY AND VALERI**

70. Plaintiffs reallege paragraphs 1-69 and incorporate same by reference.

71. Plaintiffs are protected from employment discrimination and retaliation by M.G.L. c. 151B.

72. During their employment, plaintiffs were subjected to a hostile work environment in which discrimination based on age, gender, national origin and ethnicity was chronic, repeated, and pervasive.

73. Defendant Valeri, plaintiffs' direct supervisor, operated the NBRL with abuse, discrimination, hostility and death threats. The work environment was permeated with anti-Irish, anti-Semitic, sexist and agist comments, threats and actions.

74. BU knew of and condoned this discrimination.

75. BU failed or refused to take steps to prevent discrimination, or to investigate, remedy and redress complaints of discrimination, instead choosing to support Valeri, who is the source of significant financial resources which benefit BU financially.

76. Defendants' actions, culminating in the termination or constructive discharge of plaintiffs, violated M..G.L. c. 151B.

### COUNT TWO: AIDING AND ABETTING DISCRIMINATION
### DEFENDANTS: BOSTON UNIVERSITY AND VALERI

77. Plaintiffs reallege paragraphs 1-76 and incorporate same by reference.

78. The individual defendant Valeri is a supervisory employee of BU.

79. BU knew of Valeri's discriminatory and retaliatory conduct, and aided and abetted his discrimination by, inter alia, condoning it and by conducting an investigation which was deferential to Valeri and intimidating to plaintiffs.

80. Valeri knew of and encouraged BU's discriminatory and retaliatory actions towards plaintiff, and took full advantage of its condonation of his discriminatory mistreatment of his employees.

81. Defendants aided and abetted one another in discriminating and retaliating against plaintiffs in violation of M.G.L. c. 151B.

### COUNT THREE: RETALIATION
### DEFENDANTS: VALERI AND BOSTON UNIVERSITY

82. Plaintiffs reallege paragraphs 1-81 of their Complaint and incorporate same by reference.

83. Plaintiffs engaged in protected activity by complaining about discrimination internally to administrators of Boston University.

84. Defendants had actual knowledge of plaintiffs' participation in protected activity.

85. Plaintiffs further engaged in protected activity by filing Charges of Discrimination with the MCAD.

86. Defendants had actual knowledge of plaintiffs' further participation in protected activity.

87. Defendants retaliated against plaintiffs for their participation in protected activities, such retaliation as is pleaded more specifically above, in violation of M.G.L. c. 151B.

### COUNT FOUR: VIOLATION OF CIVIL RIGHTS
### DEFENDANT: C. ROBERT VALERI

88. Plaintiffs reallege paragraphs 1-87 and incorporate same by reference.

89. Plaintiffs have a right secured by state and federal statutory and constitutional law to be free of sex discrimination in employment. Plaintiffs have a right secured by state and federal

statutory law to be free of age discrimination and to work in an environment not permeated by discrimination, abuse and threats.

90. The individual defendant, with threats of physical violence, including but not limited to death threats, violated plaintiffs' rights as set forth above in violation of M.G.L. c. 12 sec. 11I.

**COUNT FIVE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**DEFENDANT: C. ROBERT VALERI**

91. Plaintiffs reallege paragraphs 1-90 of their Complaint and incorporate same by reference.

92. Defendant Valeri subjected plaintiffs to repeated abuse, discrimination and threats of physical violence, including threats that he would get revenge against them by killing them.

93. Defendant Valeri's actions were extreme, outrageous, and beyond the bounds of civilization. He knew or should have known that his conduct would cause plaintiffs to experience severe emotional distress.

94. As a direct and proximate result of defendants' gross misconduct, plaintiffs did experience severe emotional distress, of which no person should be expected to endure.

95. Valeri's abusive actions did not advance the interests of the employer.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs Linda Pivacek and Marilyn Leavy respectfully demand that this Court:

1. Declare that defendants violated M.G.L. c. 151B by discriminating and retaliating against the plaintiffs, and by aiding and abetting the discrimination of the other defendant.

2. Declare that defendant Valeri violated plaintiffs' civil rights in violation of M.G.L. c. 12 sec. 11I.

3. Order defendant Boston University to reinstate plaintiffs to their positions at Boston University, and to restore plaintiffs wages and benefits, including but not limited to restoration of sick time each used since October, 2001.

4. Order defendants to cease and desist discriminating against women employees.

5. Order defendants to cease and desist discriminating against older workers.

6. Order defendants to cease and desist from maintaining, perpetuating and/or condoning a hostile work environment.

7. Award plaintiffs reasonable compensatory and exemplary damages.

8. Award plaintiffs statutory interest, reasonable attorneys' fees, and the costs of this litigation.

9. Issue such other relief as this Court deems just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.**

Dated: May 21, 2002

Wendy A. Kaplan
BBO #259360
Law Office of Wendy A. Kaplan
18 Tremont Street, Suite 704
Boston, MA 02108
(617) 557-4114
Attorney for Plaintiffs