---- SHEET 1   PAGE 1 ----

```
1                                      Volume:    I
2                                      Pages:   157
3                                      Exhibits: 37
4 COMMONWEALTH OF MASSACHUSETTS
5                                      04-10644-MEL
6 * * * * * * * * * * * * * * * * * *
7                                   *
8 Linda Mellen,                     *
9                 Plaintiff         *
10                                  *
11 vs.                              *
12                                  *
13 Trustees of Boston University    *
14 and Frances A. Drolette,         *
15              Defendant.          *
16                                  *
17 * * * * * * * * * * * * * * * * * *
18          DEPOSITION of George T. Snowdon, a witness
19 called on behalf of the plaintiff, taken pursuant to
20 the Massachusetts Rules of Civil Procedure, before
21 Shawna Delia Hoban, a Professional Court Reporter and
22 Notary Public in and for the Commonwealth of
23 Massachusetts, at the offices of Harry C. Beach, on
24 Thursday, December 16, 2004, commencing at 10:02 a.m.
```

---- PAGE 2 ----

```
1 A P P E A R A N C E S
2 Harry C. Beach, Esquire
3 Law Offices of Harry C. Beach
4 30 Walpole Street
5 Norwood, MA  02062
6            Counsel for the Plaintiff
7 Crystal D. Talley
8 Associate General Counsel
9 Office of the General Counsel
10 Boston University
11 125 Bay State Road
12 Boston, MA  02215
13            Counsel for the Defendant
```

---- PAGE 3 ----

```
1 INDEX
2 Witness                                        Page
3 George T. Snowdon
4      Direct Examination by MR. BEACH . . . . . 7
```

---- PAGE 4 ----

```
1 P R E M A R K E D   E X H I B I T S
2 No.   Description                             Page
3 1     Notice of Deposition . . . . . . . . . . . . . .9
4 2     Boston University Personnel Policy
5       Manual . . . . . . . . . . . . . . . . . . . . 16
6 3     Letter dated 11/20/03 . . . . . . . . . . . . .20
7 4     E-mail notice dated Monday, 10/6/03 . . . . . .61
8 5     Boston University news release dated
9       11/5/03 . . . . . . . . . . . . . . . . . . . .62
10 6    Letter dated 7/31/03 . . . . . . . . . . . . . 65
11 7    E-mail dated Friday, 7/18/03 . . . . . . . . . 70
12 8    Application and letter for family leave
13      Received 8/8/03 . . . . . . . . . . . . . . . .71
14 9    E-mail dated Monday, 10/6/03 . . . . . . . . . 74
15 10   Fax cover letter dated 10/8/03 . . . . . . . . 77
16 11   Letter dated 10/23/03 . . . . . . . . . . . . .78
17 12   Letter dated 10/24/03 . . . . . . . . . . . . .82
18 13   E-mail dated 7/1/03 . . . . . . . . . . . . . .85
19 14   Time-out/Accumulated Time worksheet . . . . . .86
20 15   Printout of Linda Mellen's vacation
21      and sick time . . . . . . . . . . . . . . . . .88
22 16   Exempt employee monthly time record
23      dated 7/1/03 . . . . . . . . . . . . . . . . . 91
```

─ SHEET 2    PAGE 5 ─

1 P R E M A R K E D  E X H I B I T S, Continued
2 No.    Description                                      Page
3 17     Handwritten notes dated 5/2/03 . . . . . . . . 92
4 18     Handwritten notes dated 5/2/03 . . . . . . . . 96
5 19     Handwritten notes dated 5/19/03 . . . . . . . .97
6 20     Handwritten notes dated 5/20/03. . . . . . . . 99
7 21     Handwritten notes dated 5/27/03 . . . . . . . 105
8 22     Handwritten notes dated 6/13/03. . . . . . . .109
9 23     Handwritten notes dated 6/20/02. . . . . . . .112
10 24    Handwritten notes dated 7/14/03. . . . . . . .113
11 25    Handwritten notes dated 7/28/03. . . . . . . .117
12 26    Handwritten notes dated 7/31/03. . . . . . . .118
13 27    Handwritten notes dated 8/21/03. . . . . . . .119
14 28    Handwritten notes dated 9/18/03. . . . . . . .127
15 29    Handwritten notes dated 10/23/03. . . . . . . 134
16 30    Handwritten notes dated 11/13/03. . . . . . . 136
17 31    Handwritten notes dated 11/19/03. . . . . . . 136
18 32    Handwritten notes dated 2/1/03. . . . . . . . 139
19 33    E-mail dated 8/7/03 . . . . . . . . . . . . . 145
20 34    E-mail dated 4/8/03. . . . . . . . . . . . . .146
21 35    E-mail dated 4/30/03. . . . . . . . . . . . . 147
22 36    Boston University Salary Change Form . . . . .150
23 37    Complaint, John Walsh versus
24       Boston University . . . . . . . . . . . . . . 152

─ PAGE 6 ─

1 S T I P U L A T I O N S
2           It is hereby stipulated and agreed by and
3 between counsel for the respective parties that all
4 objections, except as to form, be reserved until the
5 time of trial, including motions to strike.
6           It is further stipulated that the deponent
7 shall read and sign the deposition transcript; and
8 that the certification, filing and sealing of the
9 deposition transcript are hereby waived.

─ PAGE 7 ─

1                    George T. Snowdon, SWORN
2 DIRECT EXAMINATION BY MR. BEACH:
3           MR. BEACH:  Could you state your name for the
4 record, please?
5           MR. SNOWDON:  George Snowdon.
6           MR. BEACH:  And your date of birth?
7           MR. SNOWDON:  September 19, 1953.
8           MR. BEACH:  And the town of your residence right
9 now?
10          MR. SNOWDON:  I live in Watertown, Massachusetts.
11          MR. BEACH:  Do you have any plans to move out of
12 state in the next eighteen months or so?
13          MR. SNOWDON:  No.
14          MR. BEACH:  Mr. Snowdon, your counsel may have
15 already pointed this out to you or you may know it
16 from your own experience, but today is an opportunity
17 that the Federal Civil Procedures give me to ask you
18 certain questions under oath as they relate to the
19 allegations and offenses set out in the lawsuit before
20 us; that is, Linda Mellen versus Trustees of BU and
21 Frances Drolette.
22          As you know, that action is pending in Federal
23 Court and today is the opportunity the rules allow me

─ PAGE 8 ─

1 to ask you questions relating to that suit.
2           I'm going to do my best to ask you my questions
3 as clearly as possible, but if my track record is any
4 indication there will be times when you don't
5 understand my question or there's some confusion.  If
6 you would ask me at that time to restate my question
7 or clarify the question, I'd be happy to do that.
8           MR. SNOWDON:  Okay.
9           MR. BEACH:  Do you understand that, sir?
10          MR. SNOWDON:  Yes, I do.
11          MR. BEACH:  For purposes of the Court Reporter
12 here, it's going to be very helpful if we both speak
13 aloud rather than with gestures or nods or shakes of
14 our heads; do you understand that, sir?
15          MR. SNOWDON:  Yes, I do.
16          MR. BEACH:  As far as you know, do you have any
17 impediment in terms of your ability to testify as
18 thoroughly as your memory allows today?
19          MR. SNOWDON:  No, I do not.
20          MR. BEACH:  Shawna, I believe under the rules you
21 have an opportunity to make some sort of statement
22 regarding who's here and the oath and all.
23          COURT REPORTER:  I do.  My name is Shawna Delia
24 Hoban.  I'm a Court Reporter and Notary Public

SHEET 3   PAGE 9

1 operating out of Westwood, Massachusetts.
2          Today is Thursday, December 16th. It's 10:02
3 a.m. and we're at the Law Offices of Harry Beach,
4 located at 30 Walpole Street in Norwood, Mass.
5          Our deponent today is George Snowdon, Personnel
6 Director; is that correct?
7          MR. SNOWDON:  Director of Personnel.
8          COURT REPORTER:  Director of Personnel at Boston
9 University.
10          Also present is Harry C. Beach, Crystal D. Talley
11 and myself.
12          MR. BEACH:  I've premarked before this deposition
13 a Notice of Deposition which will be Exhibit No. 1,
14 and Ms. Talley, I've just provided a copy to you.
15          (Whereupon, Notice of Deposition was
16     presented as Premarked Deposition Exhibit No. 1.)
17          MR. BEACH:  Mr. Snowdon -- strike that.
18 Stipulations regarding the deposition.  I propose that
19 all objections, except as to form, be reserved until
20 the time of trial including motions to strike.
21          I propose that Mr. Snowdon read and sign the
22 deposition transcript, making any corrections he feels

PAGE 10

1 are appropriate with respect to the transcription.  As
2 far as I'm concerned that signing doesn't have to be
3 before a notary.
4          MS. TALLEY:  Okay.
5          MR. BEACH:  Is that acceptable?
6          MS. TALLEY:  That's acceptable.  Thanks.
7 Q.   What records, Mr. Snowdon, did you review in
8 preparation for today's deposition?
9 A.   I reviewed some of my notes to file that I had
10 regarding this case.
11 Q.   Are they notes to file that you created recently?
12 A.   No, they're mostly historical notes.
13 Q.   And are those notes that relate to the period roughly
14 August to November 2003?
15 A.   Yes.
16          MS. TALLEY:  I can probably help you out.  And
17 they were all notes that are been produced to you; all
18 the documents you reviewed are documents that have
19 been produced.
20 Q.   And those are hand written notes of yours, Mr.
21 Snowdon?
22 A.   There were some hand written notes and also some e-
23 mails.
24 Q.   Did you review any other documents in preparation for

PAGE 11

1 today's testimony?
2 A.   I did review the suit.
3 Q.   The complaint, the allegations of the complaint.
4 Anything else, sir?
5 A.   Not that I recall.
6 Q.   Did you review the contents of Linda Mellen's
7 personnel file?
8 A.   I did, yes.
9 Q.   And other than the complaint, did you review any other
10 pleadings or submissions in this case?
11 A.   Not that I recall.
12 Q.   Other than for your attorney, did you speak to anyone
13 in preparation for today's deposition?
14 A.   No.
15 Q.   You didn't speak with Frances Drolette?
16 A.   No.
17 Q.   Dzidra Nect or Konect?  Do you know how to -- K-N-E-C-
18 H-T?
19 A.   I believe it's pronounced "connect".
20 Q.   Is it?  Did you speak with Dzidra Knucht in
21 preparation for today's deposition?
22 A.   No.
23 Q.   Dr. Robert Meenan?
24 A.   No.

PAGE 12

1 Q.   Dr. Chobanian?
2 A.   No.
3 Q.   Your position at BU is Director Personnel, sir?
4 A.   Yes.
5 Q.   What date did you start in that position, sir?
6 A.   I believe I assumed the position of Director of
7 Personnel in January of 1996.
8 Q.   And prior to the promotion to that position, what was
9 your position at BU?
10 A.   I previously held the title of Associate Director of
11 Personnel for the Boston University Medical Campus,
12 and prior to that Assistant Director of Personnel.
13 Q.   And when did you become Associate Director, sir?
14 A.   I don't recall the year off hand.
15 Q.   Roughly the year or range of years?
16 A.   I joined the University in 1992; sometime between
17 there and 1996 my title changed from Assistant to
18 Associate Director.
19 Q.   So you're initial hire was as Assistant?
20 A.   Yes.
21 Q.   What was your position before you signed on with BU?
22 A.   I was employed by Ionics, Incorporated, in Watertown,
23 Massachusetts, in the Human Resources Department
24 there.

SHEET 4    PAGE 13

1 Q.    In Human Resources Department?
2 A.    Yes.
3 Q.    How many employees were in your office; that is, in
4 the office in the Director of Personnel, in 2003?
5 A.    Approximately a dozen.
6 Q.    BU I understand has two campuses: the Medical Campus
7 and the Charles River Campus; is that right?
8 A.    Yes, it is.
9 Q.    Your authority as Director of Personnel relates only
10 to the Medical Campus; is that correct?
11 A.    Yes, it is.
12 Q.    Who's the Director of Personnel for the Charles River
13 campus?
14 A.    It's a gentleman named Manuel Monteiro.  His title, I
15 believe, is Associate Vice President of Human
16 Resources.
17 Q.    His first name is what, sir?
18 A.    Manuel.
19 Q.    The Medical Campus includes the School of Public
20 Health; is that correct?
21 A.    Yes, it is.
22 Q.    And as you know, Linda Mellen was an employee within
23 the School of Public Health in 2003?
24 A.    Yes, she was.

PAGE 14

1 Q.    Who did you report in 2003?
2 A.    The same gentleman I report to now.  His name is
3 Michael Donovan.
4 Q.    And his position is what, sir?
5 A.    He's an Associate Vice President for Administrative
6 Services.
7 Q.    Who, in 2003, did Frances Drolette report to?
8 A.    Dean Robert Meenan.
9 Q.    Did Michael Donovan report to Dr. Meenan in 2003?
10 A.    No.
11 Q.    Who did Mr. Donovan report to, in terms of the
12 hierarchy, at BU?
13 A.    I believe his direct boss is Richard Towle, Senior
14 Vice President of the University.
15 Q.    Did you have any training in the Family and Medical
16 Leave Act since 1992?
17 A.    Yes, I believe that I have.
18 Q.    And what sort of training did you have, sir?
19 A.    I don't recall the specifics; I believe that I
20 attended a brief workshop on the Family Medical Leave
21 Act.
22 Q.    And where was that workshop conducted, sir?
23 A.    I don't recall specifically.  It may have been an
24 internal workshop within the University.

PAGE 15

1 Q.    I know you became Director of Personnel in roughly
2 January of '96.  Do you recall whether this workshop
3 took place before or after you became Director of
4 Personnel?
5 A.    I don't recall.
6 Q.    Have you had any training in the code of Federal
7 regulations as they relate to the Family and Medical
8 Leave Act?
9 A.    I don't believe I've had specific training.
10 Q.    Have you had any general training regarding the code
11 of Federal regulations as they relate to the FMLA,
12 Family and Medical Leave Act.
13 A.    Not that I recall.
14 Q.    Have you had any training in the Small Necessities
15 Leave Act since 1998, sir?
16 A.    I don't recall any specific training.
17 Q.    Do you recall any general training that you've had in
18 the SNLA, the Small Necessities Leave Act?
19 A.    I recall receiving information on the act when it
20 became effective.
21 Q.    Who did you receive that information from, sir?
22 A.    I believe it came from Mr. Monteiro's office.
23 Q.    Have you had any training since -- in or since 1998 in
24 the Code of Massachusetts regulations relating to the

PAGE 16

1 SNLA, which is my shorthand for the Small Necessities
2 Leave Act.  Any training in the Code of Mass.
3 regulations?
4 A.    Not that I recall.
5 Q.    Any training in the Attorney General's Advisory
6 Opinions regarding the SNLA since '98?
7 A.    Not that I recall.
8 Q.    Let me show you another document, sir.  I imagine
9 you've seen before.  This would be Exhibit 2 to this
10 deposition.  Feel free to look through that, sir, but
11 are you able to identify that document?
12                (Whereupon, Boston University Personnel
13        Policy Manual was presented as Premarked
14        Deposition Exhibit No. 2.)
15 A.    Yes, I am.
16 Q.    And what do you understand that document to be?
17 A.    It's the University's Personnel Policy Manual for non-
18 representative, non-faculty personnel.
19 Q.    And let me represent for the record that the number on
20 the first page in the lower right-hand corner, BU0324,
21 was on the document when it was produced to us by
22 Boston University.  Do you know if this Personnel

SHEET 5    PAGE 17

1 Policy Manual before you, Exhibit 2, was in effect in
2 the year 2003?
3 A.    Yes, it was.
4 Q.    And do these rules remain in effect through today?
5 A.    Yes, they do.
6 Q.    And these rules apply to Linda Mellen's employment in
7 2003, sir; is that correct?
8 A.    Yes, they do.
9 Q.    And they state the rules by which employees of the
10 School of Public Health are to guide themselves?
11 A.    Yes.
12 Q.    And they also state the rules by which supervisors are
13 obligated to follow in their management of employees;
14 is that correct?
15         MS. TALLEY:  Objection; ambiguous.  Go ahead.
16 A.    Yes.
17 Q.    Are supervisors obliged to follow these rules in their
18 management of employees within the School of Public
19 Health?
20 A.    Yes.
21 Q.    And even more specifically, was Frances Drolette
22 obliged to follow these rules in her management of
23 Linda Mellen?
24 A.    Yes.

PAGE 18

1 Q.    And your office, too;  that is, the Personnel Office
2 was obliged to comply with these rules as well, sir,
3 in 2003; is that correct?
4 A.    Yes.
5 Q.    As a general matter, Mr. Snowdon, what is your role in
6 connection with the termination of employees at the
7 Medical Campus?
8 A.    I am generally consulted regarding any potential
9 terminations.
10 Q.    And as a general matter, again, sir, who is it that
11 consults with you with respect to terminations of
12 employees?
13 A.    It could come from different levels; a manager, a
14 department head, a dean, associate dean.
15 Q.    Since the year 2000, have you ever initiated the
16 termination of an employee?
17 A.    Not that I recall off hand.
18 Q.    Did you initiate the decision to terminate Linda
19 Mellen?
20         MS. TALLEY:  Objection.
21 A.    No, I did not.
22 Q.    Who did?
23         MS. TALLEY:  Objection; assumes facts not in
24 evidence.

PAGE 19

1 A.    I don't know specifically.
2         MR. BEACH: Can we go off the record a second?
3 Q.    Who initiated the decision to terminate Linda Mellen?
4 A.    I believe it was Ms. Drolette.
5 Q.    And did you make the final decision to terminate Linda
6 Mellen?
7 A.    No, I did not.
8 Q.    Who did?
9 A.    I believe it was Ms. Drolette.
10 Q.    I'm sorry?
11 A.    I believe it was Ms. Drolette.
12 Q.    As a general matter, again, general, do you consult
13 with BU's Office of General Counsel in connection with
14 the termination of employees?
15 A.    It would depend upon the circumstances.
16 Q.    And depending on the circumstances, again, generally,
17 what role does the Office of General Counsel play in
18 connection with the decision to terminate an employee?
19         MS. TALLEY:  Objection.  I'll instruct you to not
20 answer that on the grounds of attorney-client
21 privilege.
22 Q.    Do you know Erica Geetter?
23 A.    Yes, I do.
24 Q.    Did you consult with Erica Geetter in connection with

PAGE 20

1 Linda Mellen's termination in 2003?
2 A.    Yes, I did.
3 Q.    Let me show you another document, Mr. Snowdon, and ask
4 you to take a look at that.  This was premarked as
5 Exhibit No. 3 to this deposition.  Are you able to
6 identify that document, Mr. Snowdon?
7         (Whereupon, letter dated 11/20/03, was
8         presented as Premarked Deposition Exhibit No. 3.)
9 A.    Yes, I am.
10 Q.    And do you understand -- strike that.  What do you
11 understand this document to be, sir?
12 A.    I believe it to be a notice to Ms. Mellen that the
13 University considered her to have voluntarily resigned
14 her position from the University by her failure to
15 return from her approved leave.
16 Q.    And were you copied with this letter as indicated at
17 the bottom of the first page?
18 A.    Yes, I was.
19 Q.    And the second page of this document, sir, although
20 the copy isn't great, especially in the upper half,
21 what do you understand the second page to be?
22 A.    I would take this to be the final pay to Ms. Mellen.

SHEET 6    PAGE 21

1 Q.    And that amount being $12,081.24?
2 A.    Yes.
3 Q.    Do you know whether this check represented the value
4 of Ms. Mellen's accrued vacation leave at the time of
5 her separation?
6 A.    Yes, it is my understanding.
7 Q.    At any point in 2003, did Frances Drolette communicate
8 to you that she was opposed to Linda Mellen's
9 separation?
10 A.   No.
11 Q.   Did you see Exhibit No. 3, this letter from Frances
12 Drolette to Ms. Mellen dated November 20, 2003, before
13 Ms. Drolette signed it; that is, did you see a draft
14 of it?
15 A.   I don't recall.
16 Q.   But you did receive a copy of it after she signed and
17 sent it; is that correct?
18 A.   Yes.
19 Q.   And do you understand by this letter, the reason that
20 Frances Drolette gave for Linda Mellen's separation
21 was that she did not come to work on November 19,
22 2003?
23 A.   Yes.
24 Q.   And do you agree that's the only reason stated in this

PAGE 22

1 letter as to why Frances Drolette terminated Linda
2 Mellen's employment?
3          MS. TALLEY:  Objection.
4 A.    Yes.
5 Q.    Do you agree, sir, that if Linda Mellen had returned
6 to work on November 19, 2003, she would not have been
7 terminated?
8          MS. TALLEY:  Objection.  You can answer.
9 A.    Yes.
10 Q.   What role -- And you can set that aside, sir.  Please
11 refer to it if you need to, of course.  What role did
12 Dr. Robert Meenan play in the decision to terminate
13 Linda Mellen?
14          MS. TALLEY:  Objection.
15 A.   I don't know off hand.
16 Q.   Did you consult with Dr. Robert Meenan before November
17 20, 2003, about the decision whether to terminate
18 Linda Mellen's employment?
19          MS. TALLEY:  Objection.
20 A.   I don't believe that I did.
21 Q.   Do you know, of your personal knowledge, whether
22 Frances Drolette consulted with Dr. Robert Meenan
23 prior to November 20, 2003, regarding the termination
24 of Linda Mellen's employment?

PAGE 23

1          MS. TALLEY:  Objection.
2 A.    Yes, I believe that she did.
3 Q.    How do you know that?
4 A.    I would need to check my notes but I believe I have a
5 recollection that I asked that question of Ms.
6 Drolette at some point.
7 Q.    And do you recall Ms. Drolette responding to you that
8 she had consulted with Dr. Robert Meenan regarding the
9 termination of Linda Mellen's employment?
10          MS. TALLEY:  Objection.
11 A.   Yes, I believe that to be the case.
12 Q.   At any point, whether before November 20 or after
13 November 20, did Dr. Meenan communicate to you his
14 view of Linda Mellen's termination?
15          MS. TALLEY:  Objection.
16 A.   I don't recall.
17 Q.   What role, if any, did Dr. Aram Chobanian play in the
18 decision to terminate Linda Mellen?
19          MS. TALLEY:  Objection.
20 A.   I don't know.
21 Q.   Did you consult with him before November 20, 2003,
22 regarding the termination of Ms. Mellen's employment?
23          MS. TALLEY:  Objection.
24 A.   Not that I recall.

PAGE 24

1 Q.    Did you discuss that termination after; that is, did
2 you discuss it with Dr. Chobanian after November 20,
3 2003?
4 A.    Not that I recall.
5 Q.    I stumbled over the name Dzidra Knucht earlier in
6 today's deposition; do you understand who I mean by
7 that pronunciation?
8 A.    Yes, I do.
9 Q.    Who is she?
10 A.   She's a former Associate Dean in the School of Public
11 Health.
12 Q.   You said former.  When did she stop being the
13 Associate Dean of the School of Public Health?
14 A.   I believe it was some time in the year 2002.
15 Q.   And who succeeded her in the role of Associate Dean in
16 the School of Public Health?
17 A.   Ms. Drolette.
18 Q.   And that Associate Dean position, is that the
19 Associate Dean position associated with Administration
20 and Finance?
21 A.   Yes, it is.
22 Q.   You started at BU in '92; is that correct, sir?
23 A.   Yes, it is.
24 Q.   Was Ms. Knucht the Associate Dean -- an Associate Dean

SHEET 7  PAGE 25

1 in the School of Public Health in '92?
2 A.    I don't recall her specific title at that time; she
3 was within the School of Public Health at that time.
4 Q.    Was Ms. Knucht Linda Mellen's supervisor before
5 Frances Drolette came to the scene?
6 A.    I believe that she was.
7 Q.    And at some point during your service as Director of
8 Personnel, did you have occasion to speak with Ms.
9 Knucht about Linda Mellen's work performance?
10 A.   Not that I recall.
11 Q.   Did you ever have occasion to speak with Ms. Knucht
12 regarding any problems with Linda Mellen's work, of
13 any kind?
14 A.   Not that I recall.
15 Q.   Do you recall having any discussion with Ms. Knucht
16 regarding problems associated with Linda Mellen's
17 attendance at work?
18 A.   No, I do not.
19 Q.   And did you have any discussions with Ms. Knucht
20 regarding -- at any time, regarding whether Linda
21 Mellen's employment should be terminated?
22        MS. TALLEY:  Objection.
23 A.   No, I didn't.
24 Q.   How closely did you work with Ms. Knucht prior to her

PAGE 26

1 leaving BU in roughly 2002?
2 A.    Very closely.
3 Q.    And did you develop with Ms. Knucht any kind of
4 personal relationship -- not in the sense of romantic,
5 but personal in a sense of being friends?
6 A.    Yes, we had a very collegiate relationship.
7 Q.    Did you develop at any point, Mr. Snowdon, an opinion
8 regarding Ms. Knucht's honesty and character?
9 A.    I had no reason to question her honesty or character.
10 Q.   It was Ms. Drolette who supervised Linda Mellen's work
11 in 2003; is that correct?
12 A.   Yes, it is.
13 Q.   And she; that is, Ms. Drolette, was Linda Mellen's
14 direct supervisor in 2003; is that correct?
15 A.   Yes.
16 Q.   And was it Ms. Drolette who controlled Linda Mellen's
17 work schedule in 2003?
18 A.   Yes.
19 Q.   And was it Ms. Drolette who determined physically
20 where Linda Mellen's office would be located in 2003?
21 A.   I believe that to be the case, yes.
22 Q.   And did Ms. Drolette maintain personnel files --
23 personnel records regarding Linda Mellen in 2003?
24 A.   I don't have direct knowledge of that.

PAGE 27

1 Q.    Where are personnel files of employees in the School
2 of Public Health generally maintained?  Physically,
3 I'm talking about.
4 A.    I don't know.
5 Q.    Is there a central repository, such as in the
6 Personnel Office, for personnel files of employees in
7 the School of Public Health?
8 A.    I don't know.
9 Q.    Well, do you maintain in your office, and by your
10 office I mean in the Personnel Office now, the
11 personnel files of any School of Public Health
12 employees?
13 A.   We maintain the copies of the personnel files, yes.
14 Q.   And did you have that practice as well in 2003?
15 A.   Yes.
16 Q.   You say you maintain copies, do the original personnel
17 files stay with the employee's supervisor?
18 A.   They may well, yes.
19 Q.   In the case of Frances Drolette and Linda Mellen, did
20 Frances Drolette maintain the original personnel file
21 relating to Linda Mellen's employment in 2003?
22 A.   I don't have direct knowledge of that.
23 Q.   Did Ms. Drolette have the ability to affect, either up
24 or down, Linda Mellen's salary, her compensation, in

PAGE 28

1 2003?
2 A.    Yes.
3 Q.    Was Linda Mellen an exempt employee in 2003?
4 A.    Yes, she was.
5 Q.    Could you explain to me, sir, what an exempt employee
6 at BU is?
7 A.    In my view it's a professional level employee who is
8 salaried for their work for the University.
9 Q.    And at some point prior to today, did you review Linda
10 Mellen's personnel file?
11 A.   Yes, I did.
12 Q.   And when did you last do that, sir?
13 A.   I believe it was a couple of weeks ago.
14 Q.   When you reviewed that personnel file -- strike that.
15 In the period that you served as Director of Personnel
16 from '96 on; that is, for the Medical Campus, did
17 your office have a policy regarding conducting annual
18 performance reviews of Medical Campus employees?
19 A.   We have a practice of conducting annual merit reviews.
20 Q.   And what is the purpose of those annual merit reviews?
21 A.   To determine whether or not an individual employee
22 would receive a salary increase for the coming year.
23 Q.   And do you distinguish, in your mind, annual merit
24 reviews from annual performance reviews?

SHEET 8  PAGE 29

1 A.    Yes, I do.
2 Q.    Did the School of Public Health, from '96 on, have a
3 practice of conducting annual performance reviews of
4 employees?
5 A.    I know that they currently do it, I'm not certain what
6 year they put it into place.
7 Q.    Do you know if that practice was in place in Frances
8 Drolette's office in 2003?
9 A.    I recall having discussions with Ms. Drolette
10 regarding it; I don't recall if it was fully
11 implemented at that time.
12 Q.    Do you know if Ms. Knucht, Associate Dean Knucht, had
13 a practice within her office of conducting annual
14 performance reviews of her employees?
15 A.    Not that I'm aware of.
16 Q.    What is the distinction you make, Mr. Snowdon, between
17 annual performance reviews and annual merit reviews?
18 A.    The University does not have a formal performance
19 evaluation system in place. There are departments
20 that may conduct performance reviews on their own, in
21 their own manner. The annual merit review, in my mind
22 is as I mentioned earlier, an opportunity to evaluate
23 whether or not a person will receive an increase in
24 their wage for the coming year.

PAGE 30

1 Q.    And those merit reviews, sir, are they initiated by
2 your office?
3 A.    We provide guidelines and instructions to departments
4 in that process.
5 Q.    And who initiates them, sir; that is, these merit
6 reviews?
7 A.    Well, the determination of whether the University will
8 have a merit review each year is initiated at the
9 highest level of the University.
10 Q.    And within any specific department, such as
11 Administration and Finance, Frances Drolette's office,
12 who within that office determines whether a merit
13 review will be conducted of any particular employee?
14 A.    That would be Ms. Drolette.
15 Q.    To your knowledge was there every any formal
16 performance reviews conducted of Linda Mellen at any
17 time?
18 A.    Not that I'm aware of.
19 Q.    When you reviewed Ms. Mellen's personnel file a couple
20 of weeks ago, to your best memory, were there any
21 formal performance review documents in that file?
22 A.    I don't' recall.
23 Q.    Do you recall whether you saw a couple of weeks ago
24 when you reviewed the personnel file, any formal merit

PAGE 31

1 review documents regarding Ms. Mellen?
2 A.    I do recall seeing documents within the personnel file
3 which affected merit increases over the years for Ms.
4 Mellen.
5 Q.    That is, these documents formalized the fact that Ms.
6 Mellen received a merit increase?
7 A.    Yes.
8 Q.    Did you see in that personnel file any underlying
9 documents that would support whatever merit increases
10 Ms. Mellen received?
11 A.    I don't recall.
12 Q.    Mr. Snowdon, does BU have an interest in having
13 advance notice -- receiving advanced notice of an
14 employee's resignation?
15 A.    Yes.
16 Q.    And BU, as a matter of policy, expects employees to
17 give at least one month advanced notice of their
18 resignation; is that correct?
19 A.    That's our expectation for exempt level employees,
20 yes.
21 Q.    And by the way, Linda Mellen was an exempt level
22 employee?
23 A.    Yes, she was.
24 Q.    And this one month advance notice requirement that BU

PAGE 32

1 has, is the purpose of that so that BU has time to
2 make personnel adjustments?
3 A.    Yes, it is.
4 Q.    If I could refer to you again, Mr. Snowdon, to Exhibit
5 No. 2, the Personnel Policy Manual, may I ask you to
6 page to Rule Number 204.1. I have it at page
7 nineteen.
8 A.    Yes.
9 Q.    And is this the rule which expresses BU's interest in
10 having one month's advance notice of an employee's
11 resignation?
12         MS. TALLEY: Objection; ambiguous. You can
13 answer.
14 A.    Yes. That is the University's expectation for exempt
15 level employees.
16 Q.    Would you agree with me that an employee's resignation
17 with less than one month advanced notice runs contrary
18 to this rule?
19         MS. TALLEY: Objection.
20 A.    Yes.
21 Q.    BU also has an interest, doesn't it Mr. Snowdon, in
22 receiving -- strike that. BU has an interest, doesn't
23 it Mr. Snowdon, in giving employees advanced notice of
24 lay-offs?

SHEET 9   PAGE 33

1 A.    Yes.
2 Q.    And this interest is based on what, sir; that is, in
3 giving employees advanced notice of a lay-off? Why
4 does BU have that policy?
5 A.    When possible we endeavor to provide that notice so
6 that an employee can begin their search for other
7 employment, whether it be within or without the
8 University.
9 Q.    And so the normal practice is to give employees a
10 month's notice before they are laid off; is that
11 correct?
12 A.    Yes, whenever possible.
13 Q.    And Rule 204.2, sir, that's a statement of BU's
14 interest in this regard; is that correct?
15 A.    Yes, it is.
16 Q.    So whether the matter is a resignation or a lay-off,
17 the rule at BU is one month advanced notice; is that
18 correct?
19          MS. TALLEY: Objection.
20 A.    It's certainly the preference of the University. I
21 have trouble with the word rule.
22 Q.    If I could direct your attention, sir, of page two of
23 this Personnel Manual, basically the Table of
24 Contents.

PAGE 34

1 A.    Yes.
2 Q.    You see entries under the General Chapter 100 and
3 entries under the General Chapter 200, etc., sir?
4 A.    Yes, I do.
5 Q.    And under each chapter there are specific sections;
6 isn't that correct, sir?
7 A.    Yes, it is.
8 Q.    Each section, if it's not a rule, what is it? What do
9 you call these?
10 A.    Policies.
11 Q.    Policies?
12 A.    Yes.
13 Q.    And in your mind, sir, what is the difference between
14 a BU policy and a BU rule?
15 A.    In my mind, a policy is something we endeavor to
16 adhere to; a rule is a more strict and hard fast.
17 Q.    For instance, sir, on page five, Section 101.1, is it
18 your testimony that BU has a policy of equal
19 opportunity but not a rule of equal opportunity?
20          MS. TALLEY: Objection.
21 A.    Yes.
22 Q.    Would you agree with me, sir, that BU supervisors,
23 again Medical Campus supervisors, may discipline an
24 employee who demonstrates a consistent pattern of

PAGE 35

1 unscheduled absences?
2 A.    Yes.
3 Q.    And BU supervisors may discipline, including
4 terminate, employees who have excessive unscheduled
5 absences; is that correct, sir?
6 A.    That may occur, yes.
7 Q.    Let me direct you to Rule or Policy 202.3 in this
8 Exhibit 2, sir. I'm sorry it's on page seventeen;
9 202.3.
10 A.    Yes.
11 Q.    And is this the section by which BU expresses its
12 policy regarding unscheduled or excessive absences?
13 A.    Yes, it is.
14 Q.    At any time over her twenty-six years at BU, did Linda
15 Mellen, to your knowledge, exhibit a consistent
16 pattern of unscheduled absences?
17 A.    Not that I'm aware of.
18 Q.    Based on your knowledge, Mr. Snowdon, over her twenty-
19 six years at BU, did Linda Mellen exhibit a consistent
20 pattern of excessive, unscheduled absences?
21 A.    Not that I'm aware of.
22 Q.    As far as you're aware, Ms. Mellen had never been
23 disciplined for any unscheduled absences; had she?
24 A.    Not to the best of my knowledge.

PAGE 36

1 Q.    Well, you've reviewed her personnel file within the
2 last several weeks, sir; is that correct?
3 A.    Yes, it is. I'm sorry.
4 Q.    Did you see in that personnel file any disciplinary
5 measures taken against Linda Mellen because of
6 unscheduled or unauthorized absences?
7          MS. TALLEY: Objection. If it's a question of
8 memory, we've produced the file and you can certainly
9 show it to him.
10 A.    Not that I recall.
11 Q.    To your knowledge, had Linda Mellen over her twenty-
12 six years at BU ever been formally disciplined for on-
13 the-job misconduct?
14          MS. TALLEY: Objection; ambiguous.
15 A.    Not that I'm aware of.
16 Q.    And are you aware of any instance over the course of
17 Ms. Mellen's twenty-six years at BU where she was
18 formally disciplined because of deficiencies in her
19 work performance?
20 A.    Not that I'm aware of.
21 Q.    Since 1996, sir, you've been involved in one role or
22 another with the termination of employees at the
23 Medical Campus; is that correct?
24 A.    Yes, it is.

SHEET 10   PAGE 37

1 Q.    Do you have any way to ball park for me today --
2 understanding that ball parks can be large, ball park
3 for me today the number of terminations you've been
4 involved with since 1996?
5 A.    I cannot even venture a guess, sir.
6 Q.    Do you have any sense whether it's more or less than
7 ten?
8 A.    It would be more than ten.
9 Q.    And, again, I understand what you said but let me
10 press you just a little.  Do you have any sense
11 whether it's more or less than fifty?
12 A.    Probably more than fifty.
13 Q.    I'll leave it at that for now, understanding your
14 testimony.  How many employees, BU employees, have you
15 been involved with in connection with their
16 termination who had more than ten years experience,
17 who had no job deficiency or attendance issues in
18 their personnel files, who were terminated for missing
19 one day of work?
20         MS. TALLEY:  Objection.
21 A.    I can't recall any such instances off hand.
22 Q.    BU has a policy, Mr. Snowdon, doesn't it which applies
23 a three work-day grace period for unexcused absences?
24         MS. TALLEY:  Objection.

PAGE 38

1 Q.    Do you want me refrain that? I didn't mean to lead you
2 into somewhere you didn't want to go.
3 A.    Yes, I didn't understand the question.
4 Q.    Do you know whether BU has a policy which applies a
5 three work day grace period for unexcused absences of
6 employees?
7         MS. TALLEY:  Objection.
8 A.    My response would be that the University does have a
9 policy which states that if an employee does not show
10 up for work for three consecutive days without notice
11 to the supervisor that we consider it to be a
12 voluntary resignation.
13 Q.    Let me direct your attention, sir, again, to Exhibit 2
14 before you, the Personnel Manual Rule or Policy 202.1,
15 also on page seventeen.
16 A.    Yes.
17 Q.    And specifically, with respect to the second paragraph
18 of that 202.1; you see that there, sir?
19 A.    Yes, I do.
20 Q.    And is that the section that you had in mind when you
21 answered my question two or three questions ago?
22 A.    Yes, it is.
23 Q.    Is it BU's position, sir, in this litigation that
24 Linda Mellen's return-to-work date after her family

PAGE 39

1 leave was November 19, 2003?
2 A.    Yes, it is.
3 Q.    And you know that Linda Mellen did not appear for work
4 on November 19, 2003; right?
5 A.    Yes.
6 Q.    And therefore her absence her November 19, 2003, was
7 unexcused; is that correct?
8 A.    Yes.
9 Q.    And referring you back to Exhibit No. 3, that absence
10 on November 19 was the reason that Frances Drolette
11 initiated and then affected her separation from BU; is
12 that correct?
13         MS. TALLEY:  Objection.
14 A.    Yes, it is.
15 Q.    Linda Mellen, to your knowledge, sir, wasn't given the
16 three days of unexcused absences allowed by Rule
17 202.1; was she?
18         MS. TALLEY:  Objection.
19 A.    That's correct.
20 Q.    Why, to your knowledge -- I understand it wasn't your
21 decision, but why, to your knowledge, given your
22 involvement in the termination of Linda Mellen, did
23 Frances Drolette not give Linda Mellen the benefit of
24 Section 202.1?

PAGE 40

1         MS. TALLEY:  Objection.
2 A.    I believe it was because as stated in Ms. Drolette's
3 letter she referred to the leave letter which Ms.
4 Mellen received.
5 Q.    Just understanding your answer; is it your
6 understanding that a leave letter that Ms. Mellen
7 received supersedes the three-day grace period of
8 202.1?
9         MS. TALLEY:  Objection.  You can answer.
10 A.    Yes.
11 Q.    What is your basis for that understanding, Mr.
12 Snowdon?
13 A.    As it's laid out in the confirming letter that was
14 sent to Ms. Mellen regarding her leave, it states
15 that, as Ms. Drolette outlines in the letter on
16 November 20, the ramifications if the employee does
17 not return on the date expected the leave to conclude.
18 Q.    I understand that there is inconsistency between the
19 leave letter and Section 202.1, but what is your basis
20 for the view that the leave letter supersedes 202.1?
21         MS. TALLEY:  Objection.  You can answer.
22 A.    I believe that the University operates within the
23 regulations of the Family Medical Leave Act;  when an
24 absence is related to a leave.  And the Policy Manual

SHEET 11    PAGE 41

PAGE 42

1 addresses circumstances that may not fall under a
2 leave.
3 Q.    As far as you're aware, sir, and I assume that you
4 haven't committed this Personnel Manual to your memory
5 word for word, but as far as you know, sitting here
6 today, is there anything in the personnel manual which
7 establishes that a leave letter under the Family
8 Medical Leave Act supersedes and nullifies the effect
9 of 202.1?
10            MS. TALLEY:  Objection.  And you have the manual
11 and you're welcome to look at it to the extent you
12 need to answer the question.
13 A.    Would you restate your question, please?
14            MR. BEACH:  Can you read that one back?
15            (The last question was read back by the
16    reporter.)
17 A.    Within the Personnel Policy Manual there is no section
18 regarding the Family and Medical Leave Act, Section
19 312.  And one of the clauses of this policy is Policy
20 No. 312.7:  conditions of re-employment.  Within that
21 policy it states that if an employee fails to return
22 to work by that expected return date we consider to

1 have resigned voluntarily from the University.
2 Q.    And is it your view, Mr. Snowdon, that Section 312.7
3 supersedes or nullifies 202.1?
4            MS. TALLEY:  Objection.
5 A.    As it relates to a person who is out on the Family
6 Medical Leave Act, yes.
7 Q.    Is there anything in the Personnel Manual here, sir,
8 which states or allows the reading that 312.7 trumps
9 202.1?
10            MS. TALLEY:  Objection.  You can answer.
11 A.    I am not aware of any specific provision that
12 addresses that.
13            MR. BEACH:  Can we go off the record a second?
14 Q.    Currently, sir, how many employees are at the Medical
15 Campus?
16 A.    Approximately thirty-five hundred.
17 Q.    And in that count do you include faculty?
18 A.    Yes, I do.
19 Q.    And was that roughly the same situation in 2003; that
20 is, somewhere around thirty-five hundred?
21 A.    Yes.
22 Q.    And employees on the Medical Campus, they accrue
23 vacation leave as they continue to serve as employees;
24 is that correct?

PAGE 43

PAGE 44

1 A.    Yes, they do.  Yes.
2 Q.    And they accrue sick leave; is that correct?
3 A.    Yes.
4 Q.    And these employees, they routinely take vacation
5 leave and sick leave and personal leave over the
6 course of the year; don't they?
7 A.    Yes.
8 Q.    BU also recognizes other kinds of authorized absences;
9 doesn't it?  Other than vacation, sick and personal?
10 A.    I'm not sure what you're referring to.
11 Q.    BU recognizes that sometimes employees are out on
12 authorized leave because of an on-the-job injury; is
13 that correct?
14 A.    Yes.
15 Q.    And sometimes employees are out of work because of
16 maternity leave for which they may get paid; is that
17 correct?
18 A.    Yes.
19 Q.    And sometimes employees are out on sympathy leave
20 under the rules of the Personnel Policy Manual; isn't
21 that correct?
22 A.    Yes.
23 Q.    Sometimes employees are out on jury duty or military
24 leave; is that correct?

1 A.    Yes.
2 Q.    And those are all, assuming the appropriate notice,
3 authorized leaves of absences; isn't that correct?
4 A.    Yes.
5 Q.    And these employees, as a general matter on the
6 Medical Campus, they return after their period of
7 authorized leave;  isn't that correct?
8 A.    Yes.
9 Q.    On occasion -- is it your experience, though, on
10 occasion, that employees return to work later than
11 their supervisors expected?
12 A.    Yes.
13 Q.    To your knowledge, understanding that you've been at
14 BU since '92 and Director of Personnel since '96, how
15 many Medical Campus employees have been terminated
16 because they did not appear for work on the very first
17 day they were expected to return from their authorized
18 leave?
19            MS. TALLEY:  Objection.  You can answer.
20 A.    Although I can't cite the instances off hand, I
21 believe that there have been occasions of that in the
22 past.
23 Q.    Any way to number, roughly or specifically, the number
24 of occasions where employees have been terminated

SHEET 12   PAGE 45

PAGE 46

1 because they did not appear for work on the first day
2 they were expected to return?
3 A.   I believe they would be a handful or less.
4 Q.   And to your knowledge, did these employees have a
5 previous history of taking unauthorized or unexcused
6 leave from their employment?
7 A.   I don't recall.
8 Q.   Prior to the letter that Ms. Drolette sent out on
9 November 20, 2003; that is, Exhibit No. 3, what
10 investigation did your office conduct as to why Linda
11 Mellen did not appear for work on November 19?
12          MS. TALLEY: Objection. You can answer.
13 A.   We did not conduct any investigation.
14 Q.   And maybe investigation is an ambiguous word, but did
15 your office conduct or undertake any kind of inquiry
16 before this letter went out, Exhibit No. 3, as to why
17 Linda Mellen did not report to work on November 19?
18 A.   No.
19 Q.   Do you know whether Frances Drolette made any inquiry
20 before signing and sending Exhibit No. 3 as to why
21 Linda Mellen was not at work on November 19?
22 A.   I don't know.
23 Q.   Did you ever ask her whether she looked into why Linda
24 wasn't at work on the nineteenth?

1 A.   I don't recall.
2 Q.   Under BU policy, Mr. Snowdon, if a holiday -- is it
3 correct to say that if a holiday falls within an
4 employee's vacation leave, that vacation leave is
5 extended one day?
6          MS. TALLEY: Objection.
7 A.   Could you state the question again, please?
8 Q.   Do you understand, and is it BU's policy, that if a
9 holiday falls within an employee's authorized vacation
10 time that the holiday serves to extend the vacation
11 time an extra day?
12 A.   I don't believe that to be the case.
13 Q.   Let me ask you this in an attempt to focus that same
14 question. If an employee were to be approved for five
15 days of vacation at the end of May and the vacation
16 time straddled Memorial Day, the University holiday,
17 doesn't that Memorial Day holiday serve to extend his
18 vacation another day?
19          MS. TALLEY: Objection. You can answer.
20 A.   I wouldn't interpret it that way, sir. In my
21 experience, vacation time is generally requested for
22 specific dates; they may be around the holiday, they
23 may not be around the holiday.
24 Q.   Can we look together, Mr. Snowdon, at Section 301.7 of

PAGE 47

PAGE 48

1 the Personnel Manual? And it's on page thirty-two I
2 have it.
3 A.   Yes.
4 Q.   See the first paragraph in that section, sir; 301.7?
5 A.   Yes, I do.
6 Q.   In light of our immediately previous exchange, sir,
7 does this section, the first paragraph in particular,
8 prompt you to clarify your answer?
9 A.   Well, I would again state it as I did earlier: my
10 experience is that an employee generally requests
11 specific dates of vacation and they may fall around a
12 holiday.
13 Q.   But if an employee said I'm taking the next five days
14 off for vacation leave, and one of the days in that
15 five day period and one of the days in that five-day
16 period is a holiday, doesn't that holiday serve to
17 extend the employee's vacation time one more day?
18          MS. TALLEY: Objection.
19 A.   Again, sir, it's been my experience that when
20 employees have requested vacation time it's generally
21 been that specific dates. An example might be that I
22 might request vacation for May 28, 29th, and 30th, and
23 June 1, knowing that May 31 may be the holiday.
24 Q.   In your experience as Director of Personnel, have you

1 ever had to interpret 301.7 in the circumstances where
2 an employee says I'm taking off the next, for example,
3 five days and a holiday falls within that same five
4 day period?
5 A.   Not that I can recall.
6 Q.   Let me direct your attention to Section 308.3, Mr.
7 Snowdon. There are a lot of paragraphs, so give me a
8 second here. The third paragraph down, in 308.3;
9 could you take a look at that?
10 A.   Yes.
11 Q.   And by this section, this rule, this policy, BU is
12 telling employees that if they're on authorized paid
13 leave or have authorized paid absences, they'll be
14 eligible for holiday leave?
15 A.   Yes.
16 Q.   BU policy also states that sick leave can be used by
17 an employee to care for an ill member of that
18 employee's immediate family living in the same
19 household; doesn't it, sir?
20 A.   Yes, it does.
21 Q.   And if we could turn together to 302.1. Page thirty-
22 three, sir. And that's the section, the rule, the
23 policy by which BU declares that sick leave can be
24 used in the care of an ill member of the employee's

SHEET 13  PAGE 49

1 immediate family living in the same household, sir; is
2 that correct?
3 A.    Yes, it is.
4 Q.    And BU has a policy, as well, to allow its employees
5 to use a sick leave up to the number of days that
6 employee has accrued; isn't that correct, sir?
7 A.    Yes, it is.
8 Q.    And if I could turn your attention to 302.6, sir, and
9 as it follows onto page thirty-five at the top, it is
10 in that first sentence where BU announces the policy
11 that employees are entitled to use sick leave up to
12 the number of sick leave days they have accrued; do I
13 have that right?
14 A.    Yes, you do.
15 Q.    Did you know that in November 2003, Linda Mellen was
16 living with and caring for her ill mother?
17 A.    I was not aware of that.
18 Q.    Do you have an understanding, sir, why she took family
19 leave in 2003?
20 A.    Yes, I do.
21 Q.    And that reason was what?
22 A.    To assist her ill mother, yes.
23 Q.    And did you ever inquire of Linda Mellen what she was
24 doing in November 2003, to care for her ill mother?

PAGE 50

1 A.    No.
2 Q.    Do you know where Linda Mellen's mother was living in
3 November of 2003?
4 A.    It was my understanding that she was in the Albany,
5 New York area.
6 Q.    And what is your understanding based on, sir?
7 A.    Based upon documentation which we received to support
8 the leave that Ms. Mellen took.
9 Q.    And that was roughly in July or early August 2003?
10 Roughly being the important word there.
11 A.    Yes.
12 Q.    But my question was more specific: do you have any
13 knowledge as to where Linda Mellen's mother was living
14 in November 2003?
15 A.    No, I do not.
16 Q.    In looking through Linda Mellen's personnel file, did
17 you come to understand, again roughly, that Linda
18 Mellen had an abundant number of sick days accrued to
19 her account as of late 2003?
20        MS. TALLEY:  Objection.
21 Q.    That is, roughly a hundred?
22 A.    I believe at some point I inquired as to Ms. Drolette
23 the amount of sick and vacation time that Ms. Mellen
24 had available to her.

PAGE 51

1 Q.    And did you come to learn, as a result of your
2 inquiry, that Ms. Mellen had accrued a high number of
3 days, of sick days, in her sick leave account, if you
4 would?
5 A.    Yes. I don't recall a specific number.
6 Q.    I understand. But if -- strike that. On the
7 assumption that Linda Mellen had some sick days
8 accrued in her account as of November 2003, didn't she
9 have a right under 302.1 to use that accrued sick time
10 to care for a sick mother who was living in her home?
11        MS. TALLEY:  Objection. You can answer.
12 A.    Could you state the question again, please?
13        (The last question was read back by the
14        reporter.)
15 A.    Our Policy Manual provides for an employee to request
16 a continued leave of absence once the Family Medical
17 Leave Act runs out. Given that scenario, it would
18 have been appropriate for Linda to have requested
19 continued leave.
20 Q.    And what exactly did you inform Ms. Mellen that it
21 would be appropriate for her in November 2003 to
22 request an extension of her time out of the office?

PAGE 52

1        MS. TALLEY:  Objection.
2 A.    I didn't have such a conversation with Ms. Mellen. I
3 was not aware that she was going to need additional
4 time.
5 Q.    To your knowledge, did Frances Drolette ever inform
6 Ms. Mellen that she, Linda Mellen, had the obligation
7 to request additional time off to care for her mother;
8 that is in November 2003?
9 A.    I don't know.
10 Q.    Do you have the policy, again, before you, sir?
11 A.    Yes.
12 Q.    To put it succinctly, 302.1 allows sick leave to be
13 used in the care of an ill relative and 302.6 allows
14 employees to use all the sick leave they have. Why
15 wasn't, given that, Linda Mellen given the benefits of
16 those rules on November 19, 2003?
17        MS. TALLEY:  Objection.
18 A.    I believe because she had already fully utilized the
19 leave available to her under the Family Medical Leave
20 Act.
21 Q.    But you testified earlier that she had some amount --
22 I think the record will establish later that it was
23 roughly a hundred days, but that she had some amount
24 of sick leave accrued to her in late November 2003.

SHEET 14  PAGE 53

1 A.    Yes.
2 Q.    And the policy allows sick leave, accrued sick leave,
3 to be used for the care of an ill relative; isn't that
4 correct?
5 A.    Yes.
6 Q.    But isn't it true that Ms. Drolette denied Ms. Mellen
7 the benefits of these sick leave rules when she did
8 not permit Ms. Mellen to use her accrued leave on
9 November 19?
10             MS. TALLEY: Objection.
11 A.    As I stated earlier, I believe that Ms. Mellen had
12 utilized the maximum amount of time provided to her in
13 the Family Medical Leave Act.
14 Q.    Well, I understand the Family and Medical Leave Act
15 but I'm talking about sick leave and 302.1 and 302.6.
16 She had sick leave accrued; she's allowed under BU
17 policy to use sick leave to care for her sick
18 relative. Why instead of terminating her or
19 separating her on November 19, was she not allowed the
20 benefits of those sick leave rules?
21             MS. TALLEY: Objection.
22 A.    I feel like I'm answering the same question. Again, I
23 point to the fact that she utilized the maximum time
24 available to her under the Family Medical Leave Act.

PAGE 54

1 Q.    Do you agree that even if Linda Mellen had no sick
2 leave accrued to her in November 2003, she was
3 allowed, as a general matter, to use accrued vacation
4 time to care for ill relatives?
5 A.    Yes.
6 Q.    And again, Mr. Snowdon, 302.6, if I could. Thirty-
7 four continuing over to thirty-five. That policy that
8 you just testified to is set out in the third
9 paragraph of 302.6; isn't it? Employees who exhaust
10 their accrued sick leave may request that additional
11 absences that would normally be taken as sick leave be
12 charged to their accrued vacation leave, etc.
13 A.    Yes.
14 Q.    Did you have an understanding in November 2003, that
15 Linda Mellen had a substantial amount of vacation
16 leave accrued in her account?
17 A.    Yes.
18 Q.    And actually later, directing your attention to
19 Exhibit 3, apparently the value of that accrued
20 vacation was roughly $12,000; wasn't that correct?
21 Isn't that correct?
22 A.    No. I think that the check for $12,000 represents
23 payment for work through November 19, plus -- I'm
24 sorry through November 18, plus the accrued vacation

PAGE 55

1 time.
2 Q.    But some part of that check represents accrued
3 vacation leave?
4 A.    Yes.
5 Q.    And the payment for that accrued leave; is that
6 correct?
7 A.    Yes.
8 Q.    Why didn't BU allow Ms. Mellen to use her accrued
9 vacation leave consistent with 302.6 on November 19,
10 instead of firing her?
11             MS. TALLEY: Objection.
12 A.    I'm not aware that Ms. Mellen requested that the
13 additional absences be charged to her vacation time.
14 Q.    Did you ever inform Ms. Mellen that she had to make
15 that request; your office, that is?
16 A.    No.
17 Q.    Did Ms. Drolette, to your knowledge, ever inform Ms.
18 Mellen that she had to make that request?
19 A.    I don't know.
20 Q.    Is it your testimony that had Ms. Mellen made that
21 request, she wouldn't have been fired?
22             MS. TALLEY: Objection.
23 A.    No.
24 Q.    Why do you answer no to that question, sir?

PAGE 56

1 A.    It's my opinion that if Ms. Mellen had requested
2 additional time off or requested to use the vacation
3 time that there would have been a different analysis
4 regarding her continued status with the University.
5 Q.    And what, to your understanding, would that different
6 analysis be?
7 A.    That would depend on a review of the facts.
8 Q.    By Ms. Drolette?
9 A.    And others, yes.
10 Q.    And is it your understanding that under no
11 circumstance was Ms. Drolette prepared to give Ms.
12 Mellen additional leave after November 18?
13             MS. TALLEY: Objection. You can answer.
14 A.    I don't know.
15 Q.    Do you know whether Linda Mellen had any accrued comp.
16 or compensatory time in her account as of November
17 2003?
18 A.    I don't know.
19 Q.    If she did, she would have been under Rule 309.1,
20 allowed to use that comp. time as a basis for an
21 authorized absence; isn't that correct?
22             MS. TALLEY: Objection.
23 A.    I don't know; it would depend on when the compensatory
24 time was built up.

SHEET 15   PAGE 57

1 Q.    Again, my question did rely on assumption.  If she did
2 have comp. time accrued to her, in her account as of
3 November 2003, she, as a general matter, would have
4 been able to use that comp. time as a basis for an
5 authorized absence from her position; isn't that
6 correct?
7           MS. TALLEY: Objection.
8 A.    Yes.
9 Q.    Could I draw your attention, Mr. Snowdon, to 313.1?
10 Sorry.  On page fifty-six, on paid time off?  You have
11 that there, sir?
12 A.    Yes.
13 Q.    And as I understand it, unpaid time off is an
14 authorized absence from work; is that correct, sir?
15 A.    Yes, it is.
16 Q.    Why didn't BU charge Ms. Mellen's absence on November
17 19, to unpaid time off under 313.1 and following?
18           MS. TALLEY: Objection.  You can answer.
19 A.    I don't know.
20 Q.    314.1, sir.  If I could draw your attention to that.
21 BU also has a policy of allowing authorized absences
22 based on medical leave of absences; is that correct?
23 A.    Yes.
24 Q.    And at least under 314 there, sir, that medical leave

PAGE 58

1 of absence is an unpaid but authorized leave; is that
2 correct, sir?
3 A.    Yes.
4 Q.    Why didn't BU, on November 19, register Linda Mellen's
5 absence as a leave under medical leave of absence
6 unpaid?
7           MS. TALLEY: Objection.  You can answer.
8 A.    I'm not aware that at the time we had any indication
9 that continued leave was necessary.
10 Q.    But again, I don't mean to belabor this, but again,
11 your office never inquired of Linda Mellen what her
12 circumstances were in late November regarding her need
13 for further authorized absences, did it?
14 A.    No.
15           MS. TALLEY: Objection.
16 Q.    And to your knowledge, again, Ms. Drolette didn't
17 inquire of Ms. Mellen either; is that correct?
18           MS. TALLEY: Objection; asked and answered.
19 A.    Not that I'm aware of.
20 Q.    Again, sir, 315.1.  BU has a policy of allowing
21 personal leave of absences as authorized absences from
22 work under this section; doesn't it, sir?
23 A.    Yes.
24 Q.    And at least under this section that personal leave of

PAGE 59

1 absence is taken in an unpaid status; is that correct?
2 A.    Yes.
3 Q.    Why didn't BU, on November 19, register Ms. Mellen's
4 absence that day as a personal leave of absence unpaid
5 under 315?
6           MS. TALLEY: Objection.  You can answer.
7 A.    I'm not aware that Ms. Mellen requested that she be
8 provided with an additional leave.
9 Q.    As we already discussed, Ms. Mellen wasn't given the
10 benefit of that three unexcused absences rule either,
11 was she, as far as her November 19 absence was
12 concerned?
13           MS. TALLEY: Objection.
14 Q.    Is that correct?
15 A.    Yes.
16 Q.    Why wasn't, on November 19, Ms. Mellen given the
17 benefit of the twenty-four hours of family leave
18 mandated by the Small Necessities Leave Act?
19           MS. TALLEY: Objection.
20 A.    I'm not aware that she requested leave under the
21 circumstances.
22 Q.    Is it your understanding, Mr. Snowdon, that -- again,
23 I'm just asking for your understanding, that the Small
24 Necessities Leave Act requires a request from an

PAGE 60

1 employee to take leave under that law?
2           MS. TALLEY: Objection.
3 A.    Yes.
4 Q.    Is it your understanding as well, Mr. Snowdon, that
5 the Family and Medical Leave Act requires an employee
6 to request, with reference to the FMLA, family leave?
7           MS. TALLEY: Objection.  You can answer that if
8 you can.
9 A.    I don't know; I can't say.
10 Q.    Prior to the separation of Linda Mellen in November
11 2003, had you ever been involved in a termination of a
12 BU employee who had an unblemished, long-term tenure
13 at BU because that employee missed one day of work?
14           MS. TALLEY: Objection.
15 A.    I don't recall.
16           MR. BEACH: Let me know if you need to take a
17 break or stretch, Mr. Snowdon, and I'll just keep
18 pushing on.
19 Q.    If I could, sir, 308.1 of the Personnel Manual.  With
20 reference to 308.1, sir, on page forty-six, am I
21 correct in reading this that BU has a policy of twelve
22 authorized paid holidays to a normal work year?
23 A.    Yes.
24 Q.    And in 2003, BU added for that year the Daniel S.

1 employees that their sick leave, their annual leave,
2 their personal days or comp. time are going to count
3 against their family leave; isn't that correct?
4 A.    Yes.
5 Q.    Would you agree with me, sir, that 312.5 says nothing
6 about holiday leave?
7 A.    That's correct.
8 Q.    Let me show you your letter of July 31, 2003, to Ms.
9 Mellen, premarked as Exhibit 6 to this deposition.
10 Maybe I'm going too fast now, Mr. Snowdon, let me slow
11 down. Can you identify that document, sir?
12             (Whereupon, letter dated 7/31/03, was
13       presented as Premarked Deposition Exhibit No. 6.)
14 A.    Yes.
15 Q.    You see your signature on the third page of that
16 document?
17 A.    Yes, I do.
18 Q.    And is this three-page document, dated July 31, 2003,
19 a letter from you to Ms. Mellen regarding her family
20 leave?
21 A.    Yes, it is.
22 Q.    Specifically her leave under the FMLA; is that

1 correct, sir?
2 A.    Yes.
3 Q.    As you review that letter, sir, would you agree with
4 me that there's nothing in this letter that tells
5 Linda Mellen that University holidays will be counted
6 against her family leave?
7             MS. TALLEY: Objection.
8 A.    Yes.
9 Q.    It may be for the last time, sir, but let me direct
10 you again to Exhibit No. 2, the Personnel Manual;
11 specifically page two, the Table of Contents.
12 A.    Yes.
13 Q.    We can both see, as we review those Table of Contents
14 that there is no separate section for the Small
15 Necessities Leave Act.  I believe we agree as to that,
16 sir?
17 A.    Yes.
18 Q.    Is there any place in this Personnel Manual here,
19 Exhibit No. 2 to this deposition, where the rights of
20 employees to take family leave under the Small
21 Necessities Leave Act are set out?
22 A.    No.
23 Q.    Are those rights, again, those rights being the SNLA
24 rights, outlined to Medical Campus employees in any

1 other document in 2003?
2 A.    Not that I'm aware of.
3 Q.    Have you ever seen postings in -- strike that.  Have
4 you ever directed that there be postings on the
5 Medical Campus of documents which outline for
6 employees their rights to take family leave under the
7 Small Necessities Leave Act?
8 A.    No.
9 Q.    So you never directed that notices be posted under the
10 SNLA; is that correct?
11 A.    Yes.
12 Q.    In 2003, did you understand that the SNLA permits
13 employees to take up to twenty-four hours of family
14 leave to care for elderly relatives with certain kinds
15 of medical or dental needs?
16 A.    Yes.
17 Q.    What consideration did your office give to the Small
18 Necessities Leave Act in calculating Linda Mellen's
19 period of family leave in 2003?
20             MS. TALLEY: Objection.
21 A.    I don't believe it was taken into account.
22 Q.    Did your office take any steps in November 2003, to
23 assure itself that Linda Mellen had the benefit of
24 family leave under the SNLA?

1             MS. TALLEY: Objection.
2 A.    I'm sorry, your question again?
3 Q.    Let me try it again.  What steps, if any, did your
4 office take in 2003 to assure itself, to assure you,
5 that Linda Mellen enjoyed the benefits of the SNLA in
6 connection with her family leave that year?
7             MS. TALLEY: Objection. Go ahead.
8 A.    I don't think we took any steps.
9 Q.    Do you know, of your personal knowledge, whether
10 Frances Drolette took into account or took any steps
11 to assure herself that Linda Mellen received the
12 benefits of the SNLA in 2003?
13 A.    I don't know.
14 Q.    You don't know?
15 A.    I don't know.
16             MR. BEACH: Do you need to stretch or anything?
17 I think sandwiches are coming around twelve-thirty.
18 Q.    You approved, or your office approved, in 2003,
19 intermittent FMLA leave for Linda Mellen; isn't that
20 correct?
21 A.    Yes.
22 Q.    And again, referring to Exhibit No. 6, your letter of
23 July 31. Page three, you checked the line next to the
24 sentence provided that you received proper medical

SHEET 18   PAGE 69

PAGE 70

1 verification, etc., etc; do you see that, sir?
2 A.    Yes.
3 Q.    And you understood your approval of Linda Mellen's
4 FMLA leave request to entitle her to intermittent
5 family medical leave; is that correct?
6 A.    Yes.
7 Q.    And prior to sending -- strike that. At some point,
8 whether prior to this letter or soon after, you
9 received satisfactory evidence from her that she
10 qualified for medical leave -- family medical leave?
11 A.    Yes.
12 Q.    Would you agree with me, sir, that the duration of
13 Linda Mellen's family medical leave was uncertain from the
14 very beginning?
15           MS. TALLEY: Objection.
16 A.    No.
17 Q.    Let me direct your attention, sir, to page two at the
18 very bottom, sir. The first sentence of that last
19 paragraph. Do I read it correctly, "Provided that
20 there is timely medical verification for the leave,
21 the leave is scheduled to begin or already began on
22 August 4, 2003." Second sentence, "You are currently
23 expected to return to work on your regular schedule on
24 October 3, 2003." Did I read that correctly?

1 A.    Yes.
2 Q.    And on page three, sir, again where the "X" is
3 entered, there was your approval that if needed, that
4 family leave would be extended through November 18,
5 2003; is that correct?
6 A.    Yes.
7 Q.    And did you understand at some point, sir, Ms.
8 Drolette was confused or uncertain about how much
9 family leave Linda Mellen was asking for?
10 A.    Yes.
11 Q.    Let me direct your attention, sir, to Exhibit No. 7.
12 You understand that document, sir, as an e-mail from
13 Frances Drolette to Linda Mellen dated July 18, 2003?
14           (Whereupon, e-mail dated Friday,
15      7/18/03, was presented as Premarked Deposition
16      Exhibit No. 7.)
17 A.    Yes.
18 Q.    And in that e-mail, sir, Ms. Drolette acknowledges
19 that she is confused about the amount of time; that
20 is, family leave that is definite; isn't that correct?
21 A.    Yes, although Ms. Drolette states that she understands
22 and appreciates the need to apply for the maximum

PAGE 71

PAGE 72

1 amount of leave.
2 Q.    And yet in the second paragraph there, there's some
3 uncertainty represented about the amount of time, six
4 weeks or eight weeks; is that correct, sir?
5           MS. TALLEY: Objection; document speaks for
6 itself.
7 Q.    And in connection with her Family and Medical Leave
8 request, sir, Linda Mellen submitted to you a form;
9 that is, Exhibit 8; isn't that correct, sir?
10           (Whereupon, application and notice for
11      family leave dated 8/8/03, was presented as
12      Premarked Deposition Exhibit No. 8.)
13 A.    Yes.
14 Q.    And this form before you is a four page form with a
15 one page attachment, a letter from Dr. Doyle that Ms.
16 Mellen submitted to your office at your request under
17 the Family and Medical Leave Act; is that correct?
18 A.    Yes.
19 Q.    Do you see that date stamp on the top of page one,
20 sir?
21 A.    Yes.
22 Q.    Is that your office's date stamp?

1 A.    I believe that it is, yes.
2 Q.    So it indicates receipt on August 8, 2003; is that
3 correct?
4 A.    Yes.
5 Q.    Let me direct your attention on this Exhibit 8, sir,
6 to the third page, actually the bottom of the third
7 page. You have that there, sir?
8 A.    Yes, I do.
9 Q.    At the bottom of the third page, you see a signature.
10 Do you recognize that signature as Linda Mellen's?
11 A.    Yes, I do.
12 Q.    And she submitted this document to you -- at least she
13 entered her signature, rather, on August 4, 2003, as
14 best you can tell?
15 A.    Yes.
16 Q.    And your office received it on August 8, 2003?
17 A.    Yes.
18 Q.    Do you see in this document on page three, sir, Ms.
19 Mellen's statement that she will be absent from
20 October 28 through November 20?
21 A.    Yes.
22 Q.    And this submission, this Exhibit 8, was submitted to
23 you after Exhibit 6, your July 31, 2003, letter; isn't
24 that correct?

1 A.    Yes, it is.
2 Q.    What effort did you make between -- your office make
3 between your receipt of Exhibit No. 8 and November 19,
4 2003, to communicate with Ms. Mellen about the
5 duration of her family leave?
6 A.    None that I'm aware of.
7 Q.    Was it apparent to you, sir, upon receipt of Exhibit
8 No. 8, that Ms. Mellen understood and was stating to
9 your office that she would be out on medical leave
10 through November 20?
11             MS. TALLEY:  Objection.
12 A.    Yes.
13 Q.    Was there any communication between August 8, 2003,
14 and November 19, 2003, by which your office attempted
15 to correct Ms. Mellen's understanding as to the
16 duration of her family leave?
17 A.    Not that I'm aware of.
18 Q.    Did your office make any attempt in that same time
19 period, August 8, 2003, until November 19, 2003, to
20 find out whether Ms. Mellen, by her submission; that
21 is, Exhibit 8, intended to receive the benefits of the
22 3NLA?
23 A.    I'm sorry.  Your question again?
24 Q.    Did you make any effort between August 8, 2003, and

1 November 19, 2003, to inquire of Ms. Mellen whether by
2 this Exhibit 8 she was requesting leave under the
3 3NLA?
4 A.    No.
5 Q.    Did you understand that Ms. Drolette continued to be
6 uncertain into October 2003, about the duration of Ms.
7 Mellen's family leave?
8             MS. TALLEY:  Objection.
9 A.    Yes.
10 Q.    Let me show you Exhibit No. 9, Mr. Snowdon.  And as
11 you know, as you probably know, when you print out e-
12 mails, the first e-mail appears at the end of the
13 document and the most recent one shows at the top.
14 With that understanding, do you understand that
15 Exhibit No. 9 as an exchange of e-mails over the
16 period October 1, 2003, to October 6, 2003, regarding
17 Linda Mellen?
18             (Whereupon, e-mail dated Monday,
19             10/6/03, was presented as Premarked Deposition
20             Exhibit No. 9.)
21 A.    Yes.
22 Q.    And the one at the very top of the first page, sir, is

1 an e-mail from Ms. Drolette to you; is that correct?
2 A.    Yes.
3 Q.    And in the e-mail directly below that -- strike that.
4 In the e-mail lower down the page dated 10/2/2003,
5 9:16 a.m., there's a correspondence from Frances
6 Drolette to Linda Mellen; isn't there, sir?
7 A.    Yes.
8 Q.    And in that e-mail, Ms. Drolette acknowledges
9 confusion about when Ms. Mellen was to return from her
10 family leave; is that correct?
11             MS. TALLEY:  Objection.
12 A.    Yes.
13             MS. TALLEY:  It explicitly says returning from
14 vacation.
15 Q.    And then in the next e-mail, there is a response from
16 Ms. Mellen to Ms. Drolette regarding Ms. Mellen's
17 family leave period; is that correct?
18 A.    Yes.
19 Q.    And in that statement, Ms. Mellen represents that
20 she'll be out on FMLA leave through November 19; is
21 that correct?
22 A.    Yes.
23 Q.    Did your office make any attempt, after being
24 forwarded these e-mails on October 6, 2003, to

1 communicate with Ms. Mellen regarding the period of
2 family leave she was entitled to?
3 A.    Not that I'm aware of.
4 Q.    Following this e-mail exchange; that is, Exhibit --
5 that is set out, in Exhibit 9, did Ms. Drolette come
6 to speak with you directly?  Let me withdraw that
7 question, it's a bit too vague.
8             You see in Exhibit No. 9, the signing-off
9 sentence from Ms. Drolette to you, Mr. Snowdon:  I
10 will call you later in the day?
11 A.    Yes.
12 Q.    Following that e-mail, or soon after that e-mail, did
13 Ms. Drolette, in fact, sit down with you to discuss
14 Linda Mellen's family leave?
15 A.    I believe that we did, yes.
16 Q.    And what conversation did you have; that is,
17 substantively, following the October 6, 2003, e-mail?
18 A.    I recall that we had a discussion regarding confusion
19 over Linda's vacation in the midst of the leave.  And
20 that that would lengthen the period of the leave.
21 Q.    And that's what you advised Ms. Drolette; that is,
22 that the vacation would serve to extend the period of
23 family leave?
24             MS. TALLEY:  Objection.  What are you saying by

SHEET 20   PAGE 77

PAGE 78

1 your question?

2 Q.    I was just trying to flesh out a little more what the
3 nature of the conversation is.  What did Ms. Drolette,
4 as best you can remember, say to you and what did you
5 say to her in this conversation following at some
6 point, the October 6, 2003, e-mail?

7 A.    I don't recall the specifics.  I do recall a
8 discussion regarding the confusion about the vacation
9 leave in the midst of the FMLA and that Linda would
10 then invoke the second piece of the FMLA leave that
11 she had requested.

12 Q.    And do you recall, sitting here today, what Ms.
13 Drolette's attitude or tone was in connection with
14 this discussion about the duration of Linda Mellen's
15 family leave?

16 A.    I don't have a recollection, I'm sorry.

17 Q.    Let me show you another exhibit, sir.  Exhibit No. 10,
18 a copy of a fax cover sheet.  Again, at the very
19 bottom, BU0284 indicates an identifier attached to
20 this document by BU in its production of documents.

21               [Whereupon, fax cover letter dated
22        10/8/03, was presented as Premarked Deposition
23        Exhibit No. 10.]

---

1               MR. BEACH:  In light of this document, sir; that
2 is, Exhibit No. 1C, the fax cover sheet, do you
3 recall, sitting here today, that whether Ms. Drolette
4 faxed you certain documentation regarding Ms. Mellen's
5 family leave in advance of your meeting with her?

6 A.    Yes, I believe that she did.

7 Q.    What documents did she send to you, sir?

8 A.    I don't recall specifics.  I believe that there were
9 some e-mails included, a number of different
10 documents.

11 Q.    Other than some e-mails and a number of different
12 documents, can you in any further way, further manner,
13 specify what documents Ms. Drolette provided to you in
14 advance of your meeting with her.

15 A.    I'm sorry, I don't recall.

16               MS. TALLEY:  Can we take a quick break?

17 Q.    Let me show you yet another document, Mr. Snowdon,
18 Exhibit No. 11 to this deposition, what purports to be
19 a letter from Linda Mellen to Ms. Drolette copied to
20 you, dated October 23, 2003.  Sir, do you recall being
21 copied with this letter?

22               [Whereupon, letter dated 10/23/03, was

---

PAGE 79

1        presented as Premarked Deposition Exhibit
2               No. 11.]

3 A.    Yes, I do.

4 Q.    And did you understand in reading that letter back in
5 October 2003, that Ms. Mellen continued to understand
6 that her FMLA leave would take her through November
7 20?

8 A.    Yes.

9 Q.    And, again, I don't want to belabor this, but what
10 efforts did you make between your receipt of this
11 Exhibit 10 and November 19 to communicate with Ms.
12 Mellen about the duration of her family leave?

13 A.    I recall that Ms. Drolette and I consulted on this
14 letter and I believe that she sent the response.

15 Q.    Did your office send any response to -- strike that.
16 Did your office communicate with Ms. Mellen following
17 your receipt of Exhibit No. 10 regarding the duration
18 of Ms. Mellen's family leave?

19 A.    No.  As I say we spoke with Ms. Drolette and she sent
20 the letter off.

21 Q.    And was that Exhibit No. 12, sir; Ms. Drolette's
22 letter as best you can account?

23 A.    Yes, it is.

---

PAGE 80

1 Q.    And that document before you purports to be a letter
2 from Ms. Drolette to Ms. Linda Mellen dated October
3 24, with a "cc" to Dr. Meenan and to your office, sir?

4 A.    Yes.

5 Q.    And did you, in fact, receive a copy of this letter?

6 A.    Yes, I did.

7 Q.    And this letter followed your meeting with Ms.
8 Drolette in early October; is that correct?

9               MS. TALLEY:  Objection.

10 A.    This letter was issued after our meeting, yes.

11 Q.    And Ms. Drolette, did she write this letter, or did
12 someone from your office write the letter?

13 A.    She authored it;  I agreed to discuss the letter.

14 Q.    Did you make any -- strike that.  Did you see the
15 letter in draft form?

16 A.    I don't recall specifically;  I may have.

17 Q.    And am I being too specific by saying to you did
18 anyone in your office see this letter in draft form?

19 A.    If so, it would have been myself and I don't recall
20 drafting it.

21 Q.    Actually, that raises a question.  Did anyone other
22 than yourself -- strike that.  Was anyone other than
23 yourself, from your office, involved in approving
24 Linda Mellen's family leave?

SHEET 21   PAGE 81

1 A.    No.
2 Q.    Was anyone from your office involved, other than you,
3 involved in analyzing the duration of that leave?
4 A.    I believe I consulted with my Manager of Benefits,
5 Joanne Walsh, who assists me with these matters.
6 Q.    And Joanne Walsh is titled as what, sir?
7 A.    Manager of Benefits.
8 Q.    And what, as best you can recall, Mr. Snowdon, did you
9 discuss with Joanne Walsh in connection with Linda
10 Mellen's situation?
11 A.    When preparing the confirming letter that went out to
12 Ms. Mellen, I recall that Joanne and I reviewed the
13 calendar to determine what the exact time frame the
14 twelve week leave would be.
15 Q.    And when you say confirming letter, is that Exhibit
16 No. 6, your letter of July 31, 2003?
17 A.    That's correct.
18 Q.    Other than for that consultation at that time with Ms.
19 Walsh, was Ms. Walsh involved at any subsequent time
20 with the questions revolving around Linda Mellen's
21 family leave?
22 A.    We may have had discussions regarding the Physician's
23 Certification Form to support the leave.
24 Q.    Any other topic that you and Ms. Walsh may have

PAGE 82

1 discussed in connection with Linda Mellen's family
2 leave?
3 A.    Not that I recall.
4 Q.    Back to Exhibit No. 11, Ms. Drolette's letter of
5 October 24.  Did you have any input into the
6 statements, the contents, contained in this letter?
7 A.    Not that I recall.  I believe this was mostly a
8 recitation of Ms. Drolette's chronology of events.
9 Q.    Were you asked to approve the letter before it went
10 out, Mr. Snowdon;  that is, Exhibit No. 12?
11                    [Whereupon, letter dated 10/24/03,
12                    was presented as Premarked Deposition Exhibit
13                    No. 12.)
14 A.    Not that I recall.
15 Q.    Do you recall having any discussion with Ms. Drolette
16 regarding the fact that she could not use Ms. Mellen's
17 family leave as a negative factor in terms of
18 evaluating Linda Mellen's employment?
19 A.    Yes;  I believe that we did have a discussion at some
20 point.
21 Q.    And did you effectively say something along the lines,
22 well, you can't hold that against her.  That is, you

PAGE 83

1 can't hold her family leave against her?
2 A.    More likely, my advice to Ms. Drolette would have been
3 that Ms. Mellen's legally entitled to access her
4 rights under the Family and Medical Leave Act.
5 Q.    Do you remember any more specific guidance you gave
6 her regarding the fact that she could not use that
7 family leave as a negative factor in evaluating Ms.
8 Mellen?
9 A.    No more than what I've answered.
10 Q.    Is it your understanding, Mr. Snowdon, that under BU
11 policy, University holidays do not extend an
12 employee's family leave?
13 A.    Yes, with one exception.  It's been our interpretation
14 over the years that the intersession week, which the
15 University typically enjoys, would be viewed as a shut
16 down and we have viewed persons who apply for leave
17 that would go through the intersession time to not
18 have that week count as one of the twelve weeks?
19 Q.    So the intersession week or intersession period would
20 serve to extend an employee's family leave, for
21 instance.
22 A.    Yes.
23 Q.    And would serve to extend an employee's maternity
24 leave?

PAGE 84

1 A.    Yes.
2 Q.    Would it serve, with your understanding of BU policy,
3 would that intersession time extend any other kinds of
4 leave an employee may enjoy?
5 A.    Not that I can think of.
6 Q.    Setting that aside, the intersession period, I
7 understand that you said it was an exception.  Your
8 understanding is that it is BU policy that University
9 holidays do not extend an employee's family leave; is
10 that correct?
11 A.    Yes.
12 Q.    What's the basis for that understanding?
13 A.    I believe it's a determination by the University that
14 an employee's entitled to leave under the Family and
15 Medical Leave Act and the length of that leave may be
16 twelve weeks, but that any University holidays that
17 fall within that time do not serve to extend it all.
18 Q.    And is that the determination, as you phrase it,
19 contained in this Personnel Policy Manual;  that is,
20 Exhibit 2?
21 A.    I don't believe that it's articulated there.
22 Q.    Is that determination, the one you just referred to,
23 published or disseminated to Medical Campus employees
24 to your knowledge?

SHEET 22  PAGE 85

1 A.   Not that I'm aware of.
2 Q.   Did you ever have a discussion with Linda Mellen
3 regarding the issue of whether University holidays
4 serve to extend the period of her family leave?
5 A.   Not that I recall.
6 Q.   Let me show you what I've identified for this
7 deposition as Exhibit No. 13. Again, an exchange of
8 e-mails, the second one purportedly from Ms. Drolette
9 to you, dated July 1, 2003. And again this is Exhibit
10 13. Are you familiar with this exchange of e-mails,
11 sir?
12               (Whereupon, e-mail dated 7/01/03, was
13        presented as Premarked Deposition Exhibit
14               No. 13.)
15 A.   Yes.
16 Q.   And was this among the documents that you reviewed in
17 preparation for today's deposition?
18 A.   Yes.
19 Q.   That handwriting on the bottom half of the page, sir,
20 do you recognize whose handwriting that is?
21 A.   I am not certain whose hand writing that is, no.
22 Q.   You don't recognize it as your own?

PAGE 86

1 A.   I don't recognize it as my own.
2 Q.   And by the July 1 e-mail, Ms. Drolette --
3 understanding the document speaks for itself -- Ms.
4 Drolette represented to you that it was challenging to
5 plan and manage the office objectives with sporadic
6 absences; is that correct?
7 A.   Yes.
8 Q.   And those sporadic absences are those of Linda Mellen;
9 is that correct?
10 A.   I believe that's what she's referring to, yes.
11 Q.   So did you understand even before Linda Mellen's
12 family leave began on August 4, 2003, that Ms.
13 Drolette was not happy with Linda Mellen's absences in
14 2003?
15 A.   Yes.
16 Q.   Exhibit 14, sir. This is a single page of handwritten
17 notes. Do you recognize the handwriting on this
18 document to be yours, sir?
19               (Whereupon, time-out/accumulated time
20        worksheet was presented as Premarked Deposition
21        Exhibit No. 14.)
22 A.   No, I don't believe it is mine.

PAGE 87

1 Q.   Do you recognize the handwriting to be that of Ms.
2 Drolette?
3 A.   I don't know.
4 Q.   Do you know whether the calculation here of sick and
5 vacation time for the period of July '02, through
6 August 4, '03, accurately reflects the time Ms. Mellen
7 was absent from work during that period?
8 A.   That would be my understanding.
9 Q.   And with respect to the accumulated vac., which I
10 assume is vacation, and the accumulated sick, do you
11 understand those entries to be a fairly accurate
12 representation of Ms. Mellen's accrued vacation and
13 sick time, respectively, as of approximately August
14 '03?
15        MS. TALLEY: Objection.
16 A.   Yes.
17 Q.   Did you see this document; that is, Exhibit 14, in
18 the personnel file that you reviewed several weeks
19 ago; that is, Linda Mellen's personnel file?
20 A.   I don't recall it being in the file. I'm not certain.
21 Q.   Let me show you Exhibit 15, sir. It's a document that
22 we received as a result of the production of Linda
23 Mellen's personnel file. This is premarked as Exhibit
24 15. A lot of numbers here, sir, but if I could direct

PAGE 88

1 your attention to the last page of this five page
2 document, are you familiar with documents like this;
3 that is, calculations of earned, used, vacation and
4 sick time for employees?
5               (Whereupon, a vacation/sick time
6        printout was presented as Premarked Deposition
7        Exhibit No. 15.)
8 A.   Yes.
9 Q.   And is this a document that generally, not this one
10 specifically, but generally that your office produces
11 on occasion?
12 A.   No.
13 Q.   Who produces documents like this for Medical Campus
14 employees; that is, at BU?
15 A.   These would generally be generated within the
16 department.
17 Q.   Within who's department?
18 A.   The individual employee's department.
19 Q.   Have you seen this specific document before, sir?
20 A.   I don't know that I have, sir.
21 Q.   Again, directed to the last page, sir, I'm not asking
22 you to attest to the accuracy of it, but just to help

— SHEET 23   PAGE 89 —

1 me in the reading of it. Under the vacation column,
2 sir, earned, used, balance; does this document
3 represent that as of June 2002, Linda Mellen's balance
4 in her vacation account was 87.1 days?
5            MS. TALLEY: Objection.
6 A.    I read it as 76.1 days.
7            MR. BEACH: We're sharing the copies we have.
8 Q.    So at the beginning balance, you read it as 76.1 days;
9 is that correct?
10 A.   Yes.
11 Q.   And at the bottom, sir, as of June -- I assume you
12 understand that to be June 2002?
13 A.   Oh, yes.
14 Q.   Is the balance then 87.1 days?
15 A.   Yes.
16 Q.   And if we go over further to the right, sir, do you
17 understand that as of June 2002, the balance in Linda
18 Mellen's sick leave account was 423 days?
19           MS. TALLEY: Objection; if you know.
20 A.   I don't know.
21 Q.   But as far as interpreting this document, sir, does
22 this document, given your familiarity with these
23 documents, indicate to you that she had 423 sick days
24 accrued?

— PAGE 90 —

1            MS. TALLEY: Objection; if you know.
2 A.    I don't know.
3 Q.    But what does that indicate under the sick columns
4 there, sir, and the balance column. What are all
5 those numbers from 405 down to 423?
6 A.    That I'm not certain. I'm not sure if they indicate
7 hours or days.
8 Q.    Okay. Do you see that handwriting to the right of the
9 balance column in the sick leave accounts?
10 A.   Yes.
11 Q.   Do you read that to say cancel only one hundred and
12 thirty days?
13 A.   Yes.
14 Q.   Is there a policy within BU that you can only -- at
15 least the Medical Campus, that you can only accrue a
16 hundred and thirty sick leave days in your account?
17 A.   That's correct.
18 Q.   And that above a hundred and thirty, they're lost?
19 A.   Yes.
20 Q.   Does that entry -- do you recognize the handwriting of
21 that entry?
22 A.   I don't.
23 Q.   Does that entry help clarify for you that the four
24 hundred and twenty-three registered in the slot for

— PAGE 91 —

1 June 2002 refers to four hundred and twenty-three
2 days?
3            MS. TALLEY: Objection.
4 A.    I don't know.
5 Q.    Exhibit 16, sir. I'll show you that document. Are
6 you familiar with these kinds of documents, sir?
7 These exempt employee monthly time records?
8            (Whereupon, exempt monthly time record
9            was presented as Premarked Deposition Exhibit
10           No. 16.)
11 A.   Yes.
12 Q.   And are they generated by your office or somewhere
13 else?
14 A.   No, they'd be generated within the department.
15 Q.   And you recognize Frances Drolette's signature down at
16 the bottom of the page?
17 A.   Yes, I do.
18 Q.   And you recognize Linda Mellen's signature at the
19 bottom left of the page?
20 A.   Yes, I do.
21 Q.   Roughly early July 2003?
22 A.   Yes.

— PAGE 92 —

1 Q.    And you see on the bottom two lines there, a statement
2 regarding the approved sick days and vacation days
3 Linda Mellen had?
4 A.    Yes.
5 Q.    And as far as you know, sir, this document was
6 generated within Frances Drolette's department?
7 A.    Yes.
8            MR. BEACH: Let's go off the record, if we could?
9 Q.    If you could, Mr. Snowdon, Exhibit 17 is a page, a
10 single page of hand-written notes, sir. This is
11 Exhibit 17 to this deposition. Do you recognize the
12 handwriting as your own, sir?
13           (Whereupon, handwritten notes dated
14           5/2/03, were presented as Premarked Deposition
15           Exhibit No. 17.)
16 A.   Yes, I do.
17 Q.   Are these notes entered on or about May 2, 2003?
18 A.   Yes, they are.
19 Q.   And did they follow, or were they entered following a
20 meeting with Frances Drolette?
21 A.   I don't recall the occasion that generated these
22 notes.

SHEET 24    PAGE 93

1 Q.    But the very first line says Fran Drolette; is that
2 correct?
3 A.    Yes.
4 Q.    What is the entry immediately to the left of the word
5 Fran?
6 A.    Per.
7 Q.    Per. And in your use of the word per, does that
8 communicate that you had some communication with
9 Frances Drolette before you entered these notes?
10 A.    Yes.
11 Q.    And so per Fran Drolette, does that indicate to you,
12 sir, in the nature of the way you keep handwritten
13 notes, indicate to you that what follows is per Fran
14 Drolette or according to Fran Drolette?
15 A.    In the way that I work, these are notes that I would
16 have made in a meeting or a phone conversation with
17 Fran, the subject matter being Linda Mellen.
18 Q.    Okay. For instance, the second sentence down: LM
19 using lot of vacation time. In the nature of the way
20 you keep notes, in light of the past Fran Drolette, is
21 that your commentary or is that Fran Drolette's
22 commentary; that is, LM using lot of vacation time.
23 A.    That would be my own notation to myself of Fran's
24 opinion.

PAGE 94

1 Q.    If you could, could you just read through the document
2 for me, Mr. Snowdon, precisely? Don't correct it
3 grammatically. I understand they were just notes.
4 A.    Setting objectives and goals. LM using lot of
5 vacation time. Meetings and discussions continuing.
6 LM understands job priorities. Goals and objective
7 meeting after budget process completed.
8           Currently works from home on Friday, FD doesn't
9 support. DK, I believe the next notation, in '02,
10 made this commitment for LM to take position.
11           Work not delivered to FD by weekend for FD to
12 work with. Budget packages by 5/01. FD checks with
13 LM on status.
14           Excess vacation accrual beyond max. Out four
15 weeks of March. Budget calendar set for
16 March/October. LM puts in for three weeks off in
17 October.
18           FD to discuss with LM on 5/05 RE: no priorities,
19 setting professional example.
20 Q.    And as a general matter, Mr. Snowdon, did you
21 understand following this contact with Fran Drolette
22 on or about May 2, 2003, that Ms. Drolette was unhappy
23 with Linda Mellen's absences from work? Among other
24 things?

PAGE 95

1 A.    Yes.
2 Q.    And did you have an understanding as a result of this
3 contact with Ms. Drolette that Ms. Drolette was
4 interested in taking away from Ms. Mellen the Fridays
5 from home work allowance?
6 A.    I understood that Fran didn't find that to be a
7 suitable work arrangement for her and for Linda to get
8 the job done.
9 Q.    Were you involved in the commitment that Dzidra Knucht
10 made to Ms. Mellen in connection with Linda Mellen's
11 working from home on Fridays?
12           MS. TALLEY: Objection.
13 A.    No, I was not.
14 Q.    Did you know of that commitment prior to 5/02/03?
15           MS. TALLEY: Objection.
16 A.    I don't know when I became knowledgeable of that
17 commitment.
18 Q.    Do you know whether Dr. Robert Meenan made a similar
19 commitment to Ms. Mellen; that is, if you take this
20 job as Financial Manager you can work from home on
21 Fridays?
22 A.    I don't know.
23 Q.    Exhibit 18, sir. Another single page of notes.
24 Again, the yellow bolding on that is my own. Is that

PAGE 96

1 your handwriting again, sir?
2           (Whereupon, handwritten notes dated
3           5/12/03, were presented as Premarked Deposition
4           Exhibit No. 18.)
5 A.    Yes, it is.
6 Q.    And is this another page of your notes following a
7 contact of some sort with Frances Drolette?
8 A.    Yes, it is.
9 Q.    And that contact was on or about May 12, 2003?
10 A.    Yes.
11 Q.    Sir, could you read through this following the RE:
12 Linda Mellen, just so that I understand the hand
13 writing?
14 A.    Met on 5/05/03, meet again 5/20. FD looking for more
15 leadership. Tie up loose ends with budget.
16           Five day presence on campus. Aspect of LM
17 accepting job.
18           LM asked for written list of concerns, FD more
19 interested in going forward. FD to make up list. FD
20 to draft note to LM and run it past GTS.
21 Q.    You're GTS?
22 A.    I am.

1          MR. BEACH: Could we go off the record a second?
2 Q.    On the top there: met on 5/05/03, meet again 5/20.
3 Those meetings, one completed and one anticipated,
4 whose meetings were they?
5 A.    My understanding those were meetings between Fran and
6 Linda Mellen.
7          MR. BEACH: I'll do one more.
8 Q.    Exhibit 19, sir. Another single page of handwritten
9 notes. Do you recognize that handwriting as your own,
10 sir?
11                    [Whereupon, handwritten notes dated
12        5/19/03, were presented as Premarked Deposition
13        Exhibit No. 19.]
14 A.    Yes.
15 Q.    And were the notes entered on or about May 19, 2003?
16 A.    Yes.
17 Q.    And is the very top line per Linda Mellen?
18 A.    Yes.
19 Q.    That meaning according to Linda Mellen the following?
20 A.    Yes.
21 Q.    Could you read through those notes for me, sir?
22 A.    Concerned about Fran D. Personal attacks, harassing

1 to terminate and move Rini into job. Malicious and
2 contemptible. Fear and distrust in office.
3          Vacation max out, LM requested vacation in
4 October, three weeks. Two week period between request
5 and answer, conditional yes if project's done by
6 October 1. LM unsure. GTS suggested negotiating
7 amount of time off.
8          Friday's at home since going to SPH, FD withdrew
9 this option.
10          And down below: LM, GTS to speak with FD. Being
11 treated differently than others with excessive
12 vacation. What maximum block might represent. Flex.
13 time for others and rot for Harriet.
14 Q.    Do you know what the reference to Harriet is?
15 A.    Yes. My recollection is that Linda brought up a
16 flexible schedule that another employee in the School
17 of Public Health named Harriet was enjoying.
18 Q.    And top there, you referenced a Rini? R-I-N-I, I
19 believe.
20 A.    Yes.
21 Q.    And who -- what that entry refers to?
22 A.    Mr. Rini had been an applicant for Ms. Drolette's
23 position in the year prior and had continued to make
24 contact with the school regarding opportunities.

1 Q.    And as a general matter, Mr. Snowdon, does Exhibit 19
2 represent your summary of what Linda Mellen
3 communicated to you on or about May 19, 2003?
4 A.    Yes, it does.
5          MR. BEACH: Why we don't we go off the record?
6 Is that all right for you?
7          MS. TALLEY: Yes.
8 Q.    Let me show you a further document, Mr. Snowdon; that
9 is, identified as Exhibit 20 to this deposition, two
10 pages of handwritten notes. Let me ask you, as
11 before, whether you recognize the handwriting on this
12 document?
13                    [Whereupon, handwritten notes dated
14        5/20/03, were presented as Premarked Deposition
15        Exhibit No. 20.]
16 A.    Yes, this is my handwriting.
17 Q.    Both pages?
18 A.    Yes.
19 Q.    And at the top, does it say Per Fran Drolette?
20 A.    Yes.
21 Q.    What is after -- what entry is that after Drolette?
22 A.    Meeting; m-t-g.

1 Q.    Does this indicate to you or refresh your memory that
2 you had a meeting with Fran Drolette around May 30,
3 2003?
4 A.    Yes. And as discussed in the previous exhibit, I had
5 met with Linda and had listened to her and some of her
6 concerns and then followed up with Fran to try to
7 address some of the concerns that Linda had voiced.
8 Q.    Did I read that date right? Is it May 30?
9 A.    I believe it to be May 20.
10 Q.    May 20; okay. As before, Mr. Snowdon, could you read
11 through those two pages of notes?
12 A.    First line: AP would be project oriented. That
13 refers to Anthony Rini.
14          Circled note is financial management and
15 forecasting. FD has reviewed LM j.d. -- which stands
16 for job description -- and has lowered expectations.
17 LM is noncommunicative. Tension created.
18          Vacation is the word underlined. Budget calendar
19 mapped out; LM input led to March/October cycle.
20          The boxed comment says some Fridays, not all of
21 them.
22          The next notation is three weeks in peak budget
23 time; LM owns process, show alternatives. DK worked
24 out details with LM, took off month of March. No

SHEET 26   PAGE 101

1 sunset date set for using vacation. Anita, Jolene
2 providing back up to LM.
3            A note over on the right, Jolene using vacation
4 to take summer classes. Flex. time, no others under
5 FD direction. FD not sure of Harriet schedule flex.;
6 ten to six. Tammy reports to Susie Foster.
7            October required plan of how work gets done.
8 Communication; one and two word answers, lack
9 amplification. E-mails crisp and non-responsive.
10           Vaca. September tough with enrollment. November
11 would be okay. October first cycle and new for
12 school. FD sure of outcome not process.
13 Q.    And as I asked before, these statements, these
14 observations, these characterizations, are they Fran
15 Drolette's or yours? As contained --
16 A.    No, these are Fran's responses to me when I questioned
17 her about some of the concerns that Linda had raised
18 in my own conversation with Linda.
19 Q.    Did you communicate to Ms. Drolette the substance of
20 what Ms. Mellen communicated to you on May 19, '03;
21 that is, Exhibit 19?
22 A.    That's correct.
23 Q.    AR is Anthony Pini; is that what you said?
24 A.    Yes.

PAGE 102

1 Q.    And what is in the circle, again? I'm sorry.
2 A.    Financial management and forecasting.
3 Q.    Next entry: Fran Drolette -- FD -- has reviewed Linda
4 Mellen's j.d. -- job description -- and has lowered
5 expectations. Do you have an understanding of what
6 that meant or that means?
7 A.    My impression at the time was that Fran had come to
8 the conclusion that Linda was not up to completely
9 filling the responsibilities of her job and Fran was
10 attempting to focus in on where Linda could be most
11 helpful.
12           The circled piece up to the right, financial
13 management and forecasting; my recollection is that
14 those were the principal activities that Fran sought
15 for Linda.
16 Q.    And was Ms. Drolette, at this time, near the end of
17 May 2003, interested in Anthony Pini being hired into
18 her office?
19 A.    I don't know. I'd only raised that because Linda had
20 raised his name and I was advised by Fran that if
21 Anthony came on, he would be project-oriented only.
22 Q.    Do you know whether Mr. Pini had, by that time,
23 expressed an interest in joining Ms. Drolette's
24 office?

PAGE 103

1 A.    I believe that he had, yes.
2 Q.    Had he expressed that interest to you or to your
3 office?
4 A.    Not that I'm aware of.
5 Q.    Below the underlined word vacation and above the
6 underlined word flex. time, there's an entry: Anita,
7 Jolene providing back up to LM; do you see that, sir?
8 A.    Yes.
9 Q.    Anita refers to who?
10 A.    Anita King.
11 Q.    And she worked within Ms. Drolette's office?
12 A.    Yes.
13 Q.    And Jolene refers to whom?
14 A.    Jolene Durant.
15 Q.    Also within Ms. Drolette's office?
16 A.    Yes.
17 Q.    And it says: Jolene using vaca. to take summer class;
18 is that correct?
19 A.    Yes.
20 Q.    And then under flex. time, sir, the reference to
21 Harriet again?
22 A.    Yes.
23 Q.    And who was Harriet?
24 A.    Harriet Brand.

PAGE 104

1 Q.    And what was your understanding of who she is?
2 A.    She's an administrator within the School of Public
3 Health. I don't believe that she's under Fran's
4 direct supervision. My note was that Fran had looked
5 into her flex. schedule and she wasn't sure but she
6 thought it was a flex. from ten to six.
7 Q.    Next line: Tammy. Who does Tammy refer?
8 A.    I'm blanking on Tammy -- Tammy Wilcox.
9 Q.    And did Tammy Wilcox have a flex. schedule, sir, to
10 your understanding?
11 A.    I don't know that for a fact. I believe that Linda
12 had brought her name up in our discussion; I, in turn,
13 raised it with Fran and her response was that Tammy
14 reported to Susie Foster. Fran didn't have control
15 over her schedule.
16 Q.    Susie Foster; do you know what her title was; that
17 is, in May of '03?
18 A.    I believe the she's a faculty member within the School
19 of Public Health.
20 Q.    Was it generally Ms. Drolette's position that no one
21 who reported to her had flex. schedules?
22 A.    Yes.
23 Q.    Let me show you two other pages of handwritten notes,
24 sir. This is Exhibit 21 to this deposition. As

SHEET 27  PAGE 105

1 before, does the first page contain your handwritten
2 notes?
3            (Whereupon, handwritten notes dated
4            5/27/03, were presented as Premarked Deposition
5       Exhibit No. 21.)
6 A.    Yes, it does.
7 Q.    And the second page?
8 A.    Yes, it does.
9 Q.    Did you enter these notes following a meeting with
10 Linda Mellen on or about May 27, '03?
11 A.    Yes, I did.
12 Q.    Could you read the first page there, sir?
13 A.    Meeting with Linda Mellen. GTS met with LM and
14 reviewed attached points per GTS meeting with Fran
15 Drolette. LM had no questions or any comments at the
16 moment.
17 Q.    And the second page, sir, could you read down one
18 through eight?
19 A.    Reception versus reality. Rini projects j.d.
20 financial management forecasting. March/October cycle
21 with LM input.
22            Explicit/implicit contract after twenty-six

PAGE 106

1 years.
2            Some Fridays, not all.  No others under Fran with
3 flex. time.
4            October vacation not denied; requires plan of how
5 work gets done.
6            Curt communication lacks necessary amplification.
7 Q.    And these entries here, within circled numbers one
8 through eight, what is the source of this listing?  Is
9 this something Linda Mellen told you?  Is this your
10 own listing?
11 A.    No.  This is my own listing what I viewed as the
12 concerns that Linda had raised in our meeting of the
13 nineteenth, and that I had reviewed with Fran her
14 meeting of the twentieth and now I was conveying back
15 to Linda what the concerns were around these different
16 points.
17 Q.    So these were basically your speaking points in
18 connection with this meeting with Linda Mellen?
19 A.    Yes.
20 Q.    Number 4, the encircled four:  explicit/implicit
21 contrasts after twenty-six years?
22 A.    Contract.
23 Q.    A contract.  You made the entry.  What did you
24 understand by this entry?  What were you trying to

PAGE 107

1 remind yourself or what were you trying to convey to
2 Linda Mellen?
3 A.    My recollection was that Linda and I in the course of
4 our discussion, she pointed out that she was a long
5 service employee of the University.  I acknowledged
6 that she had many years of service with the
7 University, that the Commonwealth was an employment-
8 at-will state and neither Linda nor myself or other
9 employees of the University had a contract, either
10 explicit or implicit, that guaranteed our employment.
11 Q.    Does the encircled Number 4 remind you, as you sit
12 here today, that you directly addressed the concept of
13 at-will-employment with Linda Mellen at or around this
14 meeting?
15 A.    I recall having that discussion with Linda.
16 Q.    At or around this meeting, May 27, '03?
17 A.    Yes.
18 Q.    And the encircled Number 7 on the second page, sir?
19 October vaca. not denied.  What does that tell you;
20 why did you make that entry?
21 A    I was conveying to Linda that according to my
22 conversation with Fran that she had not specifically
23 denied Linda's request for an October vacation but it
24 impressed upon Linda that it would require that Linda

PAGE 108

1 develop a plan of how the work would get done during
2 her absence.
3 Q.    And in circled Number 5:  some Fridays, not all.
4 Sitting here today, what does that entry convey to you
5 with respect to what you told Linda?
6 A.    It suggests to me that I conveyed to Linda that my
7 discussion for Fran resulted in Fran being in a
8 position to approve some Fridays working from home but
9 it would not be a beneficial relationship for all
10 Fridays for Linda to be working at home.
11 Q.    May I give you Exhibit No. 22, again two pages of
12 handwritten notes.  And the top right of the first
13 page, the date 6/13/03?  Again, Exhibit 22.  Are these
14 your handwritten notes, Mr. Snowdon?
15            (Whereupon, handwritten notes dated
16            6/13/03, were presented as Premarked Deposition
17            Exhibit No. 22.)
18 A.    Yes, they are.
19 Q.    And these notes were entered as a consequence of some
20 contact that you had with Ms. Drolette about Linda
21 Mellen?
22 A.    That's correct.

SHEET 28   PAGE 109

1 Q.    And was it -- do you recall, sitting here today,
2 whether that was a meeting or a phone call or some
3 other way of communicating?
4 A.    I don't recall.
5 Q.    I'd love to say, Mr. Snowdon, that the document speaks
6 for itself but I'm going to ask you to read it as best
7 you can.
8 A.    Last update meeting, LM mother ill, 5/28/03.  Was LM
9 expecting different outcome with GTS?  Exhibited low-
10 level anger.
11          Objectives meeting not set.  LM not on electronic
12 calendar.  5/28 meeting on objectives FD pointed out
13 communication problems between FD and LM.  LM
14 acknowledged not trusting FD in communication
15 problems.  LM claims FD harassing and treating
16 differently than others.
17          These are in quotes:  I've never been called
18 incompetent and you have.  I've never been micro-
19 managed; what I did was good enough for Dzidra.
20          FD: I never called you incompetent, I'm asking
21 different questions that Dzidra.  School in financial
22 difficulty.
23          LM raised vacation again:  holding me hostage.
24      FD:  We're not communicating.  You're a

PAGE 110

1 professional employee, your call to take vacation if
2 responsibility is covered.
3          LM has had many absences since budget meeting;
4 four sick days and one vacation since May.
5          GTS recommended referral to Faculty-Staff
6 Assistance Program.  Regular meetings to continue.
7 Q.    Second page of that, Mr. Snowdon, Faculty-Staff
8 Assistance Program;  what sort of service is that at
9 BU?
10 A.    Faculty-Staff Assistance Program is a short-term
11 counseling and referral service.  It's available to
12 University employees.
13 Q.    Psychological counseling?  Job counseling?  What kind
14 of counseling is it?
15 A.    It could run the gamut.
16 Q.    And you recommended such a referral; is that correct?
17 A.    I recommended to Fran that she remind Linda of the
18 availability of the services and that they were
19 available to her.
20 Q.    That Linda was in need or could perhaps be benefited
21 by the Faculty-Staff Assistance Program; is that yours
22 -- did you have any understanding that Ms. Drolette
23 would be benefited by work with the Faculty-Staff
24 Assistance Program?

PAGE 111

1 A.    No.
2 Q.    The top line of this second page, sir:  LM has had
3 many absences since budget meeting; four sick days and
4 one sick day since meeting.  Did I read that
5 correctly, sir?
6 A.    Yes.
7 Q.    And that was a sentiment that Fran Drolette expressed
8 to you at this meeting or conversation on 6/13/03?
9 A.    That's correct.
10 Q.    On the first page of that, sir, there's an entry:
11 exhibited low-level anger.  Who was exhibiting low-
12 level anger?
13 A.    My impression is that Linda was exhibiting low-level
14 anger, especially with Fran.
15 Q.    And this is something that Ms. Drolette communicated
16 to you?
17 A.    Yes.
18 Q.    Did she give any details about how this low-level
19 anger was expressed to her, her being Fran Drolette?
20 A.    My recollection is that Fran pointed out examples such
21 as what she had referred to previously in Linda's
22 answers being very curt and nonsubstantive.
23 Q.    And from that, Ms. Drolette apparently inferred that
24 Linda Mellen exhibited low-level anger;  is that your

PAGE 112

1 understanding?
2 A.    Yes.
3 Q.    Exhibit 23, sir, single page with handwriting on it.
4 Again, No. 23 dated on the upper-right, 6/20/03.  Is
5 this your handwriting again, sir?
6              (Whereupon, handwritten notes dated
7              6/20/03, were presented as Premarked Deposition
8              Exhibit No. 23.)
9 A.    Yes, it is.
10 Q.    And were these entries made following some sort of
11 contact with Fran Drolette regarding Linda Mellen?
12 A.    Yes.
13 Q.    And could you read what you entered there, sir, in
14 handwriting?
15 A.    LM in Albany with mother.  Exploring options of
16 managing care, needs personal assistant.  LM may
17 request intermittent FMLA.  LM to cover some absences
18 in SPR.
19 Q.    And this, again, was according to what Fran Drolette
20 communicated to you; is that correct?
21 A.    Yes.
22 Q.    Twenty-four, sir.  Again, the bolding on that is mine.

SHEET 29   PAGE 113

1 And your handwritten notes again, Mr. Snowdon?
2             (Whereupon, handwritten notes dated
3             7/14/03, were presented as Premarked Deposition
4      Exhibit No. 24.)
5 A.   Yes, they are.
6 Q.   And from approximately July 14, '03.
7 A.   Yes.
8 Q.   And these notes were entered after some sort of
9 communication with Fran Drolette about Linda Mellen?
10 A.   Yes.
11 Q.   Could you read what you entered there, sir?
12 A.   LM spoke to FD, RE:  leave month of August and two
13 weeks of September.  Coverage for mother not
14 necessarily long-term resolution.  FD asked about
15 coverage during absence.  LM, it's only -- and that's
16 shorthand for turnarounds --
17 Q.   It's only turnarounds?
18 A.   Turnarounds.  Disconnect RE:  professional
19 responsibility.  Upcoming Friday-Monday absences.
20       FD asked:  docs here or Albany?
21       LM:  Albany.
22       October vaca.  LM requested four weeks, FD

PAGE 114

1 concerned about approving time off.  How will
2 responsibilities get covered?
3             A hundred and twenty sick days, fifty vacation
4 days.
5 Q.   That entry at the very end there, sir, regarding sick
6 days and vacation days, who gave you those numbers?
7 A.   I believe that they were provided to me by Fran.
8 Q.   And did you understand that those numbers refer to
9 what accrued leave, sick and vacation, Linda Mellen
10 had?
11 A.   Yes.
12 Q.   What are turnarounds, sir?  T/A?
13 A.   Turnarounds are a formal process that the University
14 used to affect changes in the status of employee's
15 pay, title, rate, funding source, things of that
16 nature.
17 Q.   What did you understand by Ms. Drolette telling you
18 that Linda Mellen said something along the lines of
19 it's only turnarounds?
20 A.   I took that to be that Fran asked Linda about how her
21 responsibilities would be covered during her absence
22 and Linda responded that the only critical activity
23 was the processing of turnarounds and that Fran had
24 the impression that Linda did not fully appreciate the

PAGE 115

1 responsibilities of her position.
2 Q.   Did Ms. Drolette communicate to you that some --
3 strike that.  Did Ms. Drolette communicate to you her
4 belief that Ms. Mellen discharges her professional
5 responsibilities by showing up for work and doing the
6 work?
7 A.   I don't understand the question.
8 Q.   You see the entry:  disconnect, something,
9 professional responsibility.
10 A.   Um-hmm.  Yes.
11 Q.   What's that entry in there after disconnect?
12 A.   RE;  regarding.
13 Q.   Is Fran Drolette communicating to you that she feels
14       -- she felt that Linda Mellen had a disconnect
15 regarding her professional responsibilities?
16 A.   Yes.
17 Q.   Do you have an understanding -- I know this wasn't
18 your view at this time, but do you have an
19 understanding as to what Ms. Drolette meant regarding
20 Ms. Mellen's professional responsibility and a
21 disconnect thereof?
22 A.   It was my impression that Fran viewed Linda's
23 responsibilities as much more broad and comprehensive
24 than Linda did at the time.

PAGE 116

1 Q.   And did Ms. Drolette communicate to you that Linda's
2 taking leave was one sign of her disconnect with her
3 professional responsibilities?
4             MS. TALLEY:  Objection.
5 A.   I was under the impression that Fran was frustrated
6 because of the prospect of an upcoming leave and also
7 the vacation that Linda was planning to take at the
8 same time and that it would place a difficult burden
9 on the school to accomplish their objectives during
10 that time.
11 Q.   And it would -- Did Ms. Drolette communicate to you
12 that it would be difficult to accomplish the
13 objectives of her office if Ms. Mellen took leave, as
14 Ms. Mellen was then anticipating needing.
15 A.   Well, I understood from Fran that she was concerned
16 because she had asked Linda, I think on more than one
17 occasion, to outline how things would -- what would be
18 in place and how things would proceed during Linda's
19 absence.  It was my impression that Fran was not
20 satisfied with the responses that she got to those
21 questions.
22 Q.   Exhibit 25, Mr. Snowdon.  It's a single page with two
23 areas in which there is handwriting.  Do you recognize
24 your handwriting on this document?

SHEET 30    PAGE 117

```
 1                    (Whereupon, handwritten notes dated
 2            7/28/03, were presented as Premarked Deposition
 3        Exhibit No. 25.)
 4 A.     Yes, I do.
 5 Q.     Where on this document does your handwriting appear?
 6 A.     In the lower right-hand corner.
 7 Q.     And is that Linda Mellen's handwriting, as far as you
 8 know, in the upper left?
 9 A.     Yes, it is.
10 Q.     And the date stamp on that, is that the date stamp of
11 your office, sir?
12 A.     Yes, it is.
13 Q.     And was your handwritten entry entered on July 31,
14 '03?
15 A.     Yes.
16 Q.     Could you read your handwritten entry, please?
17 A.     GTS spoke with LM, FMLA letter to go out today. Will
18 include position certification form. Doc's note not
19 sufficient.
20 Q.     And are these your own statements or your own
21 opinions?
22 A.     Yes.
```

PAGE 118

```
 1 Q.     At some subsequent time to this entry, did Ms. Mellen,
 2 to your satisfaction, submit an appropriate doctor's
 3 note?
 4 A.     Yes.
 5 Q.     Exhibit 26. Again, another single page of handwritten
 6 notes. Top right, July 31, '03. Is this your
 7 handwriting, sir?
 8                    (Whereupon, handwritten notes dated
 9            7/31/03, were presented as Premarked Deposition
10        Exhibit No. 26.)
11 A.     Yes, it is.
12 Q.     And this, again: per Linda Mellen regarding Physical
13 Certification Form: is that right?
14 A.     Physician's Certification Form.
15 Q.     Could you read what follows, sir?
16 A.     LM spoke with Josephine Thompkins who said doc could
17 expand upon her note to detail time needed away from
18 work. GTS said he preferred Physician's Certification
19 Form as this is what Fed's provide. And GTS
20 experience has been that doc's routinely complete form
21 as they become more familiar with FMLA.
22        LM: I don't know when I will get to Albany.
```

PAGE 119

```
 1        GTS: You can send it to her; letter allows
 2 fifteen days for return.
 3 Q.     That Physician's Certification Form, is that what has
 4 been marked as Exhibit 8 in this deposition?
 5 A.     Yes, it is.
 6 Q.     Number twenty-seven, sir; Exhibit 27. Again, a
 7 single page of handwritten notes. The yellow bolding
 8 on your copy there is my own as it is in Number
 9 twenty-seven. Are these your notes, sir?
10                    (Whereupon, handwritten notes dated
11            8/21/03, were presented as Premarked Deposition
12        Exhibit No. 27.)
13 A.     Yes, they are.
14 Q.     Entered on or about August 21, 2003?
15 A.     Yes.
16 Q.     Per Fran Drolette regarding Linda Mellen; did I read
17 that correctly?
18 A.     Yes.
19 Q.     Is it my understanding then, based on our previous
20 conversation, that the entries on this single page of
21 handwritten notes convey information that Fran
22 Drolette communicated to you?
```

PAGE 120

```
 1 A.     Yes.
 2 Q.     Could you read through that document, sir; that is,
 3 read out loud.
 4 A.     To the right of Linda Mellen it says FMLA 8/04 dash FD
 5 not sure it will work long-term. LM hasn't managed
 6 responsibilities going to leave. Written notes on
 7 outstanding items during leave. LM said it would be
 8 done one week after leave began. LM to clarify
 9 requested leave period, didn't occur.
10        LM didn't advise colleagues of departure. No
11 auto-reply of absence on e-mail.
12        Conference call scheduled for 8/23 with FD,
13 Anita.
14        General passive-aggressive. Protected
15 spreadsheet. Much of office cleared out. Someone
16 else using it temporarily.
17        7/1/02 to 8/4/03, fifty-seven days, eighteen
18 sick, thirty-nine vacation.
19        Anita may retire 7/04. Theresa's job mostly task
20 oriented. Some being moved towards departments, very
21 reasonable. FD to consult with Meenan and advise ABC
22 of need to resolve strategy.
23        Progressive discipline, position elimination,
24 separation agreement.
```

SHEET 31   PAGE 121

1 Q.    So as a general matter, these are points that Ms.
2 Drolette communicated to you on or about August 21,
3 '03; is that correct?
4 A.    Yes.
5 Q.    And you understand that Ms. Mellen began her family
6 leave on August 4, 2003?
7 A.    Yes.
8 Q.    So is it fair to say that after about two weeks of Ms.
9 Mellen's being on family leave, Ms. Drolette was
10 communicating to you her unhappiness about Ms.
11 Mellen's being out on leave?
12         MS. TALLEY:  Objection.
13 A.    No.  I didn't take it to be dissatisfaction with her
14 being out on leave, but rather not having things in
15 place before she went on leave.
16 Q.    And in fact, the fact that she wasn't doing work while
17 on leave; isn't that correct?
18         MS. TALLEY:  Objection.
19 A.    Aside from the conference call that's mentioned, I
20 wasn't aware of expectations that Fran had for Linda
21 while on leave but I did understand that there were
22 loose ends when she left on leave.
23 Q.    In the upper-third of the document, it says:  LM said
24 it would come one week after leave began; do you see

PAGE 122

1 that, sir?
2 A.    Yes.
3 Q.    And was it according to what Ms. Drolette was telling
4 you, Ms. Drolette's view that Ms. Mellen was going to
5 submit some work to her, Ms. Drolette, within one week
6 after the leave began?
7 A.    I understood it to be some updates on pending matters,
8 not necessarily the specific work.
9 Q.    Who used the phrase passive-aggressive?
10 A.    I'm sorry;  that's what I'm trying to find.
11 Q.    I'm sorry;  I didn't mean to make you hunt for it.
12 Q.    Oh, I see it.  I believe that that was a comment that
13 Fran made.
14 Q.    And the reference, the phrasing, protected
15 spreadsheet;  do you have an understanding of what Ms.
16 Drolette meant by that?
17 A.    It was my understanding at the time that Fran was of
18 the opinion that Linda was not sharing all the
19 information that Fran needed to cover her
20 responsibilities while she was out on leave.
21 Q.    And did Ms. Drolette communicate to you in the course
22 of this meeting that there remained a question about
23 the duration of Ms. Mellen's leave period?
24 A.    Yes.

PAGE 123

1 Q.    AWC, who does that refer to that very bottom, sir?
2 A.    ABC?
3 Q.    Is that what it is?
4 A.    Yes.
5 Q.    ABC, what does that refer to?
6 A.    It refers to Aram Chobanian.
7 Q.    He, at that time, was the interim president?
8 A.    That's correct.
9 Q.    And Meenan is Dr. Robert Meenan?
10 A.    That's correct.
11 Q.    And did Ms. Drolette communicate to you some two weeks
12 into Ms. Mellen's family leave that she was going to
13 consult with Dr. Meenan and Dr. Chobanian about the
14 need to resolve Linda's employment situation?
15 A.    Yes.
16 Q.    Progressive discipline, sir?  Was that something that
17 Fran Drolette communicated to you as one of her
18 options with respect to Linda Mellen?
19 A.    Yes.
20 Q.    Possible elimination?  Was that another option that
21 Ms. Drolette shared with you with respect to Linda
22 Mellen?
23 A.    I took that as position elimination.
24 Q.    And was that one of the options that Ms. Drolette

PAGE 124

1 thought was available to her?
2 A.    Yes.
3 Q.    Separation agreement?  Was that yet another option
4 that Ms. Drolette communicated to you regarding the
5 resolution of Linda Mellen's employment situation?
6 A.    Yes.
7 Q.    Were you aware on August 21, '03, of any grounds on
8 which Linda Mellen could be disciplined or be
9 subjected to a system of progressive discipline?
10 A.    I was aware of concerns that Fran had before Linda's
11 leave commenced regarding her performance.
12 Q.    And those were concerns that, as of August 21, 2003,
13 had not led to any sort of discipline assigned to Ms.
14 Mellen; is that correct?
15 A.    Not that I'm aware of.
16 Q.    And by this entry here, you're indicating, is it true,
17 that Ms. Drolette raised with you the possibility of
18 progressively disciplining Ms. Mellen out of her job?
19         MS. TALLEY:  Objection.
20 A.    It was my understanding that that was something that
21 Fran was contemplating at the time.
22 Q.    And was Ms. Drolette also contemplating, as far as you
23 know, at least as of August 21, the elimination of Ms.
24 Mellen's position?

1          MS. TALLEY:  Objection.
2 A.    Yes.
3 Q.    Separation agreement.  In your experience as Director
4 of Personnel, when does the University, as a general
5 matter, enter separation agreements with its
6 employees?
7 A.    Generally they're entered into when it's determined
8 that it's mutually beneficial to separate from an
9 employee.
10 Q.    And again, on the basis of your understanding in
11 August '03, was it Ms. Drolette who was going to
12 initiate with Linda Mellen a separation agreement?
13 A.    No.  It was my understanding that there was something
14 that Fran was contemplating in terms of a longer-
15 termed strategy.
16 Q.    To your knowledge, was August 21, 2003, the first time
17 that Ms. Drolette raised with you the possibility of
18 terminating Linda Mellen?
19 A.    I recall that earlier in the year, Fran and I had had
20 discussions and I think they're in my notes that --
21 concerns about her performance and what the long-term
22 relationship was going to look like.
23 Q.    I think my question was a little more specific.  Was
24 this the first time that she relayed to you the

1 possibility of terminating Ms. Mellen;  this being
2 August 21, 2003?
3 A.    I can't recall specifically if there were discussions
4 earlier than that.
5 Q.    Was August 21, 2003, the first time Ms. Drolette took
6 up with you the possible elimination of Ms. Mellen's
7 position?
8 A.    No.  Actually, I think that had been a topic of
9 discussion in months earlier when Fran was looking at
10 the work that Linda was doing and what was needed
11 within the department.  I think she was starting to
12 consider whether that level of position was necessary.
13 Q.    Did you understand that as a result of your meeting in
14 late August 2003, with Ms. Drolette, that Ms. Drolette
15 was unhappy with Ms. Mellen's -- strike that.  Did you
16 have an understanding in late August 2003, that Ms.
17 Drolette was unhappy because she thought Linda Mellen
18 wasn't doing her job as Financial Manager?
19 A.    Yes.
20 Q.    Is it your understanding, as well, that during her
21 family leave, Ms. Mellen was doing no work that fell
22 within her job description as a financial manager?
23 A.    I'm sorry.  Your question again?
24 Q.    To your understanding, did Ms. Mellen perform any of

1 her responsibilities as the Financial Manager during
2 her family leave?
3 A.    I don't know.
4 Q.    Twenty-eight, sir.  Two more pages of handwritten
5 notes.  Mr. Snowdon, do you recognize your signature?
6 I meant -- Oh, I'm sorry.  Do you recognize your
7 handwriting?
8                    (Whereupon, handwritten notes dated
9                    9/18/03, were presented as Premarked Deposition
10          Exhibit No. 28.)
11 A.    This is my handwriting, yes.
12 Q.    And these notes were entered on or about September 18,
13 2003?
14 A.    Yes.
15 Q.    And they were entered following some sort of
16 communication with Ms. Drolette regarding Linda
17 Mellen; is that true?
18 A.    Yes, it is.
19 Q.    Could you read that document, sir, as best you can?
20 A.    Underneath the date of the document:  Anita retires
21 7/1/04.  Bob has spoken with ABC, ABC okay with move.
22 No other spot for LM at Medical Campus.

1          Summary of status reports, FD requested
2 conference call.  LM responded by e-mail to FD that
3 not available for conference call, didn't have time to
4 -- I'm not certain what that says.  To, something,
5 office procedures, Anita will know.
6          FD requested clarity on leave, requested written
7 instructions on how to deal with LM issues when
8 absent.
9          Eliminate LM position and create lower analyst,
10 around 50K.  Pick up Jolene's pieces.  Create
11 operations position.  Day to day admin., non-financial
12 now falls into Jolene's lap.  She should be dedicated
13 to faculty matters, web design.  FD needs to develop
14 job more.  Analysts job would be most similar to LM
15 job planning financial -- I think that's priorities.
16          GTS to check with EG RE:  period of time to work
17 upon return.  Re-org. of area.  E-mail of 8/24/03,
18 mother status unchanged.  FMLA through 8/3/03.
19 Q.    And these are all entries you made as a result of what
20 Ms. Drolette communicated to you regarding Linda
21 Mellen on or about September 18, '03; is that correct?
22 A.    Yes.
23 Q.    With reference to the first page, roughly in the
24 middle of the page, did Ms. Drolette communicate to

SHEET 33    PAGE 129

```
 1 you her unhappiness that Ms. Mellen was not able to
 2 engage in a conference call during this period of Ms.
 3 Mellen's family leave?
 4 A.   Yes.
 5 Q.   And again, in roughly the middle of the page, the
 6 first page, did Ms. Drolette again communicate to you,
 7 roughly on September 18, her uncertainty regarding the
 8 duration of Ms. Mellen's family leave?
 9 A.   Yes.
10 Q.   And did Ms. Drolette ask you, again with reference to
11 the middle of the first page, ask you for written
12 instructions on how to deal with Linda Mellen issues
13 when absent?
14 A.   No.
15 Q.   To your knowledge, sitting here today, do you know if
16 Ms. Drolette requested written directions and written
17 instructions on how to deal with Linda Mellen issues
18 from anyone else; that is, you said -- let me phrase
19 that again.
20      You just testified that Fran didn't ask you for
21 written directions, instructions regarding how to
22 treat Linda Mellen while she was on leave; is that
23 correct?
24 A.   I'm confused. You asked about written instructions
```

PAGE 130

```
 1 and treating her.
 2 Q.   All right. You see that entry there: requested
 3 written instructions?
 4 A.   Yes.
 5 Q.   What did you understand at the time you entered that
 6 sentence, that phrase?
 7 A.   That that was something Fran had requested of Linda;
 8 some written instructions on how to deal with Linda's
 9 issues when she was absent.
10 Q.   Did you have an understanding at the time you entered
11 this what Linda issues were?
12 A.   I understood them to -- well, there were a variety of
13 issues.
14 Q.   Including?
15 A.   General financial matters under her purview.
16 Q.   Under her purview as Financial Manager; is that
17 correct?
18 A.   Yes.
19 Q.   And these were responsibilities that were not being
20 discharged in September '03, by Linda Mellen; is that
21 correct?
22 A.   Yes. But I, again, interpreted it as written
23 instructions that Fran was expecting from Linda prior
24 to the commencement of the leave.
```

PAGE 131

```
 1 Q.   By your notes here, do they refresh your memory that
 2 in this meeting Ms. Drolette, again, raised the issue
 3 of eliminating Linda's position?
 4 A.   Yes.
 5 Q.   And did she discuss with you, she being Ms. Drolette,
 6 the possibility of creating new positions to take over
 7 the responsibilities that Linda Mellen had as
 8 Financial Manager?
 9      MS. TALLEY: Objection. You can answer it if you
10 understand.
11 A.   Yes. Could you restate the question, please?
12 Q.   In this meeting, of roughly September 18, '03, did Ms.
13 Drolette take up with you the possibility of creating
14 new positions in her office which would then assume
15 Linda Mellen's responsibilities as Financial Manager?
16      MS. TALLEY: Objection.
17 A.   I understood it to be a lower-level position than
18 Linda's that would encompass some of the
19 responsibilities of Linda's position.
20 Q.   And in this meeting with Ms. Drolette of mid-September
21 '03, did you agree to speak with Erica Geetter
22 regarding the period of time to work upon return?
23 A.   Yes, I did.
24 Q.   When you made that entry, sir, what did you mean by
```

PAGE 132

```
 1 the phrasing, "period of time to work upon return"?
 2      MS. TALLEY: And I'll just caution you not to
 3 disclose any of your communications with an attorney.
 4 A.   I choose not to answer the question based upon that.
 5 Q.   Well, I just wanted to know when you entered this
 6 phrase on your notes here, Exhibit 28, what you meant
 7 -- I'm not asking what Ms. Geetter may have told you
 8 or what you said to Ms. Geetter. But what you meant
 9 when you entered the phrase, "period of time to work
10 upon return"?
11      MS. TALLEY: And you can answer the question of
12 what you meant when you wrote this but don't reveal
13 anything about your actual communications with any
14 attorney including Ms. Geetter.
15 A.   My note was a reflection of the question of the period
16 of time upon the return from leave to then address any
17 performance issues.
18 Q.   So when you entered this note, you were reminding
19 yourself, or noting for yourself, the open question of
20 how long Linda Mellen -- strike that. When you
21 entered this note, you were indicating to yourself the
22 open question of how long BU had to employ Linda
23 Mellen before taking steps against Linda Mellen to
24 either terminate her or eliminate her position; is
```

SHEET 34    PAGE 133

1 that correct?
2        MS. TALLEY: Objection.
3 A.    No.
4 Q.    Well, what does it mean?
5        MS. TALLEY: Objection; asked and answered.
6 Q.    "Period of time to work upon return"? Could you have
7 another go at that answer? Maybe I didn't understand
8 your first answer, but I still don't understand what
9 that phrasing means.
10 A.   As I mentioned earlier, I viewed it as what would be a
11 reasonable amount of time upon Linda's return from
12 leave to then evaluate her performance in the job.
13 Q.   And then to take either progressive discipline against
14 her or to possibly eliminate her position?
15        MS. TALLEY: Objection.
16 A.   I didn't consider it in those terms, no.
17 Q.   Do you recall whether Ms. Drolette asked you in mid-
18 September 2003, how long she needed to wait after
19 Linda Mellen returned to her job to take action
20 against Linda Mellen?
21 A.   I don't recall. I don't remember from my notes.
22 Q.   Isn't it true that Linda Mellen's failure to do her
23 work as Financial Manager in August, September,
24 October and most of November 2003, played a role in

PAGE 134

1 BU's decision to separate her, Linda Mellen, from BU?
2        MS. TALLEY: Objection.
3 A.    I don't believe so.
4 Q.    Exhibit 29, Mr. Snowdon. A handwritten note of, I
5 take it, 10/23/03. Is that your handwriting, sir?
6        (Whereupon, handwritten notes dated
7        10/23/03, were presented as Premarked Deposition
8        Exhibit No. 29.)
9 A.    Yes, it is.
10 Q.   And what's the per here?
11 A.   Per Fran.
12 Q.   Per Fran, okay. Regarding Linda Mellen?
13 A.   Yes.
14 Q.   And what does the note read, sir?
15 A.   FD torn on questionable phrase.
16        And below that it says LM has been communicating
17 with others in SPH, "am I in the doghouse?"
18 Q.   And this is what Ms. Drolette relayed to you, sir?
19 A.   Yes.
20 Q.   And the terms there, "questionable phrase", what did
21 that refer to, sir?
22 A.   I do not recall.

PAGE 135

1 Q.    Do you have before you, sir, Exhibit No. 12, this
2 October 24, 2003, letter from Ms. Drolette to Ms.
3 Mellen?
4 A.    Yes.
5 Q.    Does this letter, sir, of October 24 refresh your
6 memory as to the meaning of "questionable phrase",
7 which you entered on October 23?
8 A.    No.
9 Q.    Do you recall sitting here today, sir, whether in the
10 draft of this October 24 letter, there was a
11 questionable phrase that Ms. Drolette had concerns
12 about?
13 A.   I do not recall.
14 Q.   Does this note indicate to you; that is, twenty-nine,
15 Exhibit 29, that Ms. Drolette believed that Linda
16 Mellen had been communicating with Chris, is it?
17 A.   Others.
18 Q.   Oh. With others in the School of Public Health?
19 A.   Yes.
20 Q.   And the phrase "am I in the doghouse", who, as you
21 entered this note, did you understand that question to
22 be coming from?
23 A.   From Linda to others in the School of Public Health.
24 Q.   Exhibit 30, sir. Another page of handwritten notes

PAGE 136

1 dated 11/13/03. Are they your notes, sir?
2        (Whereupon, handwritten notes dated
3        11/13/03, were presented as Premarked Deposition
4        Exhibit No. 30.)
5 A.    Yes, they are.
6 Q.    And these notes were per Fran; that is, from Fran
7 regarding Linda Mellen?
8 A.    That's correct.
9 Q.    Could you read those notes, sir?
10 A.   No word from LM. FD received confirmation letter of
11 pick-up. I believe that says 11/3/03. Expect back
12 Wednesday, 11/19/03. Will plan weekly meetings upon
13 return.
14 Q.   Exhibit 31, sir. Are these your notes, again, sir?
15        (Whereupon, handwritten notes dated
16        11/19/03, were presented as Premarked Deposition
17        Exhibit No. 31.)
18 A.   Yes, they are.
19 Q.   Dated 11/19/03.
20 A.   Yes.

SHEET 35   PAGE 137

1 Q.    On that day, did you have a meeting with Ms. Drolette?
2 A.    I don't recall. I think this may have been a phone
3 conversation.
4 Q.    And what does this note provide, sir? What does it
5 say?
6 A.    LM did not show up today as expected. What should
7 response be?
8 Q.    And did Ms. Drolette ask you on 11/19/03 what her
9 response should be?
10 A.   Yes.
11 Q.  And did you respond to that question?
12 A.  I don't believe that I responded directly to Fran. At
13 the time, I think I took the matter up with our
14 attorneys in the Office of the General Counsel.
15 Q.  Did you later respond to Ms. Mellen in response to her
16 question, what should her response be?
17         MS. TALLEY: Objection.
18 Q.  Did you later communicate with Ms. Mellen in response
19 to her question?
20         MS. TALLEY: Objection. I mean, he testified
21 this was Fran's question.
22 A.  Yes. This was Fran's.
23 Q.  Oh, yeah. You already stated it. Did you later
24 respond; that is, later on 11/19, respond to Ms.

PAGE 138

1 Drolette to her question, "what should her response
2 be?"
3         MS. TALLEY: And I'll just caution you not to
4 reveal your communications with counsel or your
5 communications to others the advice of counsel.
6 A.   I don't believe I can answer that question.
7 Q.   Did you later have a conversation with Ms. Drolette
8 after this, what you believed to be, a telephone call
9 with her?
10 A.   I don't recall specifically.
11 Q.  Did you, on the nineteenth, tell Ms. Drolette that she
12 could go ahead and terminate Ms. Mellen?
13         MS. TALLEY: And the same guidance I just gave
14 applies. So don't reveal any communications you had
15 with an attorney or any communications you had with
16 anybody else that reflected the advice of an attorney.
17 A.   I don't think I can answer the question.
18 Q.   Well, I'm just asking you what you told Ms. Drolette.
19 I'm not asking about attorneys.
20         MS. TALLEY: Right. But if he --
21 Q.   What did you say to Ms. Drolette?
22         MS. TALLEY: But if he is passing along legal
23 advice that is privilege.
24 Q.   Yeah. Don't tell me, Erica Geetter told me that you

PAGE 139

1 could "X".
2 A.   I really don't think I can answer it.
3 Q.   Okay. Thank you. Thirty-two, sir. Another page of
4 handwritten notes. Are they your notes, sir?
5         (Whereupon, handwritten notes dated
6         2/1/03, were presented as Premarked Deposition
7         Exhibit No. 32.)
8 A.   Yes, they are.
9 Q.   Where they entered on or about 12/1/03?
10 A.   Yes, they are.
11 Q.  Who is Bill Gasper?
12 A.   Bill Gasper is an Associate Vice President for
13 Financial and Business Affairs at the University.
14 Q.   And what is his authority relative to Frances
15 Drolette's authority? At least as of that time,
16 12/03?
17 A.   I don't believe he has any direct authority over Fran.
18 He's an Associate VP for Financial and Business
19 Affairs for BU Medical Campus.
20 Q.   Does he have any authority -- do you have any
21 reporting authority to him; that is, your office,
22 Director of Personnel?

PAGE 140

1 A.   Tangentially.
2 Q.   And are you saying that Frances Drolette had no
3 reporting authority to Mr. Gasper or Dr. Gasper?
4 A.   Not that I'm aware of.
5 Q.   Could you read what you entered there, sir?
6 A.   Yes. 1998, UIS access issue. Went to SPH and felt
7 slighted by OFA. Janis may have info. Check with
8 Barbara. GTS left voicemail for BC to call.
9 Q.   I see at the top, it's regarding Linda Mellen --
10 A.   Yes.
11 Q.  -- but nothing below, at least explicitly, relates to
12 Linda Mellen. Do these issues, these entries, relate
13 to Linda Mellen?
14 A.   Yes, they do.
15 Q.  Could you explain how?
16 A.   Linda had previously worked in the Office of Financial
17 Affairs prior to going to the School of Public Health.
18 I had spoken to Mr. Gasper regarding the circumstances
19 of her departure from the Office of Financial Affairs
20 to the School of Public Health.
21 Q.   And these entries here, do they represent what Mr.
22 Gasper said in response to you?
23 A.   Yes.
24 Q.   What does 1998 VIS access issue mean?

1 A.    It suggests to me that Mr. Gasper conveyed to me that
2 in 1998 there was a UIS access issue involving Linda.
3 I don't have any other specifics beyond that.
4 Q.    Did you know what a UIS access issue is?
5 A.    UIS is University Information Systems. It would
6 probably relate to some type of system accessibility
7 for use of the internal systems of the University.
8 Q.    Is there some suggestion here that in 1998, Linda
9 Mellen somehow acted improperly with respect to UIS
10 access?
11 A.    I would not use the word improperly. I would only
12 take from my notes that there was an issue at that
13 time.
14 Q.    And the next line: went to SPH, went to School of
15 Public Health. Who went to School of Public Health?
16 Linda?
17 A.    Yes.
18 Q.    And felt slighted by -- what's that? CF?
19 A.    OFA.
20 Q.    OFA. What is OFA?
21 A.    Office of Financial Affairs.
22 Q.    And by entering this, did you indicate that Mr. Gasper
23 thought that Linda Mellen felt slighted by OFA?
24         MS. TALLEY: Objection.

1 A.    Yes.
2 Q.    And the next line is what -- Javis?
3 A.    Janis.
4 Q.    Janis may have info. Mr. Gasper told you that -- I'm
5 sorry. What's the name? Janet?
6 A.    Janis.
7 Q.    Janis may have info. Info. regarding what?
8 A.    Regarding Linda's performance and experience in the
9 Office Of Financial Affairs.
10 Q.    Check with Barbara. Who is Barbara?
11 A.    Barbara is Barbara Cole, Assistant Vice President for
12 Financial Affairs at the University.
13 Q.    And was Mr. Gasper telling you to check with Barbara
14 Coles about Linda's experience in OFA?
15 A.    Yes.
16 Q.    Did you do that?
17 A.    My note indicates I left a voicemail for Barbara. I
18 don't have a direct recollection of a following
19 conversation.
20 Q.    What was the purpose of this contact with Mr. Gasper
21 regarding Linda Mellen, given the fact that Linda
22 Mellen had been terminated roughly ten days earlier?
23 A.    We were still reviewing the situation.
24 Q.    Who's the we?

1 A.    Management in the University.
2 Q.    You were still reviewing the situation: that's clear.
3 Was Frances Drolette still reviewing the situation?
4 A.    I don't know.
5 Q.    And who initiated the contact with Mr. Gasper?
6 A.    I believe that was upon my phone call.
7 Q.    And why did you call him regarding an employee who had
8 been terminated ten days earlier?
9         MS. TALLEY: Objection.
10 A.    Seeking context regarding Linda's earlier experiences
11 in the Office of Financial Affairs.
12 Q.    Were you looking for something else you could pin on
13 Linda at this point?
14         MS. TALLEY: Objection.
15 A.    No.
16 Q.    Well, were you looking for information as a
17 consequence of this contact with Mr. Gasper that you
18 could charge Linda Mellen with?
19         MS. TALLEY: Objection.
20 A.    No.
21 Q.    Why, ten days after an employee is terminated, would
22 you go looking for information about that employee,
23 information that dated back at least five years?
24         MS. TALLEY: Objection.

1 A.    Once again, to set the context of Ms. Mellen's
2 experience with the University.
3 Q.    That's what I'm trying to focus in on here, Mr.
4 Snowdon. What does that general phrase mean, "in the
5 context of Ms. Mellen's experience with the
6 University"? Why were you working on the Linda Mellen
7 case after she was fired?
8         MS. TALLEY: Objection. And asked and answered
9 many times now.
10 A.    I think I answered that question.
11 Q.    On whose initiative did you -- Did someone ask you to
12 call Mr. Gasper?
13 A.    It may have been -- the call may have come after
14 discussion with the attorney in the General Counsel's
15 Office.
16 Q.    After November 19, 2003, were you able to determine
17 that whether Ms. Mellen had engaged in any improper
18 conduct of any kind at BU prior to her termination?
19 A.    No, I was not.
20 Q.    Do you know if any other person or any other
21 department determined whether Ms. Mellen had engaged
22 in misconduct of any sort prior to her termination on
23 November 19?
24 A.    I don't know.

SHEET 37    PAGE 145

```
1              MR. BEACH: We're getting near the end.
2  Q.   Thirty-three, sir. Do you recognized Exhibit No. 33
3  as an e-mail from Ms. Drolette to you regarding an
4  Anthony Rini?
5              (Whereupon, e-mail dated 8/7/03, was
6         presented as Premarked Deposition Exhibit
7              No. 33.)
8  A.   Yes.
9  Q.   And are those your notes at the bottom half of the
10 page, sir?
11 A.   Yes, they are.
12 Q.   Were those notes entered approximately August 8, 2003?
13 A.   Yes, they were.
14 Q.   And could you read those notes, please?
15 A.   Per FD, no current position in SPH. Probability of
16 replacing Anita Ring in twelve to eighteen months. FD
17 to consider GTS calling CR, which stands for Charles
18 River, with recommendation and get back to me.
19 Q.   Does this e-mail, this document here, refresh your
20 memory as to whether Ms. Drolette was interested in
21 bringing Anthony Rini into her department in August
22 2003?
```

PAGE 146

```
1  A.   No.
2  Q.   Did you go ahead and contact Charles River campus on
3  Mr. Rini's behalf?
4  A.   I don't believe that I did.
5  Q.   That job opening there, Assistant Dean, Administration
6  and Finance; do you see that, sir?
7  A.   Yes.
8  Q.   Office of the Dean of Students.
9  A.   Yes.
10 Q.   Is that a position within Frances Drolette's
11 department?
12 A.   No.
13 Q.   So it was a position somewhere else in the University
14 or in the Medical Campus?
15 A.   Not on the Medical Campus.
16 Q.   Oh, in the Charles River Campus.
17 A.   That's correct.
18 Q.   Thirty-four, sir. Have you seen the e-mail that is
19 Exhibit 34 prior to today, sir?
20              (Whereupon, e-mail dated 4/8/03, was
21         presented as Premarked Deposition Exhibit
22              No. 34.)
```

PAGE 147

```
1  A.   I don't recall.
2  Q.   Again, the entry at the bottom relates to BU's own
3  identification of this document in connection with its
4  production to me. Sitting here today, do you have a
5  memory that Ms. Mellen requested time off, vacation
6  days precisely, in October, November and December '03?
7  A.   Yes.
8  Q.   Exhibit 35, sir. Exhibit 35 is a series of e-mails.
9  Again, in the nature of these things, the first e-mail
10 starts at the end of the document and then it builds
11 to the first page. Scanning those e-mails, sir, have
12 you seen them before?
13              (Whereupon, e-mail dated 4/30/03, was
14         presented as Premarked Deposition Exhibit
15              No. 35.)
16 A.   I don't believe that I have.
17 Q.   The bottom of -- the first page, sir, is an e-mail
18 from Linda Mellen to Frances Drolette. Do you see
19 that there, sir; April 29?
20 A.   Yes.
21 Q.   Do you see the first two sentences in that e-mail,
22 sir?
```

PAGE 148

```
1  A.   Yes, I do.
2  Q.   Do you have any knowledge, sitting here today, that
3  Ms. Drolette approved Ms. Mellen's vacation request
4  for the period October 6 through October 27?
5  A.   No, I do not.
6  Q.   As Director of Personnel since '96, sir, were any
7  Medical Campus employees authorized to take more than
8  twelve weeks of FMLA leave in any one year period?
9  A.   Not that I'm aware of.
10 Q.   Do you know Eileen Dennis?
11 A.   I know Eileen Dennis.
12 Q.   Is she a Medical Campus employee?
13 A.   I believe that she is.
14 Q.   Did she go out on FMLA leave to your knowledge?
15 A.   I don't know; she may have.
16 Q.   Were you involved with Ms. Dennis' going out on FMLA
17 leave either in 2003 or 2004?
18 A.   I don't recall.
19 Q.   Do you know what department Ms. Dennis worked in?
20 A.   No, I believe she's in a couple of different
21 departments in the BU Medical Campus.
22 Q.   Do you have any personal knowledge, sir, as to whether
23 Ms. Dennis went out on FMLA leave to care for her ill
24 son who had meningitis?
```

SHEET 38   PAGE 149

1 A.    I don't recall off hand.
2 Q.    Did you learn at some subsequent time that Ms. Dennis
3 herself then suffered a serious medical condition?
4 A.    No.
5 Q.    As you sit here today, is it your testimony that you
6 don't know anything about Eileen Dennis' family leave
7 situation in 2003/2004?
8 A.    I don't have any direct recollection as I sit here.
9 Q.    Do you know where -- And to the last few questions,
10 sir. Do you know where Frances Drolette worked before
11 she took over Ms. Knucht's position?
12 A.    I believe she came to us from Babson College.
13 Q.    Do you know what the circumstances of her leaving
14 Babson College were?
15 A.    No, I do not.
16 Q.    Do you know whether she left Babson voluntarily or
17 involuntarily?
18 A.    I don't know.
19 Q.    Do you know an employee, a BU employee, by the name of
20 Arthur Culbert? C-U-L-B-E-R-T?
21 A.    Yes, I do.
22 Q.    Is he currently an employee on the Medical Campus?
23 A.    Yes, I believe he is.
24 Q.    Was he charged, at some point, with serious personal

PAGE 150

1 misconduct with respect to a student?
2 A.    I don't know.
3 Q.    Was he charged with some serious personal misconduct
4 on the job?
5 A.    I don't know off hand.
6 Q.    In any case, to your knowledge, Mr. Culbert continues
7 to work at BU through today?
8 A.    As far as I'm aware.
9 Q.    Exhibit 36, sir. Do you recognize this document?
10              (Whereupon, Boston University Salary
11              Change Form was presented as Premarked
12              Deposition Exhibit No. 36.)
13 A.    Yes.
14 Q.    It relates to Linda Mellen as a Financial Manager,
15 sir?
16 A.    Yes, it does.
17 Q.    The date of the document, referring to the bottom of
18 the document, roughly January '02?
19 A.    Yes.
20 Q.    On this document, does it indicate what Ms. Mellen's
21 base salary was at that period of time?
22 A.    Yes. This document indicates that effective January

PAGE 151

1 1, 2002, that her base salary was raised from $73,210
2 to $75,410.
3 Q.    At any time since early 2002 and November 2003, do you
4 know whether Ms. Mellen's base salary increased
5 further?
6 A.    I don't know off hand.
7 Q.    Do you know what she was earning at the time she was
8 fired?
9 A.    I don't know a specific figure.
10 Q.    Do you know generally whether it was higher or lower
11 than seventy-five, four-ten a year?
12 A.    I don't. I only recall it was in the mid-seventies.
13 Q.    Did Ms. Drolette eventually take from Ms. Mellen her
14 entitlement to take Fridays or to work Fridays from
15 home?
16              MS. TALLEY: Objection.
17 A.    I don't know.
18 Q.    Who initiated -- strike that. Who raised the issue of
19 taking from Ms. Mellen her Fridays working at home
20 benefit?
21              MS. TALLEY: Objection.
22 A.    My knowledge is that I recall Fran being frustrated by
23 that arrangement and did seek to change it.
24 Q.    Are you familiar with a John Walsh versus Boston

PAGE 152

1 University litigation, sir? Exhibit 37 before you is
2 the complaint.
3              (Whereupon, complaint of John Walsh
4              versus Boston University was presented as
5              Premarked Deposition Exhibit No. 37.)
6 A.    I'm not familiar with this.
7 Q.    Have you been deposed of the action John Walsh versus
8 Boston University?
9 A.    Not that I recall.
10 Q.    Have you been deposed before today?
11 A.    Yes.
12 Q.    Roughly, how many times would you say?
13 A.    I think twice.
14 Q.    Have you been deposed since 1996 when you became
15 Director of Personnel?
16 A.    Yes.
17 Q.    What -- Were you deposed in two different actions?
18 Two different lawsuits?
19 A.    I have a recollection of being deposed in one law
20 suit, yes.
21 Q.    And what was that law suit, at least identified by
22 parties? To your best memory?

SHEET 39  PAGE 153

1 A.    Marilyn Leavy and Linda Pivacek versus Boston
2 University.
3 Q.    And the -- What is your understanding, as you sit here
4 today, of the allegations involved in that law suit?
5 A.    I don't -- there are too many different matters
6 related to the situation.
7 Q.    Do you recall when you were deposed in that law suit?
8 A.    I do not recall the year.
9 Q.    Was it since 2000 or before 2000?
10 A.   I believe that it was since 2000.
11 Q.  And the names of the plaintiffs?  What were they
12 again?
13 A.   Marilyn Leavy and Linda Pivacek.
14 Q.  Do you know how to spell Pivacek?
15 A.   P-I-V-A-C-E-K, I think is the correct spelling.
16 Q.  And were they BU employees?
17 A.   Yes, they were.
18 Q.  Do you know if they worked on the Medical Campus?
19 A.   Yes, they did.
20 Q.  Do you know what department they worked in?
21 A.   They worked in the Naval Blood Research Laboratory.
22 Q.  And were you a party to that action, sir; that is,
23 were you named in the complaint?
24 A.   I don't recall.

PAGE 154

1             MR. BEACH: Can you give me just a couple of
2 minutes?  I'm going to scan my notes to make sure I
3 don't have any glaring omissions.
4             MS. TALLEY: We can go off the record for a
5 minute.
6 Q.    Mr. Snowdon, do you acknowledge that if Linda Mellen's
7 rights under the SNLA were granted to her in November
8 '03, she would have been privileged to be out of work
9 on November 19, 2003.
10            MS. TALLEY: Objection.
11 A.  No.
12 Q.  What is your basis for that answer?
13 A.   That she was extended the full rights under the Family
14 Medical Leave Act and the maximum leave allowed under
15 that act.
16 Q.  But with respect to the SNLA, do you understand that
17 Ms. Mellen was entitled to an additional twenty-four
18 hours of family leave?
19            MS. TALLEY: Objection.
20 A.  Yes.
21 Q.  And do you acknowledge that had she been given that
22 twenty-four hours of family leave under the SNLA, she
23 would have been privileged under the SNLA to be out of
24 work on November 19?

PAGE 155

1             MS. TALLEY: Objection.
2 A.    No.  I'm of the opinion that that leave would have
3 needed to be requested.
4             MR. BEACH: I don't have anything further,
5 Christy.
6             MS. TALLEY: We have nothing.
7             (Deposition concluded at 2:18 p.m.)

PAGE 156

1 S I G N A T U R E   P A G E
2           I, George T. Snowdon, do hereby certify that I
3 have read the foregoing deposition transcript of my
4 testimony given in the aforementioned matter, and the
5 same contains a true and accurate record of my answers
6 given to the questions set forth therein, with the
7 exception of the accompanying and corresponding
8 reason(s):
9 Page  Line          Is Amended to Read
10 ___  |____|_____
11 ___  |____|_____
12 ___  |____|_____
13 ___  |____|_____
14 ___  |____|_____
15 ___  |____|_____
16 ___  |____|_____
17 ___  |____|_____
18 ___  |____|_____
19
20                   George T. Snowdon

SHEET 40    PAGE 157

```
 1 C E R T I F I C A T E
 2 Commonwealth of Massachusetts
 3           I, Shawna Delia Hoban, a Notary Public in and for
 4 the Commonwealth of Massachusetts, do hereby certify:
 5           That George T. Snowdon, the witness whose
 6 deposition is herein set forth, was duly sworn by me,
 7 and that such deposition is a true record of the
 8 testimony given by the witness.
 9           IN WITNESS WHEREOF, I have hereunto set my hand
10 and Notarial Seal this ___ day of _____, 2004.
11           _____
12                 Shawna Delia Hoban, Notary Public
13                      My Commission Expires: _____
```